# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| JEAN VINYARD, derivatively on behalf of THE SOUTHERN COMPANY,<br><br>       Plaintiff,<br><br>   v.<br><br>THOMAS A. FANNING; ARTHUR P. BEATTIE; EDWARD DAY, VI; G. EDISON HOLLAND, JR.; JUANITA POWELL BARANCO; JON A. BOSCIA; HENRY A. CLARK, III; DAVID J. GRAIN; VERONICA M. HAGEN; WARREN A. HOOD, JR.; LINDA P. HUDSON; DONALD M. JAMES; JOHN D. JOHNS; DALE E. KLEIN; WILLIAM G. SMITH, JR.; STEVEN R. SPECKER; LAWRENCE D. THOMPSON; and E. JENNER WOOD, III;,<br><br>       Defendants,<br><br>   -and-<br><br>THE SOUTHERN COMPANY, a Delaware Corporation,<br><br>       Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

By and through her undersigned counsel, Plaintiff Jean Vinyard ("Plaintiff") brings this stockholder derivative action on behalf of Nominal Defendant The Southern Company ("Southern Company" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, and corporate waste. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning herself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Southern Company and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, stockholder communications, and postings on Southern Company's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from related civil actions, including the pending securities fraud class action, *Monroe County Employees' Retirement System v. The Southern Company et al.*, Case No. 1:17-cv-00241-MHC (N.D. Ga.) (the "Securities Class Action"); and (e) review of other publicly available information concerning Southern Company and the Individual Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1.      Southern Company is a gas and electric utility holding company based in Atlanta, Georgia.  The Company's subsidiaries include public utility companies throughout the southeastern United States, including Mississippi Power Company ("Mississippi Power"), Alabama Power Company, Georgia Power Company ("Georgia Power"), Gulf Power Company, and Southern Power Company.

2.      Mississippi Power, a wholly owned subsidiary of the Company, operates as a utility company providing power to retail customers in the State of Mississippi and to wholesale customers in the Southeastern United States.

3.      In 2006, Southern Company announced that Mississippi Power would build an advanced "clean coal" energy facility, an integrated gasification combined cycle ("IGCC") plant, in Kemper County, Mississippi (the "Kemper Plant").  The Kemper Plant would purportedly require an approximate investment of $1.8 billion, and would be completed in 2013.

4.      After extensive negotiations with state and federal officials, the Mississippi Public Service Commission approved the Kemper Plant project in May 2010 subject to, *inter alia*, a construction cost cap of $2.88 billion.

5.      In an earnings call with investors and analysts on July 28, 2010, Southern Company announced that the Kemper Plant was expected to be placed in service in May 2014, with a construction cost estimate of $2.4 billion.  If timely

2

built, the Kemper Plant project would qualify for nearly $700 million in federal incentives, including $412 million in investment tax credits and $270 million in clean coal power initiative funds.

6.     Since at least April 25, 2012 through the present (the "Relevant Period"), the Individual Defendants caused Southern Company to issue false and misleading statements concerning the Company's business, operations, and financial prospects, including misrepresentations regarding internal controls over financial reporting, and the costs and timing of the expected completion of the Kemper Plant project.

7.     Specifically, the Individual Defendants caused the Company to make false and/or misleading statements, and/or failed to disclose that: (i) the Kemper Plant would not be completed by the May 2014 deadline; (ii) the total project cost of the Kemper Plant would exceed the $2.88 billion cost cap set by state regulators; (iii) the Company's management actively prevented accurate information regarding the true status of the Kemper Plant project from reaching investors; and (iv) as a result of the foregoing, Southern Company's public statements were materially false and misleading at all relevant times.

8.     As a result of the foregoing false and misleading statements that the Individual Defendants caused the Company to issue, the Company's stock price rose dramatically.

9.     In public statements and press releases, the Individual Defendants repeatedly reassured investors that the Kemper Plant would be completed by the May 2014 deadline, including a statement in the Form 10-Q filed with the SEC on August 6, 2013, that "The Kemper IGCC . . . [is] scheduled to be placed in service in May 2014."

10.     But in October 2013, the truth about the Individual Defendants' false and misleading statements regarding the Kemper Plant began to emerge.

11.     On October 2, 2013, the Individual Defendants caused Southern Company to disclose for the first time that the Kemper Plant would not be completed by the May 2014 deadline, and that the Company would therefore have to repay $133 million in federal tax credits.  However, this disclosure grossly understated the Kemper Plant's anticipated problems and delays, and in a Form 8-K filed with the SEC, the Individual Defendants caused the Company to continue to mislead investors by stating that Mississippi Power "currently expects that the Kemper IGCC will be placed in service later in 2014."  Indeed, the Company's continued misleading positive statements that the Individual Defendants made or caused to be made, continued to suggest that the Kemper Plant would still be completed in 2014 and that the Company would still be eligible to receive approximately $150 million of additional tax credits, falsely assuring investors and

causing the price of Southern Company stock to maintain its artificially inflated level.

12.     Despite the continued reassurances of the Individual Defendants, the Kemper Plant was not completed in 2014 and is still not complete as of the date this action was filed.

13.     Then, in May 2016, the Company announced that both Southern Company and Mississippi Power were being investigated by the SEC regarding "accounting matters, disclosure controls and procedures, and internal controls over financial reporting" associated with the Kemper Plant.   By May 2016, the anticipated project costs had increased from $2.88 billion to *a staggering $6.58 billion*.

14.     In July 2016, shortly after a lawsuit was filed by one of the Kemper Plant project partners alleging intentional misrepresentations regarding the project's construction and costs, the *New York Times* published a detailed investigative report based on its review of thousands of previously undisclosed internal documents and surreptitious recordings regarding the delays and cost overruns of the Kemper Plant.

15.     The documents and recordings were provided to the *New York Times* by Brett Wingo, a former Southern Company manager turned whistleblower who for eight years supervised design and construction at the Kemper Plant.   The

documents and recordings demonstrate that the Individual Defendants knowingly caused the Company to promulgate false and misleading information regarding Kemper Plant's construction. According to Mr. Wingo, the Individual Defendants intentionally concealed construction delays and issued misleading statements in order to (i) remain eligible for tax credits and (ii) avoid disclosing to investors that the Company would lose federal subsidies.

16.     Through December 31, 2016, in the aggregate, the Company and Mississippi Power have incurred charges of ***$2.76 billion*** as a result of changes in the cost estimate above the construction cost cap for the Kemper Plant.

17.     On January 6, 2017, almost three years after the original 2014 anticipated completion date, the Individual Defendants caused Mississippi Power to announce that it expected the Kemper Plant to begin operations by the end of January 2017.

18.     On January 31, 2017, Mississippi Power announced that the Kemper Plant was finally generating electricity from gasified lignite coal, but that the target date for full operations was being pushed back once more, to February 28, 2017.

19.     Then, on February 22, 2017, the Company announced that the Kemper Plant would not be fully operational until mid-March 2017. The estimated cost of the project has ballooned to ***approximately $6.99 billion, more than double the cost estimate at the time that construction began***. According to the Sierra

Club, the Kemper Plant is the most expensive power plant ever built for the amount of electricity that it will generate.

20.    Southern Company's Board of Directors (the "Board") has not, and will not, commence litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Southern Company for authorizing or failing to correct the false and misleading statements alleged herein and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred and continues to occur.   Accordingly, a pre-suit demand upon the Board is a useless and futile act.   Thus, Plaintiff rightfully brings this action to vindicate Southern Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Southern Company.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22.    This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this County, or is an individual which has sufficient minimum contacts with Georgia so as to render the exercise of jurisdiction by the Georgia courts permissible under traditional notions of fair play and substantial justice.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the events and omissions complained of herein occurred in this District. The Company maintains its principal executive offices in this District, and Defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## THE PARTIES

### A.    Plaintiff

24.    Plaintiff Jean Vinyard first purchased shares of Southern Company stock on or about November 23, 1992, and is and at all relevant times has been a holder of Southern Company common stock.  Plaintiff is a citizen of Arizona.

### B.    Nominal Defendant

25.    Nominal Defendant Southern Company is incorporated in Delaware, and the Company's principal executive offices are located at 30 Ivan Allen Jr.

Boulevard, N.W., Atlanta, Georgia 30308.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "SO."  The Company has more than 979 million shares outstanding as of September 30, 2016.

### C. Individual Defendants

26.    Defendant Thomas A. Fanning ("Fanning") has been the Company's President, Chief Executive Officer ("CEO"), and Chairman of the Board since 2010, and has worked for Southern Company for more than 35 years.  Fanning also serves as chair of the Federal Reserve Bank of Atlanta.  Fanning is a defendant in the Securities Class Action.  Fanning received total compensation from Southern Company of $11,845,151 in 2015; $11,515,993 in 2014; $8,438,291 in 2013; and $13,035,348 in 2012.  Fanning is a citizen of Georgia.

27.    Defendant Arthur ("Art") P. Beattie ("Beattie") has been the Executive Vice President and Chief Financial Officer ("CFO") of the Company since August 2010.  Beattie is a defendant in the Securities Class Action.  Beattie was the CFO, Executive Vice President, and Treasurer of Alabama Power Co., a subsidiary of Southern Company, from 2005 to 2010.   Beattie received total compensation from Southern Company of $3,970,529 in 2015; $4,424,522 in 2014; $2,932,842 in 2013; and $5,423,374 in 2012.  Beattie is a citizen of Georgia.

28.    Defendant Edward Day, VI ("Day") was the President, CEO, and director of Mississippi Power from August 2010 to May 20, 2013.  During the

same time period, Day was also an executive officer of Southern Company.   On May 20, 2013, Day abruptly resigned from the Company, and entered into a three-year consulting agreement with Mississippi Power which entitled Day to an annual retainer of $150,000 per year.   Day is a citizen of Alabama.

29.     Defendant G. Edison ("Ed") Holland, Jr. ("Holland") has been the Chairman of the board of Mississippi Power since May 2013, and was President of Mississippi Power from May 2013 to October 2015, and CEO of Mississippi Power and Executive Vice President of Southern Company from May 2013 to December 2015.   Holland is also President and CEO of Southern Company Holdings, Inc. ("Holdings") and Executive Vice President of Southern Company Services, Inc. ("Southern Company Services"), positions he has held since January 2016.   Fanning received total compensation from Southern Company and its subsidiaries of at least $2,616,803 in 2015; $3,150,767 in 2014; and $2,018,950 in 2013.  Holland is a citizen of Mississippi.

30.     Defendant Juanita Powell Baranco ("Baranco") has been a director of the Company since 2006.  During the Relevant Period, Baranco was a member of the Audit Committee.   Baranco received total compensation from Southern Company of $234,267 in 2015; $238,169 in 2014; $221,025 in 2013; and $219,300 in 2012.  Baranco is a citizen of Georgia.

31.     Defendant Jon A. Boscia ("Boscia") has been a director of the Company since 2007.  During the Relevant Period, Boscia was a member and Chair of the Audit Committee.  Boscia received total compensation from Southern Company of $253,958 in 2015; $241,499 in 2014; $220,920 in 2013; and $205,587 in 2012.  Boscia is a citizen of Florida.

32.     Defendant Henry A. Clark, III ("Clark") has been a director of the Company since 2009.  During the Relevant Period, Clark was a member of the Finance Committee and the Chairman of the Compensation and Management Committee.   Clark received total compensation from Southern Company of $254,188 in 2015; $233,390 in 2014; $218,565 in 2013; and $219,166 in 2012. Clark is a citizen of Connecticut.

33.     Defendant David J. Grain ("Grain") has been a director of the Company since 2012.  During the Relevant Period, Grain was a member of the Compensation and Management Succession Committee and the Chairman of the Finance Committee.  Grain received total compensation from Southern Company of $233,305 in 2015; $221,311 in 2014; and $208,310 in 2013.  Grain is a citizen of Florida.

34.     Defendant Veronica M. Hagen ("Hagen") has been a director of the Company since 2008.  During the Relevant Period, Hagen was a member of the Nuclear/Operations Committee and the Chair of the Governance Committee.

11

Hagen received total compensation from Southern Company of $258,759 in 2015; $241,453 in 2014; $221,099 in 2013; and $206,611 in 2012. Hagen is a citizen of California.

35.    Defendant Warren A. Hood, Jr. ("Hood") has been a director of the Company since 2006. During the Relevant Period, Hood was a member of the Audit Committee. Hood received total compensation from Southern Company of $234,076 in 2015; $221,444 in 2014; $205,879 in 2013; and $206,517 in 2012. Hood is a citizen of Florida.

36.    Defendant Linda P. Hudson ("Hudson") has been a director of the Company since 2014. During the Relevant Period, Hudson was a member of the Nuclear/Operations Committee and the Governance Committee, and the Chair of the Business Security Committee. Hudson received total compensation from Southern Company of $246,949 in 2015; and $166,302 in 2014. Hudson is a citizen of Florida.

37.    Defendant Donald M. James ("James") has been a director of the Company since 1999. During the Relevant Period, James was a member of the Compensation and Management Succession Committee and the Finance Committee. James received total compensation from Southern Company of $254,076 in 2015; $233,314 in 2014; $208,495 in 2013; and $218,046 in 2012. James is a citizen of Alabama.

38.     Defendant John D. Johns ("Johns") has been a director of the Company since 2015.  During the Relevant Period, Johns was the Chairman of the Audit Committee.  Johns received total compensation from Southern Company of $202,774 in 2015.  Johns is a citizen of Alabama.

39.     Defendant Dale E. Klein ("Klein") has been a director of the Company since 2010.  During the Relevant Period, Klein was a member of the Compensation and Management Succession Committee, the Nuclear/Operations Committee, and the Business Security Committee.   Klein received total compensation from Southern Company of $247,090 in 2015; $221,176 in 2014; $205,810 in 2013; and $206,548 in 2012.  Klein is a citizen of Texas.

40.     Defendant William G. Smith, Jr. ("Smith") has been a director of the Company since 2006.  During the Relevant Period, Smith was a member of the Governance Committee and the Finance Committee.   Smith received total compensation from Southern Company of $253,784 in 2015; $241,175 in 2014; $220,810 in 2013; and $219,477 in 2012.  Smith is a citizen of Florida.

41.     Defendant Steven R. Specker ("Specker") has been a director of the Company since 2010.  During the Relevant Period, Specker was a member of the Compensation and Management Succession Committee, and the Chairman of the Nuclear/Operations Committee.   Specker received total compensation from

Southern Company of $254,047 in 2015; $233,226 in 2014; $208,499 in 2013; and $207,199 in 2012.  Specker is a citizen of Florida.

42.    Defendant Lawrence ("Larry") D. Thompson ("Thompson") has been a director of the Company since 2014.  During the Relevant Period, Thompson was a member of the Governance Committee and the Finance Committee.  Thompson received total compensation from Southern Company of $234,141 in 2015; $19,410 in 2014; and $206,522 in 2012.  Thompson is a citizen of Georgia.

43.    Defendant E. Jenner Wood, III ("Wood") has been a director of the Company since 2012.  During the Relevant Period, Wood was a member of the Governance Committee and the Nuclear/Operations Committee.  Wood received total compensation from Southern Company of $234,141 in 2015; $221,676 in 2014; and $208,525 in 2013.  Wood is a citizen of Georgia.

44.    Defendants identified in ¶¶ 26–43 are sometimes referred to herein as the "Individual Defendants."

45.    Defendants identified in ¶¶ 26, 30–43 are sometimes referred to herein as the "Director Defendants."

46.    Defendants identified in ¶¶ 30–31, 35, and 38 are sometimes referred to herein as the "Audit Committee Defendants."

## COMPANY BACKGROUND

47.    Southern Company is a gas and electric utility holding company based in Atlanta, Georgia.  The Company's subsidiaries include public utility companies throughout the southeastern United States, including Mississippi Power, Alabama Power Company, Georgia Power Company, Gulf Power Company, and Southern Power Company.

48.    Through its subsidiaries, the Company serves over nine million gas and electric utility customers in nineteen states.

49.    The Company was founded in 1945 and incorporated in Delaware. The Company established its headquarters in Georgia in 1950.

50.    Mississippi Power, a wholly owned subsidiary of the Company, operates as a utility company providing power to retail customers in the State of Mississippi and to wholesale customers in the Southeastern United States.

## FACTUAL ALLEGATIONS

51.    On December 13, 2006, Southern Company announced that Mississippi Power planned to build the Kemper Plant in Kemper County, Mississippi.  According to the press release issued by the Company, the project would cost about $1.8 billion and would be completed in 2013:

> Mississippi Power has cleared the first major step toward building an advanced coal gasification facility, integrated gasification combined cycle (IGCC) plant, to generate electricity in Kemper County, Miss.

15

The new generation technology would use locally mined lignite coal to produce electricity with significantly fewer emissions.

Mississippi Power has received Department of Energy certification for the project and Internal Revenue Service approval of tax credits allowed under the National Energy Policy Act of 2005.

"Over the past 15 years, working in concert with the Department of Energy, Southern Company has invested millions of dollars researching and developing new clean coal technologies," said David Ratcliffe, Southern Company's chairman, president and chief executive officer. Mississippi Power is a wholly-owned subsidiary of Southern Company.

"We're now moving from the research lab to practical application. It is the culmination of years of hard work to convert our research into large-scale power production facilities," said Ratcliffe. "The support provided under the Energy Policy Act for clean coal technologies significantly advances the realization of environmentally sound solutions to our nation's future energy needs."

***The proposed 600-megawatt plant would require an approximate investment of $1.8 billion and would create approximately 540 new construction jobs and 260 permanent jobs. The plant would be completed in 2013.***[1]

52.     On January 19, 2007, W. Paul Bowers, at the time the CFO of Southern Company (now Chairman, President, and CEO of Georgia Power, Southern Company's largest subsidiary) wrote a letter to the U.S. Department of Energy expressing Southern Company's desire to keep Department of Energy funding.   The letter states, "Front-End Engineering and Design (FEED) for

---

1 Unless otherwise noted, any emphasis in the quoted material in this Complaint has been added by Plaintiff.

Kemper County is currently underway to support commercial operation in June 2013."

53.    On August 1, 2007, Brett Wingo, an engineer project manager for the Kemper Plant (who would eventually become a whistleblower), began working for the Company as a subcontractor.   Mr. Wingo's duties included assisting with scheduling and design decisions on the Kemper Plant project.

54.    On a January 30, 2008 conference call with analysts discussing the Company's fourth quarter 2007 earnings, then-CFO Bowers, in response to a question for a timeline and milestones for the Company's Mississippi IGCC plant, states that by "sometime by the end of this year, we will know whether or not we're going to go forward with that project."

55.    In 2009, Mississippi Power applied to the Mississippi Public Service Commission for approval to build the Kemper Plant.  Mississippi Power received notification from the Internal Revenue Service ("IRS") that the IRS had allocated $133 million of Phase I credits to the Kemper Plant project, if certification requirements were met and the Kemper Plant was in service no later than May 11, 2014.

56.    On December 7, 2009, Craig Roach, an independent evaluator hired by Mississippi, submitted testimony noting uncertainties and assumptions in Southern Company's Kemper Plant proposal, particularly in light of the substantial

capital costs Mississippi ratepayers would be asked to commit to pay and because of the fact that the technology to be used was not fully commercialized.  Mr. Roach questioned whether the costs to Mississippi ratepayers of the Kemper Plant were worth the benefits, particularly compared to a natural gas plant.

57.    In May 2010, after extensive negotiations with state and federal officials, including raising the cost cap from $2.4 billion to $2.88 billion, the Mississippi Public Service Commission approved the Kemper Plant project.

58.    In an earnings call with investors and analysts on July 28, 2010, Southern Company announced that the Kemper Plant was expected to be placed in service in May 2014, with a construction cost estimate of $2.4 billion.  During the call, in response to a question regarding the Kemper Plant project, Mr. Bowers stated, "So we're real confident that we can make the contracted or the target price, the 2.4 [billion], but we have the $2.88 billion cap that's available to it."

59.    In August 2010, Defendant Beattie was appointed CFO and Executive Vice President of the Company, replacing Mr. Bowers as CFO, who at the same time became COO and later President and CEO of Georgia Power, the Company's largest subsidiary.

60.    On August 12, 2010, the U.S. Department of Energy authorized $270 million in federal funds for the Kemper Plant project.

61.     On December 6, 2010, a groundbreaking ceremony was held at the Kemper Plant site.

62.     On a January 25, 2012 earnings call with analysts, Defendant Beattie forecasted capital expenditures of $1.5 billion for the Kemper Plant project for 2012 through 2014.

63.     On April 25, 2012, the Southern Company issued a press release and filed a current report on Form 8-K with the SEC announcing its financial and operating results for the first quarter of 2012, ended March 31, 2012.[2]   For the quarter, Southern Company reported earnings of $368 million, or $0.42 per share, on revenues of $3.60 billion.

64.     On the same date, the Company held a conference call regarding the quarterly financial results, during which investors, analysts, and media representatives were reassured that the Kemper Plant remained on schedule. During the call, Defendant Fanning predicted a June 2013 startup and stated previously stated construction schedule and costs remained "achievable":

> [O]n April 24, the Mississippi Public Service Commission finalized a new Certificate of Public Convenience and Necessity for the Plant Ratcliffe in Kemper County, Mississippi. This became necessary after

---

[2] Unless otherwise specified, each Form 8-K reporting financial results, and each Form 10-Q and Form 10-K filed with the SEC, is a combined filing furnished separately by six registrants: Southern Company, Alabama Power Company, Georgia Power, Gulf Power Company, Mississippi Power, and Southern Power Company.

the Mississippi Supreme Court's recent reversal of the Commission's previous order. In the interim, construction continued on the Kemper County site under a temporary authorization granted by the PSC on March 30. And will now proceed under the authority of the new permanent order. ***Initial startup and testing are now only 14 months away.*** And we remain confident that this project will provide the best value to customers over the long term. ***Targets remain achievable for both the Vogtle and Kemper County projects with regard to construction schedule and cost to customers***.

65.    On May 7, 2012, the Southern Company filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the first quarter of 2012 (the "Q1 2012 10-Q"). The Q1 2012 10-Q contained the following statements regarding the Kemper Plant:

The certificated cost estimate of the Kemper IGCC is $2.4 billion, net of $245.3 million of grants awarded to the project by the DOE under the Clean Coal Power Initiative Round 2 (CCPI2) and excluding the cost of the lignite mine and equipment and the carbon dioxide ($CO_2$) pipeline facilities. The 2012 MPSC Order, like the 2010 MPSC Order, (1) approved a construction cost cap of up to $2.88 billion (exemptions from the cost cap include the cost of the lignite mine and equipment and the $CO_2$ pipeline facilities), (2) provided for the establishment of operational cost and revenue parameters based upon assumptions in Mississippi Power's proposal, and (3) approved financing cost recovery on CWIP balances not to exceed the certificated cost estimate, which provided for the accrual of AFUDC in 2010 and 2011 and provides for the current recovery of financing costs on 100% of CWIP in 2012, 2013, and through May 1, 2014, (provided that the amount of CWIP allowed is (i) reduced by the amount of state and federal government construction cost incentives received by Mississippi Power in excess of $296 million to the extent that such amount increases cash flow for the pertinent regulatory period and (ii) justified by a showing that such CWIP allowance will benefit customers over the life of the plant). As of March 31, 2012, Mississippi Power had utilized substantially all of its contingency

contained in the certificated cost estimate. ***Mississippi Power anticipates that the costs to complete construction of the portion of the Kemper IGCC subject to the construction cost cap will be less than the cost cap*** but will likely exceed the certificated cost estimate.

**. . . .**

The Kemper IGCC plant, ***expected to begin commercial operation in May 2014***, will use locally mined lignite (an abundant, lower heating value coal) from a mine adjacent to the plant as fuel. The mine is scheduled to be placed into service in June 2013.

66.     Southern Company's Q1 2012 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Fanning and Beattie, stating that the information contained in the Q1 2012 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

67.     On June 1, 2012, the Congressional Budget Office published a report on the federal effort to reduce carbon-capture technology costs.  The report stated that the cost of building carbon-capture plants typically costs approximately 75% more than building traditional plants.

68.     On July 6, 2012, Mississippi Power released a status report disclosing a new estimated Kemper Plant cost overrun of $117.9 million, bringing the total cost to $2.88 billion.

69.    On July 16, 2012, a senior manager at the Kemper Plant, Brett Wingard, e-mailed Mr. Wingo and other engineers at the Kemper Plant and wrote Mississippi Power CEO and President Day wanted "cost cutting ideas" by the next morning, July 17, 2012.

70.    On July 25, 2012, the Southern Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the second quarter of fiscal year 2012, ended June 30, 2012.  For the quarter, Southern Company reported earnings of $623 million, or $0.71 per share, on revenues of $4.18 billion.

71.    On the same date, the Southern Company held a conference call regarding the quarterly financial results, during which investors, analysts, and media representatives were again reassured that the Kemper Plant remained on schedule.  During the call, Defendant Fanning stated:

> **Construction continues** at the Ratcliffe site [the Kemper Plant], **as we move toward our target completion date of May 2014**. Our most recently filed status report reflects an **estimated cost for the project of $2.88 billion**, including a $62 million contingency.

> Earlier this year, the original certification order for Plant Ratcliffe was remanded back to the Mississippi Public Service Commission. The PSC acted quickly to enact a temporary order, so that construction activity could continue while it considered the remanded order.

> The PSC later issued a new order, with 70 additional pages of supporting detail, and 300 references to the original record to protect against future challenges to the certification. In its original order in

2010, the PSC agreed to allow Mississippi Power to recover its financing costs during construction. This agreement was a key to Mississippi Power's initial decision to proceed with this project. The revised order included in April -- issued in April of 2012 contained the same provisions.

In June 2012, the commission decided to deny CWIP recovery, pending the resolution of outstanding legal challenges to the certification. Mississippi Power has asked the Mississippi Supreme Court, consistent with the stipulation reached with the PSC staff earlier this year, to allow it to begin recovering these costs, subject to refund, until such time as the court makes a final ruling. Denying these rates will increase costs for Mississippi Power's customers over the long-term, and we are, therefore, hopeful for a timely resolution to this matter.

In the meantime, *our current analysis indicates that the overall cost to customers for Plant Ratcliffe will be less than projected in the original certification*, due primarily to the lower cost of debt financing, and the proceeds from the byproduct sales mentioned earlier. In the end, our intent is to provide customers in Mississippi with the benefit of a cost-effective, cutting-edge technology that exceeds even the EPA's proposed new source CO2 standards.

72.     On August 6, 2012, the Company filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the second quarter of fiscal year 2012 (the "Q2 2012 10-Q").  The Q2 2012 10-Q reiterated the statements previously made that the Kemper Plant was "expected to begin commercial operation in May 2014."

73.     Southern Company's Q2 2012 10-Q contained signed certifications pursuant to SOX by Defendants Fanning and Beattie, stating that the information contained in the Q2 2012 10-Q fairly presented, in all material respects, the

23

financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

74.    On August 8, 2012, Mississippi Power CEO and President Day e-mailed Mr. Wingo and other senior staff at Kemper Plant stating, in part, "I would like to remind everyone 'again,' no numbers, schedules, or information in general should be communicated to external parties until I review it/them first.........no speculation, no estimates, no forecast, etc."

75.    On August 9, 2012, Mississippi Power issued a press release announcing that the Kemper Plant was "nearing peak construction, creating jobs." The press release stated, in part:

> With **commercial operation** of its Kemper County integrated gasification combined cycle plant **less than two years away**, Mississippi Power is well-positioned to execute the most critical next steps in the peak construction phase beginning later this year.

> "Our partnership with our construction contractors is stronger than ever," said Mississippi Power President and CEO Ed Day. "Together, for the benefit of Mississippi Power customers and Mississippians, we're safely executing on a 21st century coal plant that will deliver clean, safe, reliable and affordable energy."

> Day further remarked that the company recently realigned the project work of onsite contractors so that each company can focus on its key competencies and **bring the project online by May 2014**.

76.    On September 13, 2012, Mississippi Power issue another reassuring press release announcing that the Kemper Plant would be completed by May 2014. The press release stated, in part:

> Recently, Mississippi Power safely completed a major construction milestone at its Kemper County energy facility as **plant construction nears the halfway mark**. Installed was a section of the plant's gasifier, which will be used to convert the plant's affordable fuel source, lignite, into a synthesis gas to generate electricity.
>
> . . . .
>
> An abundance of Mississippi lignite located adjacent to the plant site will be gasified to create clean, reliable and affordable energy for customers for the next 40 years.
>
> . . . .
>
> Powering Mississippi homes and businesses: **Commercial operation of the 582-megawatt facility is expected to begin May 2014**.

77.    Then on October 9, 2012, Mississippi Power issued a press release stating that the Kemper Plant was on schedule to begin operations in May 2014.

78.    On November 5, 2012, Southern Company issued a press release and filed a current report on Form 8-K with the SEC announcing its financial and operating results for the third quarter of fiscal year 2012, ended September 30, 2012.  For the quarter, Southern Company reported earnings of $976 million, or $1.11 per share, on revenues of $5.05 billion.

79.     On the same date, Southern Company held a conference call regarding the quarterly financial results, during which investors, analysts, and media representatives were yet again reassured that the Kemper Plant remained on schedule, and that the project cost would be below the $2.88 billion cost cap. During the call, Defendant Fanning provided details regarding the successful completion of the project, stating:

> At Plant Ratcliffe in Kemper County, Mississippi, ***construction remains on schedule to begin commercial operation in May of 2014.*** Cost projections remain on target to finish ***at or below $2.88 billion***. We continue to actively manage ongoing pressures on costs and schedule which are typical for a project of this scale. Installation of the gasifiers and assembly is proceeding exceptionally well and the carbon dioxide absorbers are all in place. Natural gas and effluent water pipelines, as well as critical transmission upgrades, ***have all been completed on time or ahead of schedule***. Contracts for the sale of final byproducts of the gasification process have been finalized, which combined with the expected savings from financing and factoring in current capital estimates are projected to provide approximately $500 million more in value to Mississippi Power customers than was originally projected. Over the next few months and early into 2013, the remaining gasifier list will be completed. Other major elements such as the water plant and air compressor are scheduled to be completed in the spring.
>
> ***Start-up activity begins next year as well***, with the first fire of the gas turbine scheduled for the second quarter of 2013. Heat-up of the gasifiers is scheduled for late '13 and ***reliable flows of syngas are expected to begin in early 2014***. Once the plant is finished and operational, customers in Mississippi will enjoy the benefits of a clean, cost-effective, cutting-edge energy for decades to come.

26

80.     During the call, when asked specifically about the possibility of cost overruns and the eventual performance of the Kemper Plant, Defendant Fanning again touted the Company's ability to successfully complete the project on schedule, and had the following exchange with an analyst:

[Analyst ANGIE STOROZYNSKI]: Okay. And secondly, about your IGCC. *We're watching another IGCC project with some cost overruns and some issues* with the gasifier. You mentioned that your gasifier is going to be installed or heated up only in late 2013. *How can you be comfortable with the performance of the gasifier before it's actually been installed*?

TOM FANNING: Perfect. You know, it's funny, we love our earnings call and we love preparing for them. I remember Jim von Riesemann asked me a question about why we were different than Edwardsport, and I went off on a soliloquy for 20 minutes. I'll resist the temptation to do that. Let me give you some headlines as to why we're different. Number one, this is our technology. We're not buying from a third party. Number two, you know that we are the only one in the industry with an engineering and construction services group of 1600 people. We're able to self-build this effort, along with other main subcontractors; but this is our effort. And when you look at the fact that we've deployed, I guess by the end of '13, $13 billion of environmental equipment, *we know how to build stuff. We think we're going to do likewise a great job here.*

Thirdly, remember that we're the only Company engaged in proprietary research and development in a robust way in the industry, and the heartbeat of that effort is in our Wilsonville facility. We call it the PSDF, Power Systems Development Facility. We grew this technology and really it evolved into some R&D that we started way back in the '60s with liquefaction. It is now gasification. We've run that thing for like – I forget how many man hours -- 50,000 man hours or some enormous -- *we have enormous experience running this technology with this fuel at that* -- we actually imported fuel from that site to run through our PSDF facility.

*For a variety of reasons, we think we're going to be in very good shape to fulfill the promise of this for the benefit of the customers in Mississippi Power.*

81.     On November 7, 2012, the Company filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the third quarter of fiscal year 2012 (the "Q3 2012 10-Q").  The Q3 2012 10-Q reiterated the statements previously made that the Kemper Plant was "expected to be in service in May 2014," and also stated that "Mississippi Power continues to believe its cost estimate and schedule projection remain appropriate based on the current status of the project."

82.     Southern Company's Q3 2012 10-Q contained signed certifications pursuant to SOX by Defendants Fanning and Beattie, stating that the information contained in the Q3 2012 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

83.     On December 13, 2012, Tim Pinkston, a senior manager at the Kemper Plant, e-mailed Kemper Plant engineers, including Mr. Wingo, stating, "MPC is now requiring approval for all presentations both external and internal that have any information related to the Kemper project.  Please let me know if you get a request to do a presentation and be prepared to provide a copy of your presentation for approval as early as possible."

84.     On January 30, 2013, Southern Company issued a press release and filed a current report on Form 8-K with the SEC announcing its financial and operating results for the fourth quarter and full year 2012, ended December 31, 2012.  For the quarter, Southern Company reported earnings of $383 million, or $0.44 per share, on revenues of $3.703 billion.   For full year 2012, Southern Company reported earnings of $2.35 billion, or $2.70 per share, on revenues of $16.54 billion.

85.     On the same date, Southern Company held a conference call regarding the quarterly financial results, during which it was represented that the Kemper Plant remained on schedule and would be in service by May 2014.  During the call, Defendant Fanning stated:

> The second priority is achieving success with our major construction projects, specifically Plant Vogtle Units 3 and 4, and **the Kemper project**, both of which are **continuing to progress in an outstanding manner**. While projects of this scale and magnitude always face unforeseen challenges, **we continue to demonstrate our ability to constructively manage those issues and achieve a favorable outcome**.
>
> Meanwhile, **the Kemper Project is now 35% complete and remains on track for its May 2014 commercial operation date**. To-date, approximately $2.5 billion has been spent on the project. **The plant is scheduled to begin startup activities this summer** with first fire going to the CTs in June, and the first gasifier heat up taking place in December. **Reliable syngas is expected to begin flowing to the CTs in February 2014**.

86.   On February 28, 2013, Southern Company to filed its consolidated Form 10-K with the SEC for fiscal year 2012 (the "2012 10-K").  The 2012 10-K stated in part:

> The Company is constructing the Kemper IGCC which will utilize an IGCC technology with an output capacity of 582 MWs. The Kemper IGCC will use as fuel locally mined lignite (an abundant, lower heating value coal) from a mine owned by the Company and situated adjacent to the Kemper IGCC. In connection with the Kemper IGCC, the Company also plans to construct and operate approximately 61 miles of $CO_2$ pipeline infrastructure. ***The Kemper IGCC is scheduled to be placed in-service in May 2014***.
>
> . . . .
>
> ***The Company's current cost estimate for the Kemper IGCC*** (net of the $245.3 million CCPI2 grant, and excluding the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, financing costs, and certain general exceptions as contemplated in the 2012 MPSC Order and the settlement agreement between the Company and the Mississippi PSC entered into on January 24, 2013 (Settlement Agreement) that must be specifically approved by the Mississippi PSC) ***is approximately $2.88 billion***.

87.   The 2012 10-K was signed by Defendants Fanning, Beattie, Baranco, Boscia, Clark, Grain, Habermeyer, Hagen, Hood, James, Klein, Smith, Specker, and Wood, and contained signed certifications pursuant to SOX by Defendants Fanning and Beattie, stating that Southern Company's internal control over financial reporting was effective as of December 31, 2012, and that the information contained in the 2012 10-K fairly presented, in all material respects, the financial

condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

88.     On April 23, 2013, Southern Company and Mississippi Power filed a combined current report on Form 8-K with the SEC announcing cost updates to the Kemper Plant.  The Form 8-K disclosed that the Kemper Plant project would now cost $3.42 billion, a $540 million increase from its last estimate, blaming additional labor, engineering, and materials costs.  The Form 8-K included the following statements:

> Mississippi Power is constructing the Kemper IGCC which will utilize an integrated coal gasification combined cycle technology with an output capacity of 582 megawatts. The certificated cost estimate of the Kemper IGCC included in the order issued by the Mississippi Public Service Commission (the "Mississippi PSC") in April 2012 confirming the issuance of the Certificate of Public Convenience and Necessity (the "CPCN") for the Kemper IGCC (the "2012 MPSC Order") was $2.4 billion, net of $245 million of Department of Energy ("DOE") grants and the cost of the lignite mine and equipment, the cost of the carbon dioxide ("$CO_2$") pipeline facilities, and allowance for funds used during construction ("AFUDC") related to the Kemper IGCC. The 2012 MPSC Order approved a construction cost cap of up to $2.88 billion, with recovery of prudently-incurred costs subject to approval by the Mississippi PSC. Exceptions from the cost cap included in the 2012 MPSC Order include the cost of the lignite mine and equipment, the cost of the $CO_2$ pipeline facilities, AFUDC, and certain general exceptions, including change of law, force majeure, and beneficial capital (which exists when Mississippi Power demonstrates that the purpose and effect of the construction cost increase is to produce efficiencies that will result in a neutral or favorable effect on the ratepayers, relative to the provisions of the CPCN) (the "Cost Cap Exceptions"). Recovery of the Cost Cap

Exception amounts remains subject to review and approval by the Mississippi PSC.

On January 24, 2013, Mississippi Power entered into a settlement agreement (the "Settlement Agreement") with the Mississippi PSC that, among other things, establishes the process for resolving matters regarding cost recovery related to the Kemper IGCC. ***Under the Settlement Agreement, Mississippi Power agreed to limit the portion of prudently-incurred Kemper IGCC costs to be included in retail rate base to the $2.4 billion certificated cost estimate, plus the Cost Cap Exceptions as well as any other costs permitted or determined to be excluded from the cost cap by the Mississippi PSC***. As contemplated by the Settlement Agreement, Mississippi Power intends to finance (1) prudently-incurred costs in excess of the certificated cost estimate and up to the $2.88 billion cost cap and (2) the accrued AFUDC through securitization as provided in State of Mississippi legislation.

***On April 23, 2013, Mississippi Power revised its cost estimate for the Kemper IGCC from approximately $2.88 billion, net of DOE grants and the Cost Cap Exceptions, to approximately $3.42 billion, net of DOE grants and the Cost Cap Exceptions***. The revised cost estimate reflects additional cost pressures, including labor costs, piping and other material costs, engineering and support costs, and productivity decreases. Mississippi Power does not intend to seek any joint owner contributions or rate recovery for any costs of the Kemper IGCC that exceed the $2.88 billion cost cap, except for amounts subject to the Cost Cap Exceptions. Accordingly, Mississippi Power and Southern Company will reflect a pre-tax charge to income for this estimated probable loss of $540 million ($333 million after tax) in their first quarter 2013 financial statements.

89.    On April 24, 2013, Southern Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the first quarter of 2013, ended March 31, 2013.  For the quarter, Southern Company reported earnings of $81 million, or $0.09 per share,

on revenues of $3.9 billion.  These results included "a $333 million (38 cents per share) after-tax charge related to an increased construction estimate for Mississippi Power's Kemper County project."  Defendant Fanning stated: "***In keeping with our commitment to customers, Southern Company will fully absorb the increased costs related to the Kemper project***."

90.    On the same date, Southern Company held a conference call regarding the quarterly financial results, during which it was acknowledged the $540 million ($333 million after-tax) charge related to cost overruns at the Kemper Plant, but again investors, analysts, and media representatives were reassured that the Kemper Plant remained on schedule and would meet the May 2014 deadline. During the call, Defendant Fanning provided details regarding the successful completion of the project, stating:

> ***Meanwhile, progress continues at the Kemper Project in Mississippi as we continue with startup activities***. Last month, consistent with the settlement agreement we reached in January, the Mississippi Public Service Commission approved a two-step rate increase associated with the Kemper Project. The settlement agreement contemplated a seven-year plan with no further changes to base rates for Kemper Project through 2020. And, Mississippi Power recently made its necessaries filings with the Commission. This rate mitigation plan is expected [to] be addressed by the Commission this fall. ***We continue to make tremendous progress at the Kemper site with most of the major components in place***, the combined cycles, gasifiers, massive gas absorbers, and lignite dome as well as a 75-acre reservoir, the facility's appearance reflects our ***progress with startup activities which are now 40% complete***. With the final engineering almost complete, the activities leading up to commercial operation include

the very meticulous work of bringing the installed components together through sophisticated piping, cabling, and control equipment. ***Our current cost estimate for the project has increased based primarily on matters related to piping***. We've improved the quality and increased the quantity of the pipe, and increased the amount of labor needed to achieve our in-service date. Art [Defendant Beattie] will speak to the financial implications of the current estimate in a few minutes. While disappointed with the estimated cost increases, we remain accountable to customers. In light of our agreements with the Mississippi Public Service Commission, ***we will not seek recovery of these increased costs which exceed the $2.88 billion cost cap established in the Commission's 2012 certification order, net of DOE grants and cost cap exceptions included in that order***. Our current plan is only to seek recovery of the capital and variable cost components already reflected in the seven-year rate plan recently filed with the PSC. ***The revised construction cost estimate reflects the company's current analysis of the cost to complete the Kemper Project. We continue to believe that the scheduled in-service date is achievable.*** As with any project of this magnitude and complexity, we will continue to evaluate the estimated project cost and schedule as we ***proceed towards completion over the next year***.

91.     On May 10, 2013, the Company filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the first quarter of fiscal year 2013 (the "Q1 2013 10-Q"). The Q1 2013 10-Q reiterated the statements previously made that the Kemper Plant had recorded a $540 million ($333.5 million after-tax) charge related to cost overruns at the Kemper Plant, and that the Company did not intend to seek contributions or recovery of the increased costs, which exceeded the $2.88 billion cost cap.

92.     Also on May 10, 2013, Mississippi Power announced a restatement of its previously issued financial statements as a result of incorrectly accounting for

the project costs for the Kemper Plant.  In Amendment No. 1 to the 2012 10-K, Mississippi Power restated its financial statements for the year ended December 31, 2012 to recognize a pretax charge for an estimated probable loss for the Kemper Plant of $78 million ($48.2 million after tax).

93.    Also in the Q1 2013 10-Q, Southern Company disclosed a material weakness in its internal controls over financial reporting relating to Mississippi Power's failure to keep and publicly report certain information about schedule delays and cost overruns, stating:

> Management believes Mississippi Power's failure to maintain sufficient evidence supporting certain estimated amounts included in the Kemper IGCC cost estimate and to fully communicate the related effects in the development of the Kemper IGCC cost estimate would constitute a material weakness in internal control over financial reporting under standards adopted by the Public Company Accounting Oversight Board and concluded ***Mississippi Power's internal control over financial reporting was not effective as of December 31, 2012***.
>
> As of the end of the period covered by this quarterly report, Mississippi Power conducted an evaluation under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the disclosure controls and procedures (as defined in Sections 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934). ***Based upon this evaluation, which considered the material weakness described above, the Chief Executive Officer and the Chief Financial Officer concluded that the disclosure controls and procedures were not effective***.
>
> Management has initiated appropriate actions to remediate the material weakness in internal control over financial reporting. Such actions include, but are not limited to, the following:

- *establishing a new governance team focused on accounting, legal, and regulatory affairs that will meet regularly with the Kemper IGCC project and construction teams and will provide further oversight of the Kemper IGCC cost estimation process*;

- reemphasizing and enhancing communication across functional areas and departments; and

- applying appropriate performance management actions.

*Remediation of the material weakness is expected to be completed during the second quarter 2013*.

94.    Southern Company's Q1 2013 10-Q contained signed certifications pursuant to SOX by Defendants Fanning and Beattie, stating that the information contained in the Q1 2013 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

95.    On May 20, 2013, Mississippi Power abruptly announced that Day, the President and CEO of Mississippi Power, was stepping down from his position. As reported in the *Jackson Free Press* on May 21, 2013[3]:

> JACKSON, Miss. (AP) — Ed Day said his main job as president of Mississippi Power Co. was to successfully complete the company's Kemper County power plant.

---

[3] Ray Henry, *Miss. Power CEO Ed Day Out*, Jackson Free Press, May 21, 2013, http://www.jacksonfreepress.com/news/2013/may/21/miss-power-ceo-fired-stonewalling-regulators/.

Now, more than $1 billion in cost overruns at the coal-fired plant have claimed his job, and parent Southern Co. has sent in a top executive to try to salvage the mess.

Day abruptly resigned Monday as president of Mississippi Power. His replacement, effective immediately, is Ed Holland.

Until Monday, Holland had been the Atlanta-based parent company's top lawyer. He also led an internal inquiry into the April announcement that Kemper was an additional $540 million over budget. *Along the way, Holland found that Day failed to respond to requests from a Mississippi Public Service Commission lawyer about when company executives knew about a previous $376 million overrun that was announced in May 2012.*

Holland told commission lawyer Shawn Shurden last week that Day had failed to respond.

"In a subsequent management meeting, *Ed Day directed or definitely inferred that the documents should not be given to the commission, and these documents were never given to the commission*," said Northern District Commissioner Brandon Presley, a Democrat who has opposed the plant.

Holland denies Day tried to defy regulators.

"There was no intentional withholding of information," Holland said. He said executives decided to communicate the information in a meeting, but failed to follow through. "We made a mistake of not delivering in a timely fashion," he said.

Holland said Day wasn't forced to resign, but said "the pressures" of Kemper and Mississippi Power's other operations probably motivated the decision.

Holland said Mississippi Power's vice president of generation, Tommy Anderson, also resigned recently and was not fired.

37

96.     Yet despite Day's misconduct, on the same day that he resigned, Defendant Day entered into a three-year consulting agreement with Mississippi Power, which entitled him to an annual retainer of $150,000 per year for providing consulting services for "no more than four (4) days during each calendar month."

97.     On June 17, 2013, the Company's COO, Mark Crosswhite, e-mailed Company employees, including Mr. Wingo, regarding the Company's recent "significant failures," including failures that "diminished our Company's credibility . . . ."   Mr. Crosswhite urged employees to come forward and be "candid and open," promising "we will not tolerate retaliation of any form . . . ."

98.     On July 30, 2013, Southern Company and Mississippi Power filed a combined current report on Form 8-K with the SEC announcing cost updates to the Kemper Plant and the related recognition of charges to income.   The Form 8-K included the following statements:

> In July 2013, Mississippi Power's management completed its review of additional cost pressures related to the Kemper IGCC associated with ongoing construction activities, inventory necessary to mitigate startup risk, startup energy costs, and other startup activities, as well as productivity. ***As a result of this review, on July 29, 2013, Mississippi Power further revised its cost estimate for the Kemper IGCC to approximately $3.87 billion***, net of $245 million of grants awarded to the project by the U.S. Department of Energy under the Clean Coal Power Initiative Round 2 ("DOE Grants") and the cost of the lignite mine and equipment, the cost of the carbon dioxide pipeline facilities, allowance for funds used during construction related to the Kemper IGCC, and certain general exceptions, including change of law, force majeure, and beneficial capital (which exists when

Mississippi Power demonstrates that the purpose and effect of the construction cost increase is to produce efficiencies that will result in a neutral or favorable effect on customers relative to the original proposal for the Certificate of Public Convenience and Necessity) (the "Cost Cap Exceptions"). The revised cost estimate reflects additional cost pressures, including labor costs, piping and other material costs, engineering and support costs, start-up costs, and decreases in construction labor productivity. Mississippi Power does not intend to seek any joint owner contributions or rate recovery for any costs related to the construction of the Kemper IGCC that exceed the $2.88 billion cost cap, except for amounts subject to the Cost Cap Exceptions and net of the DOE Grants. ***As a result of the revised cost estimate, Southern Company and Mississippi Power will record a pre-tax charge to income for this estimated probable loss of $450 million ($278 million after tax) in their second quarter 2013 financial statements in addition to the $540 million ($333 million after tax) that has been previously recognized***.

99.     On July 31, 2013, Southern Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the second quarter of fiscal year 2013, ended June 30, 2013.  For the quarter, Southern Company reported earnings of $378 million, or $0.43 per share, on revenues of $4.25 billion.  In the press release, Southern Company also reported: "Earnings for the three and six months ended June 30, 2013, include after-tax charges of $278 million (32 cents per share) and $611 million (70 cents per share), respectively, related to increased cost estimates for the construction of Mississippi Power's Kemper County project."

100.   On the same date, Southern Company held a conference call regarding the quarterly financial results, during which investors, analysts, and media

representatives were reassured that, despite the cost overruns, the Kemper Plant remained on schedule to meet the May 2014 deadline, with startup activities scheduled to begin in late August 2013 with the firing up of the first combustion turbine.   When asked about the cost overruns at the Kemper Plant, Defendant Fanning stated:

> Simplest answer is we agreed to a cost cap with only about 10% to 15% of the engineering done. And what's happened is, is we've completed the engineering, we ran into the problem that, oh, my goodness, we're going to run over on cost and schedule and we've reduced the schedule at the same time we've agreed to the price cap. ***That actually occurred in early 2010. We didn't know we had a problem then, but in fact, that's when we had a problem***. We only knew we had the problem once the engineering became complete and we saw the implications of the rest of construction. By any investigation that we've done here, the construction has actually been exceedingly effective

101.   During the call, Defendant Fanning also admitted that the Company and its stockholders were paying the penalty for the cost overruns at the Kemper Plant:

> [Analyst ALI AGHA]: Last question, Tom, looking at Kemper today with all the information and the extra roughly $1 billion of costs, is that project still as attractive to you as you thought it would be going in, frankly, given where we are today?
>
> TOM FANNING: The honest answer -- let me split that two into two answers. Is it attractive to Mississippi's customers if we honor, as we honor the regulatory settlement that we reached? It has the economics of a nuclear plant, relatively high capital costs, very cheap energy. It's exceedingly attractive in that respect. ***Is it attractive to Southern's***

*shareholders? No. We are taking a hit here. We understand that.*
*Nobody here is happy about that, but that's the honest truth*.

102.   On August 6, 2013, Southern Company to filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the second quarter of fiscal year 2013 (the "Q2 2013 10-Q"). The Q2 2013 10-Q reiterated the statements previously made that the Kemper Plant was "scheduled to be placed in-service in May 2014."

103.   Southern Company's Q2 2013 10-Q contained signed certifications pursuant to SOX by Defendants Fanning and Beattie, stating that the information contained in the Q2 2013 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

**REASONS STATEMENTS WERE IMPROPER**

104.   The true facts, which were known or recklessly disregarded the Company's Board of Directors and management, but were concealed from the investing public, were as follows:

(a)   the Kemper Plant would not be completed by the May 2014 deadline;

(b)   the total project cost of the Kemper Plant would exceed the $2.88 billion cost cap set by state regulators;

(c)     the Company's management actively prevented accurate information regarding the true status of the Kemper Plant project from reaching investors;

(d)     Southern Company lacked effective internal financial controls; and

(e)     as a result of the foregoing, Southern Company's public statements were materially false and misleading at all relevant times.

105.   As a result of the foregoing, and as detailed further herein, the Company has been harmed.

## THE TRUTH BEGINS TO EMERGE

106.   On October 2, 2013, Southern Company and Mississippi Power filed a combined current report on Form 8-K with the SEC disclosing for the first time that it would not meet the May 2014 deadline for the completion of the Kemper Plant.  The Form 8-K included the following statements:

> Mississippi Power is revising the construction schedule for the Kemper IGCC as the result of abnormally wet weather and lower-than-planned construction labor productivity, and ***currently expects that the Kemper IGCC will be placed in service later in 2014 than the originally scheduled in-service date of May 2014***. Specific revisions to the schedule and resulting changes, if any, to the construction cost estimate subject to the $2.88 billion cost cap and including contingency are expected to be completed in late October 2013. Changes to the construction schedule or the construction costs, including any related changes to specific cost categories, are expected to be reflected in the Kemper IGCC Project Monthly Status Report through September 2013, which Mississippi Power expects to file by the end of the first week of November 2013. Mississippi Power

anticipates that any additional financing costs during construction due to the schedule extension will be recoverable.

*As a result of the schedule extension for the Kemper IGCC, Mississippi Power will be required to recapture the $133 million in Phase I investment tax credits* (the "Phase I credits") under Section 48A of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), that had been allocated to the Kemper IGCC. Therefore, Mississippi Power will reclassify the Phase I credits as a liability to the Internal Revenue Service in its third quarter 2013 balance sheet.

107. However, the full extent of the truth regarding the Kemper Plant delays and cost overruns was still concealed because of the continued misleading positive statements that the Individual Defendants made or caused to be made, which suggested that the Kemper Plant would still be completed in 2014 and would be eligible to receive approximately $150 million of additional tax credits.

108. On October 30, 2013, Southern Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the third quarter of fiscal year 2013, ended September 30, 2013. For the quarter, Southern Company reported earnings of $852 million, or $0.97 per share, on revenues of $5.02 billion.

109. On the same date, Southern Company held a conference call regarding the quarterly financial results, during which investors, analysts, and media representatives were again told that the completion of the Kemper Plant would be delayed from May 2014 until fourth quarter 2014, and that the project cost had

increased by another $93 million.  During the call, Defendant Fanning provided
details regarding the project, and repeated the explanation that unexpected wet
weather caused the delays, stating:

> Now for an update on the Kemper County project. Earlier this month
> we announced that we did not expect to meet the original May 2014
> in-service date for the Kemper project, largely as a result of lower-
> than-expected production rates and delays from wet weather. After
> recalibrating our assumptions on the rate of pipe installation, we have
> revised the in-service date to the fourth quarter of 2014. In
> conjunction with the schedule change, we have recorded an additional
> pretax estimated loss of $150 million. As a reminder, we estimated the
> incremental cost for a delay to be approximately $15 million to $25
> million per month. Our new estimate is consistent with that projection
> and also retains a $100 million contingency. Tremendous progress
> continues to be made at the site. We are now nearly halfway complete
> with pipe installation, have fired both combustion turbines and have
> synced the entire two-on-one combustion cycle to the grid.
>
> . . . .
>
> And I'll just tell you some. We believe the problem at Kemper was
> essentially at the time that we made a fixed price commitment with
> 10% engineering done at 6.7% contingency. In other words, the
> problem has been one more of a lack of engineering that was
> completed, rather than construction. By all accounts, the construction
> of Kemper has gone very well.

110.   As the months went on, the completion date for the Kemper Plant
continued to be delayed, and the costs of the project continued to increase.  On
January 28, 2014, Southern Company and Mississippi Power filed a combined
current report on Form 8-K with the SEC announcing a revised cost estimate of
$4.06 billion for the Kemper Plant project, and stating that the project "is

44

scheduled to be placed in service in the fourth quarter of 2014." The Form 8-K

also included the following statements:

> On January 27, 2014, Mississippi Power further revised its cost
> estimate for the Kemper IGCC to approximately $4.06 billion, net of
> $245 million of grants awarded to the project by the U.S. Department
> of Energy under the Clean Coal Power Initiative Round 2 ("DOE
> Grants") and the cost of the lignite mine and equipment, the cost of
> the carbon dioxide pipeline facilities, allowance for funds used during
> construction related to the Kemper IGCC, and certain general
> exceptions, including change of law, force majeure, and beneficial
> capital (which exists when Mississippi Power demonstrates that the
> purpose and effect of the construction cost increase is to produce
> efficiencies that will result in a neutral or favorable effect on
> customers relative to the original proposal for the Certificate of Public
> Convenience and Necessity) (the "Cost Cap Exceptions"). The revised
> cost estimate reflects an increase in the contingency for risks
> associated with start-up activities. Mississippi Power does not intend
> to seek any joint owner contributions or rate recovery for any costs
> related to the construction of the Kemper IGCC that exceed the $2.88
> billion cost cap, except for amounts subject to the Cost Cap
> Exceptions and net of the DOE Grants. As a result of the revised cost
> estimate, Southern Company and Mississippi Power will record a pre-
> tax charge to income for this estimated probable loss of $40 million
> ($25 million after-tax) in their fourth quarter 2013 financial
> statements in addition to charges totaling $1.1 billion ($704 million
> after-tax) that have been recognized previously.

111.   Yet investors were unaware of the extent of the false and misleading

statements and omissions being made regarding the Kemper Plant **until at least**

**early 2015**, when information first became available regarding the deliberate

actions of the Individual Defendants to prevent investors from learning the truth

regarding the status of the Kemper Plant project.

112.   On February 12, 2014, Mr. Wingo e-mailed Charles Powell, a Kemper Plant planning and development manager, with concerns that the scheduling contractor for the Kemper Plant project, PM Alliance, Inc. ("PM Alliance"), was being asked to stand behind publishing a misleading schedule.  The e-mail warns that PM Alliance would discontinue their relationship with the Kemper Plant project if the misleading schedules were published.

113.   On February 14, 2014, PM Alliance e-mailed employees at Southern Company, including Mr. Wingo, warning that PM Alliance could not support using hypothetical and misleading information in a published schedule that could ultimately be used by investors, regulators, and the public.

114.   On February 26, 2014, in response to e-mailed questions from Mr. Wingo regarding suspicious activity surrounding the official Kemper Plant project scheduling database, Babar Suleman, a Southern Company contract scheduler responsible for controlling access to the database, cautioned Mr. Wingo against further discussions of the suspicious scheduling issues by e-mail.

115.   On February 27, 2014, the president of PM Alliance e-mailed Mr. Wingo to inform him that PM Alliance was resigning from the Kemper Plant project because the project plan did not "fairly and accurately" represent the remaining work to be done:

> At this point, continued involvement by PMAlliance with the Startup and Commissioning schedule would place our company in the difficult position of being associated with a P6 project plan (and therefore a QRA process) that we believe does not fairly and accurately represent the work that still remains. Accordingly, we must respectfully withdraw from our involvement in the Startup and Commission schedule for the Kemper project immediately.

116.   Also on February 27, 2014, a noon meeting with Southern Company and Mississippi Power officials was conducted.  At the meeting, John Huggins, a Mississippi Power vice president, presented the misleading schedule that by that time several engineers and schedulers had warned was false and misleading.  The schedule claims the project was 80% likely to finish by December 1, 2014.

117.   Later that night on February 27, 2014, Mr. Wingo e-mailed John Huggins, forwarding Mr. Wingo's February 6, 2014 e-mail to Charles Powell, warning Mr. Huggins that the Company had provided the public with misleading scheduling information.  Mr. Wingo also warned that the Company's "lack of rigor in our project controls are also likely to be in clear and obvious violation of industry standards, best practices and generally accepted principles which, if I'm right, puts [the Company] in clear jeopardy with regards to Sarbanes Oxley Compliance."  Mr. Wingo further warned, "If we continue down the path we're on, the project will admit schedule slips only at the last minute, when things can't be hidden, glossed over or blamed away."

118.   On February 28, 2014, Mr. Wingo contacted PricewaterhouseCoopers ("PWC"), an auditing firm working on the Kemper Plant project, warning PWC that the Company had published a misleading, un-vetted schedule, that PM Alliance had withdrawn as a result, and that "PMA feels this obvious lack of rigor in our project controls and the cavalier nature of our projections will unfairly harm their brand as well."   In response, PWC associate Schuyler Dutton e-mailed Mr. Wingo, stating, "Sorry for the delay – just got an internal call from some concerned colleagues.  Will call back as soon as I'm able."

119.   On March 10, 2014 at 12:03 p.m., Mr. Wingo called Defendant Fanning and warned him that there was no way that the Kemper Plant project would be completed by the fourth quarter of 2014.   During a 21-minute call, Mr. Wingo warned Fanning against signing any financial reports to the SEC showing a projected completion of the Kemper Plant project by the end of 2014. Mr. Wingo explained that there was no way the Kemper Plant project would be completed by then and that there was "a fraud being perpetrated on the [Kemper Plant] project, that they hijacked the schedule to make it look like 2014 was achievable."

120.   On March 13, 2014, a meeting was held between high-level officials at Mississippi Power and Southern Company to discuss the fallout of PM Alliance's departure.   Joshua Keller of PM Alliance was invited and was in

attendance at the meeting because Southern Company was seeking to bring PM Alliance back to the Kemper Plant project.  Joshua Keller's notes regarding the meeting quote Bill Boyd, the Company's general manager in charge of Project Planning and Services, as stating during this meeting that things were changed in the schedule in the past to "protect ourselves."

121.  On March 17, 2014, Mr. Wingo spoke with a bartender at Logan's Roadhouse, a restaurant in Meridian, MI near the Kemper Plant worksite.  The bartender reported that most contractors believed that they expected work on the Kemper Plant to continue for at least two or three more years.  To preserve his recollection of the conversation with the bartender, Mr. Wingo contemporaneously e-mailed himself notes from the conversation using his cell phone.

122.  On March 19, 2014, Mr. Wingo signed his acknowledgement of a written year-end review of his performance for the period January 1, 2013 through December 31, 2013.  Mr. Wingo was given a performance rating of fully meets expectations.  Mr. Wingo's review includes comments from his manager that state, "Brett has made significant contributions by identifying needs and proactively taking action on the Kemper project."  In fact, in 2008 and every year thereafter that he was employed by the Company, Mr. Wingo was awarded the $2,000 "Southern Excellence" prize for exceeding Company expectations.

123.   On April 2, 2014, the Company filed a report on Form 8-K with the SEC reiterating the Kemper Plant's scheduled in-service date of fourth quarter 2014.

124.   On April 29, 2014, the Company filed a report on Form 8-K with the SEC that, for the first time, acknowledged that the Kemper Plant would not be ready until 2015.  The report stated that the in-service date for the Kemper Plant was currently expected to occur in the first half of 2015.

125.   On May 5, 2014, analysts at UBS downgraded the Company's rating to "sell" from "neutral," citing the Kemper Plant delays and noting that any costs above $2.9 billion could not be recovered from Mississippi ratepayers.

126.   On May 30, 2014, Mr. Wingo met with Helen Nalley, the Operations Compliance Director at Southern Company.  At this meeting, Mr. Wingo was told that the Company has proper controls in place, financial reporting was secure, and that as a result, there was no longer a compliance issue.  In response to Mr. Wingo's concerns of being asked to leave the schedule and project management issues to the leadership currently in place even though those leaders were the same ones who had been proven to be either willful, complicit, or ignorant in fraudulent scheduling, Mr. Wingo was told to "let it go" and that this was not the first time the Company had to "let things go."  Mr. Wingo was told that even if the current Kemper Plant project leadership had violated rules and

potentially led executives into breaking federal laws, the leadership could not be replaced.

127.   On June 10 and 27, 2014, Mr. Wingo e-mailed Ms. Nalley to follow up on their May 30, 2014 meeting.  Mr. Wingo's e-mails warn that a change in the Company's culture was needed, and that Mr. Wingo "challenged this culture to prevent breaking federal laws and our name from becoming synonymous with cheating and lying to customers and investors."  In the e-mails, Mr. Wingo also described a "lack of management or accountability" resulting from intense pressure to meet expectations, and stated Company officials were retroactively filing inspection reports so that the Kemper Plant could be placed into operation.

128.   On July 21, 2014, a hearing was held before the Mississippi Public Service Commission.  During the hearing, testimony was heard from Greg Zoll, the independent monitor hired by Mississippi for the Kemper Plant project.  Mr. Zoll testified, *inter alia*, that management of the project was incompetent; that the Company delayed acknowledging major cost increases and delays long after the Company knew or should have known of those changes; as early as November 2012, it was clear that the Company's May 2014 completion date was unachievable; that Mr. Zoll highlighted a projected cost overrun as early as September 2011 that was not acknowledged by the Company until May 2012; and

that the Company reported "no impacts" to the Mississippi PSC even though the Company had missed deadlines and slipped behind schedule.

129.   On September 5, 2014, Defendant Fanning sold 1,049,185 shares of Company stock for proceeds of more than $46 million.

130.   In August 2014, Mr. Wingo was placed on paid administrative leave by the Company and Mr. Wingo began recording his telephone conversations with Company officials.

131.   During an August 29, 2014 telephone conversation between Mr. Wingo and Ryan Brown, an engineer responsible for overseeing the assembly of compressors at the Kemper Plant, Mr. Brown describes routinely missing inspection records and shoddy construction work at the Kemper Plant site.   In recorded calls between Mr. Wingo and other workers, the workers similarly complain about the quality of construction work and often attribute the poor workmanship to a rushed schedule.

132.   On September 23, 2014, Mr. Wingo through counsel sent a demand letter to the Company.   The demand letter claims Mr. Wingo blew the whistle beginning in February 2014 by "loudly and consistently point[ing] out the schedule fraud" and thereby preventing additional false financial reporting.   The letter claims "[e]veryone involved with the Kemper construction knows, or should know, that Commercial Operation Date ('COD') of May 31, 2015 is not realistic."

133.   On October 1, 2014, the U.S. Department of Energy updated its contract with the Company, requiring as conditions for the Company's continued receipt of federal funds that the Company, *inter alia*, file reports whenever delays or adverse conditions impair the Company's ability to meet its objectives, and report cost overruns to federal energy officials.

134.   On October 29, 2014, Defendant Fanning stated during an earnings conference call with analysts that there were $418 million in additional costs for the Kemper Plant project, including $310 million caused by schedule extensions.

135.   On February 4, 2015, the Company reported during an earnings conference call that its 2013 results included after-tax charges of $729 million related to increased cost estimates for construction of the Kemper Plant project.

136.   On February 14, 2015, Mr. Wingo filed a retaliation claim with OSHA under the whistleblower provisions of Sarbanes-Oxley.  In the filing, Mr. Wingo alleges "willful deception" at the Kemper Plant, including "decisions being made, shortcuts being taken, concessions being granted, issues being ignored (some that might classify as safety related-like the measly time allotted for operator training), too many to list, all in support of a schedule that many of us know to be a sham."  Mr. Wingo further alleged in the filing that the Company paid millions of dollars in unnecessary expediting fees and that the Company published incorrect information regarding the Kemper Plant schedule.

137.   On February 19, 2015, Southern Company Services, a subsidiary of the Company, sued Mr. Wingo, alleging that Mr. Wingo had breached an employment termination agreement.   Initially, according to *New York Times* interviews and court records, the Company had offered Mr. Wingo $975,000 to remain quiet.   After Mr. Wingo refused, the Company filed suit against him in Jefferson County Circuit Court, alleging he had agreed to a settlement that required him to keep quiet about the Kemper Plant.   The Company obtained a temporary restraining order against Mr. Wingo in February 2015 forbidding Mr. Wingo to speak publicly about Kemper Plant.   Mr. Wingo denied any such agreement, and the Company eventually dropped its suit in March 2015.

138.   On March 9, 2015, Mississippi Power announced in a press release that the Kemper Plant had reached "one of its most significant milestones to date," the "first fire" of the plant's gasifiers.   The "first fire" term has a very specific engineering definition, and should have involved the "controlled circulation of sand and/or ash inside the various parts of the gasifier."   A "first fire" should also involve, among other steps, heating the gasifier to temperatures suitable for gasification of coal, which is about 1,800 degrees Fahrenheit.   These steps did not actually occur even though the Company said publicly that they did, according to comments from gasifier engineers from the Kemper Plant during recorded calls with Mr. Wingo.

139.   On March 10, 2015, Defendant Fanning gave a presentation at the Atlantic Council, and despite the ongoing delays at the Kemper Plant and the lack of actual power generation from the project, he continued to tout "clean coal," stating that "we have developed a technology … where we can consume coal and have a smaller carbon footprint than natural gas."

140.   On March 26, 2015, the Company filed a response to Mr. Wingo's February 17, 2015 OSHA complaint.  The response argues the Company had not retaliated against Mr. Wingo and characterized Mr. Wingo's actions as "attempting to cast the Company's refusal to renegotiate the December 31st settlement as retaliation in violation of SOX."

141.   On April 28, 2015, the Company issued promotional materials stating, in part, that "Mississippi Power has announced that the Kemper project is expected to begin operation in the first half of 2016."

142.   On July 29, 2015, during an earnings call discussing the Company's second quarter 2015 results, Defendant Fanning stated, "To a large extent, contingencies for cost and schedule have been sufficient to absorb these activities and the focus remains on the expected end-service date in the first half of 2016."

143.   In September 2015, the Individual Defendants caused Southern Company to once again announce a delay in the completion of the Kemper Plant. In a Form 8-K filed with the SEC, the Company announced that "Mississippi

Power now anticipates the in-service date to occur subsequent to April 19, 2016," and that this extension would require Mississippi Power to recapture $234 million in tax credits.

144.   On September 16, 2015, the Company filed a Response to Request for Additional Information in Mr. Wingo's OSHA matter.   The response explained why Mr. Wingo could not return to work, stating, "It would be very difficult to bring Mr. Wingo back to work in light of his allegations of unethical behavior and criminal misconduct on behalf of the company."

145.   On September 29, 2015, the Company released a statement stating that the Kemper Plant was not expected to be operational until after April 19, 2016.

146.   On December 29, 2015, the Company filed a third statement to OSHA regarding Mr. Wingo's OSHA retaliation claim.   In the statement, the Company now stated that it was "not confident of his skills, knowledge and abilities to perform as a capable employee for Southern Company Services."

147.   In February 2016, Mr. Wingo's employment with the Company was terminated.

148.   On February 15, 2016, the website "Mr. Dunn Goes to Montgomery" published an article entitled "Wingo: I told Southern CEO Fanning that Kemper

timeline was a fraud."[4]  The article was based on conversations between the author, Eddie Curran, and Mr. Wingo, as well as documents provided to Mr. Curran by Mr. Wingo.  The documents provided by Mr. Wingo included a call record showing Mr. Wingo's 21-minute telephone call to Defendant Fanning on March 10, 2014 further described above.  Mr. Curran performed a test call to the telephone number listed on the record, and confirmed that it was Defendant Fanning's phone number.  Mr. Wingo also provided his demand letter of September 23, 2014, a September 2014 letter from Mr. Wingo to Kim Greene of the Company, and an open letter dated February 16, 2016 from Mr. Wingo to the Company.

149.   The Mississippi Watchdog website published an article on February 16, 2016[5], based on a phone interview with Mr. Wingo, during which he stated that "Southern Company lied to regulators about the project's construction schedule in an effort to hang onto more than $234 million in federal tax credits."  As explained in the article:

> Wingo was the project manager for the gasifier island, which does the
> work of converting lignite coal mined on site into synthesis gas until

---

[4] Eddie Curran, *Wingo: I told Southern CEO Fanning that Kemper timeline was a fraud*, May 21, 2013, http://www.jacksonfreepress.com/news/2013/may/21/miss-power-ceo-fired-stonewalling-regulators/.

[5] Steve Wilson, *Former manager: Southern Company lied about Kemper schedule*, Feb. 16, 2016, http://watchdog.org/256865/kemper-schedule/.

2014, when he was placed on paid administrative leave by the company that August.

After starting to suspect possible delays in 2012, Wingo got confirmation as the project manager in 2014. In March 2014, he said he went all the way up the company's chain of command to Southern Company CEO Tom Fanning about his concerns with the project schedule, but his pleas were ignored at every level. The company insisted in filings with the Securities and Exchange Commission that it would make its self-imposed May 1, 2014, deadline to get the gasifier operational. The company didn't report the delay — which at the time pushed the plant's commissioning date until first quarter of 2015 — until April 29.

"They [company management] absolutely refuse to take bad news and do anything with it," Wingo said. "Basically, I tried to keep the company from going down a road, a bad, bad road. One that completely erodes trust. There's one thing that Southern Company or any other regulated utility holds dear and their number one asset is a constructive regulatory relationship. That is something you never want to damage."

"Through lies, deceptions and half truths and an unwillingness to confront that, I believe they've damaged that. We chose not to [be truthful] and we did it multiple times."

. . . .

Wingo started his career at Southern Company Services as a contractor in August 2007, when a new integrated coal gasification plant in the design phase was to be located near Orlando, Fla. After the new coal gasification plant was moved to east central Mississippi in Kemper County, Wingo was later hired as a full-time Southern Company employee in June 2009 and promoted to project manager in August 2011.

. . . .

Wingo, who is currently unemployed, said he thinks the power plant likely won't be operational until 2017. That would be almost a year behind the second half of 2016 opening Mississippi Power now quotes for the project. Wingo also said Kemper will likely cost at least $7 billion, more than $5 billion beyond the originally forecast price tag.

The original construction schedule for Kemper, Wingo said, was "highly aggressive," considering the scope of work required and the first-of-its-kind nature of the plant.

"We never had a system," Wingo said. "They threw together these half-assed schedules that made no sense that you couldn't use as a project management tool. If you took Kemper and put it on a real schedule and then you asked people that were actually responsible for executing their part of the schedule for input, to see if we can keep our promises, that schedule would've blown way out into 2015, possibly beyond. In 2012, we had a purposely broken project schedule that was designed to confuse everybody."

150.   The February 16, 2016 Mississippi Watchdog article also discussed an

independent monitor's report that further corroborated Mr. Wingo's statements:

Wingo's allegations of the utility holding back on revealing delays in the plant's schedule are seconded by the 2014 report from the independent monitor hired by the Mississippi Public Utilities Staff, a separate group from the elected Mississippi Public Service Commission. Engineering firm POWER Burns and Roe said in the report it was aware in November 2012 that the plant wouldn't be ready for its originally scheduled in-service date of May 1, 2014.

The company announced in September 2015 it wouldn't meet an April 2016 deadline to begin gasification of lignite coal and will have to repay the $234 million in IRS investment tax credits. The 582-megawatt plant has been running on natural gas since August 2014 and is billions over budget and years behind schedule.

59

151.   On March 2, 2016, several Biloxi businesses and individuals filed a complaint in Harrison County, Mississippi Circuit Court, First Judicial Circuit, alleging that Mississippi Power had defrauded them in part by covering up known delays and budget overruns.  The complaint alleges, *inter alia*, that "[a]ccording to Mr. Wingo, the opening date [of the Kemper Plant] slippage has come 'Through lies, deceptions and half-truths and an unwillingness to confront' the fact that its date projections have been fundamentally unrealistic.  '***We chose not to [be truthful] and we did it multiple times***,' says Wingo."

152.   On March 18, 2016, OSHA made a preliminary determination that the company violated the Sarbanes-Oxley Act when firing whistleblower Mr. Wingo in February 2016.  In the March 18, 2016 preliminary determination letter sent to Southern Company, OSHA found "[t]here is evidence that [Mr. Wingo] engaged in activity protected by SOX.  [Mr. Wingo] reported improper financial reporting and scheduling improprieties beginning February 27, 2014."  In the months to follow, the OSHA letter stated, Mr. Wingo "continued to seek redress of his concerns through the appropriate chain of command and contends his concerns were not addressed in a timely manner."  Regarding Mr. Wingo's termination, OSHA stated the Company "has not offered credible evidence" that justified Mr. Wingo's dismissal, and thus found it "reasonable to believe that [Mr. Wingo's] engagement

in protective activity was a contributing factor to the adverse action taken by [the Company], namely, not allowing [Mr. Wingo] back to work."

153. On or around April 5, 2016, the *New York Times* informed the Company that it knew of an SEC investigation surrounding the Kemper Plant Project.

154. On May 5, 2016, the Individual Defendants caused Southern Company to file a quarterly report on Form 10-Q with the SEC, which included the following statements:

> The SEC is conducting a formal investigation of Southern Company and Mississippi Power concerning the estimated costs and expected in-service date of the Kemper IGCC. Southern Company and Mississippi Power believe the investigation is focused primarily on periods subsequent to 2010 and on accounting matters, disclosure controls and procedures, and internal controls over financial reporting associated with the Kemper IGCC.

155. On May 12, 2016, credit-rating company Fitch Ratings downgraded the Long-Term Issuer Default Rating of the Company to "A-/Stable" from "A." In its report, Fitch Ratings expressed concerns about "the possibility of a further delay in schedule and the resultant cost creep" of the Kemper Plant project.

156. On May 13, 2016, credit-rating company Moody's Investor Service ("Moody's") downgraded the Company's long-term senior unsecured rating of the Company to "Baa2" from "Baa1." Moody's report noted Southern Company's rating "had already been weakened by over $2 billion of pre-tax charges related to

cost increases and delays at the Kemper [Plant]."   Moody's also classified Mississippi's credit outlook at "negative."

157.  On June 19, 2016, several companies, including Tellus Energy, LLC and Treetop Midstream Services, LLC, filed a complaint against the Company, Southern Company Services, Inc., and Mississippi Power in Gwinnett County, Georgia State Court alleging claims of breach of contract, conspiracy, and fraud arising from the Kemper Plant project.  The complaint alleges that "[o]ver the last six years, the Southern Company Defendants have intentionally misrepresented and concealed construction delays at the facility in order to remain eligible for hundreds of millions of dollars in federal tax credits and to prematurely and unjustifiably increase the rate they were charging customers."  Citing SEC filings, scheduling irregularities, independent monitors' reports, and Mr. Wingo's warnings, the plaintiffs seek compensatory and punitive damages.

158. On July 5, 2016, the *New York Times* published a detailed investigative report entitled "Piles of Dirty Secrets Behind a Model 'Clean Coal' Project" ("July 5, 2016 NYT Investigative Report")[6].  The July 5, 2016 NYT Investigative Report was based on a review "of thousands of pages of public records, previously undisclosed internal documents and emails, and 200 hours of

---

[6] Ian Urbina, *Piles of Dirty Secrets Behind a Model 'Clean Coal' Project*, July 5, 2016, https://www.nytimes.com/2016/07/05/science/kemper-coal-mississippi.html.

secretly though legally recorded conversations among more than a dozen colleagues at the plant," offering "a detailed look at what went wrong and why." The documents and recordings were provided to the *New York Times* by Mr. Wingo and include interviews with more than 30 current or former regulators, contractors, consultants or engineers who worked on Kemper Plant.   The documents and recordings "show that the plant's owners drastically understated the project's cost and timetable, and repeatedly tried to conceal problems as they emerged."

159.   The July 5, 2016 NYT Investigative Report also refers to a separate website entitled "The Kemper Coal Files Timeline"[7].   The Kemper Coal Files Timeline includes the documents and recordings that are part of the larger New York Times investigation reflected in the July 5, 2016 NYT Investigative Report, and continues to be updated with additional documents pending open-records requests to federal and state agencies.

160.   The July 5, 2016 NYT Investigative Report describes how Haley Harbour, the Company's chief lobbyist, aggressively lobbied for hundreds of millions of dollars in federal subsidies for the Kemper Plant before becoming governor of Mississippi.   Once in office, Mr. Barbour signed a law in 2008, the

---

[7] Ian Urbina, *The Kemper Coal Files Timeline*, https://www.thehistoryproject.com/projects/embed-view/2914 (last retrieved on February 21, 2017).

Baseload Act, that allowed much of the cost of building any new power plants to be passed on to ratepayers before the power plants were built.

161.   According to the July 5, 2016 NYT Investigative Report, to help make their case that the Kemper Plant would be competitive with natural gas, which is coal's main competitor, utility executives "predicted" to investors and regulators that the per-unit price for natural gas would be higher than $11 by 2016.  But gas remained less than $2 per unit in July 2016.

162.   In 2014, according to the July 15, 2016 NYT Investigative Report, Mr. Wingo sent several e-mails to officials of Southern Company and Mississippi Power, the state utility that runs Kemper Plant, "alleging that the company had broken federal law and engaged in corporate fraud."  At least six Kemper Plant senior engineers, in recorded conversations with Mr. Wingo, said they believed that Kemper Plant's "delays and cost overruns, as well as safety violations and shoddy work, were partly the result of mismanagement or fraud."

163.   The July 5, 2016 NYT Investigative Report and the Kemper Coal Files Timeline describe documents that show as early as 2012, cost overruns indicated that the project would not be completed for less than the $2.88 billion cap amount, and engineers were being asked to find ways to cut costs.  In addition, senior management instructed employees not to provide any information on schedules or any other information to any external parties.

164.   On July 11, 2016, the Biloxi plaintiffs filed their first amended complaint in the Harrison County, Mississippi Circuit Court, First Judicial District action against the Company and Mississippi Power.  The plaintiffs alleged they paid more for electricity rates as a result of the Company's fraud, and claim the Company made repeated false representations about the project, fraudulently concealing their knowledge of the litany of the problems with the Kemper Plant project.  In addition to monetary damages, the plaintiffs seek for the court to revoke the Kemper Plant project's license and certifications, and that control of the Kemper Plant be taken away from the Company and Mississippi Power.

165.   On a July 27, 2016 earnings call with analysts discussing the Company's second quarter 2016 results, Defendant Fanning was asked for an update regarding the SEC's investigation into the Kemper Plant.  In response, Defendant Fanning stated, "No, we just don't get updates on that. . . .  We have disclosed in our financials that we don't believe that's material."

166.   On August 8, 2016, the Individual Defendants caused the Company to file a quarterly report on Form 10-Q and a press release announcing the Kemper Plant would not be in service until October 31, 2016, a one month delay from the prior projection.

167.   Despite the existence of the extensive wrongdoing that has taken place, Southern Company's officers and directors continue to deny any

misconduct, have failed to launch any effective investigation into the deliberate misrepresentation of scheduling deadlines, and continue to reward themselves with lavish compensation to the detriment of the Company and its stockholders.

168.   On January 6, 2017, almost three years after the original 2014 anticipated completion date, the Individual Defendants caused Mississippi Power to announce that it expected the Kemper Plant to begin operations by the end of January 2017. ***The cost of the project has ballooned to approximately $6.99 billion, more than double the cost estimate at the time that construction began***. According to the Sierra Club, the Kemper Plant is the most expensive power plant ever built for the amount of electricity that it will generate.

169.   On January 31, 2017, Mississippi Power announced that the Kemper Plant was finally making electricity from gasified lignite coal, but that the target date for full operations was being pushed back once again to February 28, 2017. Six months earlier, on the investor conference call for the second quarter of 2016, Defendant Fanning, after years of already pushing back the deadline, had assured investors that "both units A and B of the [Kemper Plant] facility are expected to be fully integrated ***by the end of September [2016]***."

170.   On a February 22, 2017 conference call with analysts discussing the Company's fourth quarter 2016 results, Defendant Fanning announced that the Kemper Plant would not be in full operation until the "middle of March" 2017.

Fanning also stated during the call that Mississippi Power expected to file for cost recovery with the Mississippi PSC within the next several months, noting, "Our goal is to achieve an outcome that balances the interests of customers and investors alike, an objective which often presents challenges."

171.   As of the date of this filing, more than three years after initial scheduled deadline, the Kemper Plant **has still not been completed and put into service, and estimated costs for the project are now more than $6.99 billion and rising, accumulating at a rate of approximately $25 million to $35 million each month**.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

172.   By reason of their positions as officers, directors, and/or fiduciaries of Southern Company and because of their ability to control the business and corporate affairs of Southern Company, the Individual Defendants owed and owe the Company and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Southern Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Southern Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

173.   Each director and officer of the Company owes to Southern Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

174.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

175.   In addition to these duties, the members of the Audit Committee owed specific duties to Southern Company under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

176.   Specifically, according to Southern Company's Audit Committee Charter, the responsibilities of the Audit Committee are as follows:

> To oversee preparation of the Committee's report required to be included in the appropriate Company disclosure documents and assist the Board in fulfilling its oversight responsibilities for the following:

- The quality and integrity of the financial reporting process and the financial statements and reports of the Company.

- The system of internal control.

- The qualifications, independence and performance of the independent auditor.

- The quality and performance of the Company's Internal Auditing function.

- The Company's process for monitoring adherence with the Company's Code of Ethics and compliance with legal and regulatory requirements.

- Assistance to Executive Management and the Chief Executive Officer in setting an appropriate "Tone at the Top" that encourages the highest levels of ethical behavior and integrity in all matters.

- The Company's processes for monitoring enterprise risks.

177.   In more detail, the Audit Committee Charter provides that the Audit Committee is empowered to:

(a)   Conduct or authorize investigations into any matters within its scope of oversight. Retain outside counsel, accountants or other advisors to advise the Committee or assist in the conduct of an investigation, including the authority to approve the fees payable to such advisors and any other terms of retention.

(b)   Appoint, compensate, retain and oversee the work of the independent auditor, which will report directly to the Committee.

(c)   Resolve any disagreements between management and the independent auditor.

69

(d)    Pre-approve all auditing and permissible nonaudit services provided by the independent auditor. The Committee may delegate to its Chairman the authority to grant pre-approvals for the engagement of the independent auditor to provide any permissible service up to a limit of $50,000 per engagement. Any engagements pre-approved by the Chairman shall be presented to the full Committee at its next scheduled regular meeting.

(e)    Seek any information it requires from officers, employees or external parties—all of whom are directed to cooperate with the Committee's requests.

(f)    Meet with Company officers, independent auditor, internal auditors, inside counsel or outside counsel, as necessary.

178.   Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Conduct and Ethics**

179.   Additionally, the Individual Defendants, as officers and/or directors of Southern Company, are bound by the Company's Code of Ethics (the "Code") which, according to the Code, "links our values – Southern Style – to the company's high expectations for ethical behavior."  According to the Code:

> We respect the law. We comply with all laws and regulations. We have a responsibility to understand the laws and how they apply to our jobs. The company supports each employee in this responsibility and provides the necessary resources for compliance.

All employees have a Duty to Act – an obligation to report activities that may be in violation of any applicable law or regulation. If it is found that any law or regulation has been violated, corrective and responsible action will be taken.

180.   Upon information and belief, the Company maintained a version of the Code and the Principles during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board as those set forth above.

**Control, Access, and Authority**

181.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Southern Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Southern Company.

182.   Because of their advisory, executive, managerial, and directorial positions with Southern Company, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Southern Company.

183.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Southern Company, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

184.   To discharge their duties, the officers and directors of Southern Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of Southern Company were required to, among other things:

(a)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   properly and accurately guide stockholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)   remain informed as to how Southern Company conducted its operations, and, upon receipt of notice or information of imprudent or

unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)    ensure that Southern Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

185.  Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Southern Company and its stockholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Southern Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Southern Company, the absence of good faith on their part, and a reckless disregard for their duties to Southern Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Southern Company.

186.   The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled stockholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

187.   In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.  As a result, Southern Company has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

188.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

189.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead stockholders into believing that the Company's business and financial prospects were better than they actually were.  In furtherance of this plan,

conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

190.  The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

191.  The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

192.  Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO SOUTHERN COMPANY

193.   As a result of the Individual Defendants' wrongful conduct, Southern Company disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Southern Company's credibility.  Southern Company has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

194.   Further, as a direct and proximate result of the Individual Defendants' conduct, Southern Company has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)   costs and expenses incurred in investigating and defending Southern Company and certain officers in the pending Securities Class Action, plus potentially millions of dollars in any settlement or to satisfy an adverse judgment;

(b)   costs and expenses incurred from the Company having to respond to an investigation by the SEC, as well as costs incurred in connection with any fines that may result from the SEC investigation;

(c)   costs and expenses incurred by the Company in defending itself and related entities in various pending litigation filed by, *inter alia*, Tellus Energy, LLC and Treetop Midstream Services, LLC, alleging claims

of breach of contract, conspiracy, and fraud arising from the Kemper Plant project, as well as lawsuits filed by several Biloxi, Mississippi businesses and individuals alleging that Mississippi Power had defrauded them in part by covering up known delays and budget overruns, including any judgments or settlements that may result from such lawsuits;

(d)     costs incurred by the Company resulting from the Company's misrepresentations regarding the Kemper Plant's construction costs and timetable;

(e)     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Southern Company's artificially-inflated stock price; and

(f)     costs incurred from the loss of the Company's customers' confidence in Southern Company's products and services.

195.    Moreover, these actions have irreparably damaged Southern Company's corporate image and goodwill.  For at least the foreseeable future, Southern Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Southern Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Indeed, on

May 12, 2016, credit-rating company Fitch Ratings downgraded the Long-Term Issuer Default Rating of the Company to "A-/Stable" from "A" and expressed concerns about "the possibility of a further delay in schedule and the resultant cost creep" of the Kemper Plant project. The following day, May 13, 2016, Moody's downgraded the Company's long-term senior unsecured rating to "Baa2" from "Baa1," noting that Southern Company's rating "had already been weakened by over $2 billion of pre-tax charges related to cost increases and delays at the Kemper [Plant]." Moody's also classified Mississippi's credit outlook at "negative."

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

196. Plaintiff brings this action derivatively in the right and for the benefit of Southern Company to redress injuries suffered, and to be suffered, by Southern Company as a direct result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Southern Company is named as a nominal defendant solely in a derivative capacity.

197. Plaintiff will adequately and fairly represent the interests of Southern Company in enforcing and prosecuting its rights.

198.   Plaintiff has been a stockholder of Southern Company since 1992 and has been continuously so throughout the entirety of the wrongdoing of which Plaintiff complains.

199.   Plaintiff did not make a pre-suit demand on the Board to pursue this action because such a demand would have been a futile and wasteful act.

200.   At the time this action was commenced, the Board of Southern Company consisted of the following fifteen (15) directors: Fanning, Baranco, Boscia, Clark, Grain, Hagen, Hood, Hudson, James, Johns, Klein, Smith, Specker, Thompson, and Wood.   A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein.   Each of these individuals faces a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.   Therefore, demand is futile.

**Demand Is Futile As to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability**

201.   The Director Defendants face a substantial likelihood of liability for their individual misconduct.   The Director Defendants were directors during the Relevant Period, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

202.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf, and none of them took any steps in a good faith effort to prevent or remedy that situation.

203.   The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

204.   Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and/or participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

205.   Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to stockholders, authorized and/or permitted the issuance of various false and misleading statements, and/or failed to correct the misstatements made to stockholders once they were put on notice that such statements were indeed false

and misleading, and are principal beneficiaries of the wrongdoing alleged herein. Thus, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

206.   Moreover, the Director Defendants as directors (and, in some cases, also as Audit Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices and/or failed to correct such misstatements.

207.   Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Director Defendants face a substantial likelihood of liability, making demand upon them futile.

208.   The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's

executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

209.  The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Southern Company to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

**Demand Is Futile As to the Audit Committee Defendants**

210.   The Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing Southern Company's internal controls over financial reporting, and discharging their other duties described herein.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

**Demand Is Futile As to Defendant Fanning for Additional Reasons**

211.   In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Fanning because Fanning is not an independent director.

212.   Fanning also cannot disinterestedly consider a demand to bring suit against himself because Fanning is a named defendant in the Securities Class Action, which alleges that he made many of the same misstatements described above in violation of the federal securities laws.  Thus, if Fanning were to initiate suit in this action, he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action.  This he will not do.

213.   Demand is futile for the additional reason that Fanning is an employee of the Company who derives substantially all of his income from his employment with (and depends for his livelihood on) Southern Company, making him, as acknowledged by the Company in its most recent Proxy Statement filed on April 8, 2016, not independent.   As such, Fanning cannot independently consider any demand to sue himself for breaching his fiduciary duties to Southern Company because that would expose him to liability and threaten his livelihood.

**Demand Is Futile As to Various Directors for Additional Reasons**

214.   Demand is also futile as to various directors due to their longstanding and current professional ties.  Fanning, Barnaco, and Smith are currently serving or have previously served as directors of the Federal Reserve Bank of Atlanta. Fanning and James are currently serving or have previously served as directors of

Vulcan Materials Company.   James and Johns are currently serving or have previously served as directors of Protective Life Corporation.

215.   Due to these longstanding and current professional ties working closely together, these directors cannot and will not objectively and disinterestedly consider demands to bring the claims set forth herein.

**Demand Is Futile As to All Directors for Additional Reasons**

216.   Each of the Director Defendants receives a lavish annual retainer of between $210,000 and $260,000 purely for being a Board member.   This compensation provides a substantial stipend to these directors, from which each of them personally benefits, depending for his or her livelihood in substantial part on Southern Company.   Demand on each of the Director Defendants is futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action that would threaten the economic benefits they receive as members of Southern Company's Board.

217.   If Southern Company's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this Complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders.   However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants

in this case contain provisions that eliminate coverage for any action brought directly by Southern Company against the Individual Defendants, known as the "insured versus insured exclusion."

218.  As a result, if the Director Defendants were to sue themselves or certain of the officers of Southern Company, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policies.

219.  Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Southern Company by prosecuting this action.  Therefore, demand on Southern Company and its Board is futile and is excused.

220.  Southern Company has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching

their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

221. Plaintiff has not made any demand on stockholders of Southern Company to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Southern Company is a publicly traded company with thousands of stockholders of record and at least hundreds of thousands of beneficial owners;

(b)    Making demand on such a number of stockholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Southern Company stockholders; and

(c)    Making demand on all stockholders would force Plaintiff to incur excessive expenses and obstacles, assuming all stockholders could even be individually identified  with any degree of certainty.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

222. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

223.   The Individual Defendants owed and owe Southern Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Southern Company the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

224.   The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

225.   The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

226.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Southern Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

227.   Plaintiff, on behalf of Southern Company, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

228.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

229.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Southern Company.

230.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Southern Company.

231.   Plaintiff, as a stockholder and representative of Southern Company, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and fiduciary breaches.

232.   Plaintiff, on behalf of Southern Company, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants For Waste of Corporate Assets

233.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

234.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

235.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

236.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

237.   Plaintiff, on behalf of Southern Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, and waste of corporate assets;

B.     Directing Southern Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Southern Company and its stockholders from a repeat of the damaging events described herein, including but not limited to putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to require an independent Chairman of the Board;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Southern Company's directors, executives, and other employees;

- a proposal to permit the stockholders of Southern Company to nominate at least two candidates for election to the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to strengthen the Board's supervision of the Company's financial reporting process, including the internal audit and control functions.

C.      Awarding to Southern Company restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 27, 2017

*/s/Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.

**JOHNSON & WEAVER, LLP**
Michael I. Fistel, Jr.
Georgia Bar Number: 262062
William W. Stone
Georgia Bar Number: 273907
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email: michaelf@johnsonandweaver.com
        williams@johnsonandweaver.com

**JOHNSON & WEAVER, LLP**
Frank J. Johnson
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
Email: frankj@johnsonandweaver.com

*Attorneys for Plaintiff*

# **VERIFICATION**

I, Jean Vinyard, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: February 23, 2017

DocuSigned by:

7E0DDC109184423...

(Signature of Jean Vinyard)