**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE SOUTHERN COMPANY SHAREHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>    ALL ACTIONS. | Lead Case No.: 1:17-cv-00725-MHC (Consolidated with No.: 1:17-cv-01983-MHC)<br><br>(Derivative Action)<br><br>Judge Mark H. Cohen |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................1

II.   THE ALLEGATIONS, PROCEDURAL HISTORY, SETTLEMENT NEGOTIATIONS, AND SETTLEMENT CONSIDERATION ...................5

III.  STANDARDS GOVERNING FINAL APPROVAL ....................................7

IV.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE..........9

    A.  The Settlement Merits a Strong Presumption that it is Fair, Reasonable, and Adequate.......................................................................9

    B.  Plaintiffs' Counsel's Settlement Recommendation is Well-Informed ...13

    C.  Weighed Against yhe Possible Range of Recovery, the Substantial Benefits of the Settlement Merit Final Approval....................................15

    D.  The Substantial Costs, Delays, and Risks of Further Litigation Support Settlement Approval..............................................................................26

    E.  The Reaction of Current Southern Stockholders Supports Approval.....30

V.   THE FEDERAL FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE.............................................................................................31

    A. The Federal Parties' Agreement Merits Substantial Deference..............31

    B. The *Johnson* Factors Support the Fee Agreement ...................................34

       1.  The Results Obtained and Fee Awards in Comparable Cases............35

2.  The Novelty and Difficulty of the Questions Involved.......................38

3.  The Skill, Experience, and Reputation of Counsel ...........................39

4.  The Contingent Nature of the Fee .......................................................40

5.  The Preclusion of Other Employment Due to the Acceptance of the Case .....................................................................................................41

6.  The Time and Labor Required to Secure the Result ...........................41

VI.  THE FEDERAL PLAINTIFFS' SERVICE AWARDS SHOULD BE APPROVED .................................................................................................42

VII.  CONCLUSION...............................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) ...................................................................27

*Behrens v. Wometco Enters., Inc.*,
   118 F.R.D. 534 (S.D. Fla. 1988)
   *aff'd*, 899 F.2d 21 (11th Cir. 1990) .....................................................40

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ..................................................... passim

*Brooks v. Am. Exp. Indus., Inc.*,
   1977 U.S. Dist. LEXIS 17313 (S.D.N.Y. Feb. 17, 1977)...................12

*Camden I Condominium Association, Inc. v. Dunkle*,
   946 F.2d 768 (11th Cir. 1991) .............................................................42

*Cohn v. Nelson*,
   375 F. Supp. 2d 844 (E.D. Mo. 2005) ..................................... 18, 19, 31

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) ....................................................... 8, 13

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001)...................................................................11

*Farrar v. Hobby*,
   506 U.S. 103 (1992).............................................................................35

*Fla. Trailer & Equip. Co. v. Deal*,
   284 F.2d 567 (5th Cir. 1960) ...............................................................29

*Francisco v. Numismatic Guar. Corp.*,
   No. 06-61677-CIV,
   2008 WL 649124 (S.D. Fla. Jan. 31, 2008).........................................13

*Garst v. Franklin Life Ins. Co.*,
   1999 U.S. Dist. LEXIS 22666 (N.D. Ala. June 25, 1999)....................................15

*George v. Acad. Mortg. Corp. (UT)*,
   369 F. Supp. 3d 1356 (N.D. Ga. 2019) ..................................................... 8, 11, 16

*Gregg v. U.S. Indus., Inc.*,
   887 F.2d 1462 (11th Cir. 1989) ..........................................................................29

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)............................................................................................31

*Hugo ex rel. BankAtlantic Bancorp. v. Levan*,
   No. 08-61018-CIV,
   2011 WL 13173025 (S.D. Fla. July 12, 2011)................................................ 9, 29

*In re AOL Time Warner S'holder Derivative Litig.*,
   No. 02 Civ 6302(CM),
   2010 WL 363113 (S.D.N.Y. Feb. 1, 2010)..........................................................33

*In re AOL Time Warner S'holder Derivative Litig.*,
   No. 02 Civ 6302(SWK),
   2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)........................................................18

*In re Caremark Int'l Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996)...................................................................... 26, 38

*In re Catfish Antitrust Litig.*,
   939 F. Supp. 493 (N.D. Miss. 1996)....................................................................34

*In re Chicken Antitrust Litig.*,
   560 F. Supp. 957 (N.D. Ga. 1980) ........................................................................9

*In re Cont'l Ill. Sec. Litig.*,
   962 F.2d 566 (7th Cir. 1992) ...............................................................................33

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981) ........................................................................ 13, 16

*In re Corrugated Container Antitrust Litig.*,
   659 F.2d 1322 (5th Cir. 1981) ............................................................................16

*In re Domestic Air Transp. Antitrust Litig.*,
   148 F.R.D. 297 (N.D. Ga. 1993) .......................................................................10

*In Re Equifax, Inc. Derivative Litigation*,
   No. 1:18-CV-00317-TWT,
   2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ....................................................42

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995)..................................................................................9

*In re Infinity Broad. Corp. S'holder Litig.*,
   802 A.2d 285 (Del. 2002) ..................................................................................19

*In re King Res. Co. Sec. Litig.*,
    420 F. Supp. 610 (D. Colo. 1976)......................................................................40

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) .............................................................................13

*In re Motorsports Merch. Antitrust Litig.*,
   112 F. Supp. 2d 1329 (N.D. Ga. 2000)................................................................7

*In re NeuStar, Inc. Sec. Litig.*,
   No. 1:14cv885 (JCC/TRJ),
   2015 WL 8484438 (E.D. Va. Dec. 8, 2015) ........................................................9

*In re NVIDIA Corp. Derivative Litig.*,
   2009 U.S. Dist. LEXIS 24973 (N.D. Cal. Mar. 18, 2009)..................................18

*In re Pac. Enters. Sec. Lit.*,
   47 F.3d 373 (9th Cir. 1995) ...............................................................................26

*In re Pfizer Inc. S'holder Derivative Litig.*,
   780 F. Supp. 2d 336 (S.D.N.Y. 2011) ...............................................................19

*In re Presidential Life Sec.*,
   857 F. Supp. 331 (S.D.N.Y. 1994) .....................................................................44

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
   No. 01–1412,
   2008 WL 185809 (D.N.J. Jan. 14, 2008)............................................................36

*In re Smith,*
   926 F.2d 1027 (11th Cir. 1991) ..........................................................10

*In re Sunbeam Sec. Litig.,*
   176 F. Supp. 2d 1323 (S.D. Fla. 2001) ...............................................40

*In re The Home Depot, Inc. S'holder Derivative Litig.,*
   223 F. Supp. 3d 1317 (N.D. Ga. 2016)......................................... 26, 38

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.,*
   364 F. Supp. 2d 980 (D. Minn. 2005)...................................................44

*Ingram v. The Coca-Cola Co.,*
   200 F.R.D. 685 (N.D. Ga. 2001)................................................... 31, 42

*Johansen v. Combustion Eng'g, Inc.,*
   170 F.3d 1320, 1326 (11th Cir. 1999) .................................................29

*Johnson v. Ga. Highway Express, Inc.,*
   488 F.2d 714 (5th Cir. 1974),
   *abrogated on other grounds by Blanchard v. Bergeron,*
   489 U.S. 87 (1989) ................................................................... 34, 40

*Johnson v. NPAS Solutions, LLC,*
   975 F.3d 1244 (11th Cir. 2020) ..........................................................44

*Klein v. City of Laguna Beach,*
   810 F.3d 693 (9th Cir. 2016) ...............................................................35

*Lake v. First Nationwide Bank,*
   900 F. Supp. 726 (E.D. Pa. 1995) .........................................................9

*Leverso v. SouthTrust Bank,*
   18 F.3d 1527(11th Cir. 1994) ...............................................................8

*Lewis v. Anderson,*
   692 F.2d 1267 (9th Cir. 1982) .............................................................18

*Lunsford v. Woodforest Nat'l Bank,*
   No. 1:12-cv-103-CAP,
   2014 WL 12740375 (N.D. Ga. May 19, 2014)................... 8, 12, 16, 29

*Maher v. Zapata Corp.*,
714 F.2d 436 (5th Cir. 1983) ....................................................... passim

*Malpiede v. Townson*,
780 A.2d 1075 (Del. 2001) ....................................................................28

*Mashburn v. Nat'l Healthcare, Inc.*,
684 F. Supp. 679 (M.D. Ala. 1988) .......................................................42

*Mills v. Elec. Auto- Lite Co.*,
396 U.S. 375 (1970).................................................................... 18, 35

*Milstein v. Werner*,
58 F.R.D. 544 (S.D.N.Y. 1973) ..............................................................40

*Officers for Justice v. Civil Ser. Comm'n of City and Cty. of S.F.*,
688 F.2d 615 (9th Cir. 1982) ................................................................31

*Pinto v. Princess Cruise Lines, Ltd.*,
513 F. Supp. 2d 1334 (S.D. Fla. 2007) ..................................................42

*Rankin v. Rots*,
No. 02-CV-71045,
2006 WL 1876538 (E.D. Mich. June 27, 2006) .......................... 12, 16

*Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*,
119 A.3d 44 (Del. Ch. 2015)..................................................................27

*U.S. v. Tex. Educ. Agency*,
679 F.2d 1104 (5th Cir. 1982) ................................................................9

*Unite Nat'l Ret. Fund v. Watts*,
No. 04CV3603DMC,
2005 WL 2877899 (D.N.J. Oct. 28, 2005) ...........................................19

*Wal-Mart Stores Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005).....................................................................9

*Wood v. Baum*,
953 A.2d 136 (Del. 2008) .....................................................................27

*Zimmerman v. Bell,*
  800 F.2d 386 (4th Cir. 1986) ...................................................................7

**STATUTES, RULES AND OTHER AUTHORITIES**

8 Del. Code § 102(b)(7) ............................................................................28

Federal Rule of Civil Procedure 12(b)(6) ......................................... 27, 28

Federal Rule of Civil Procedure 23.1 ....................................................27

Pursuant to Rule 23.1(c) ("Rule 23.1") of the Federal Rules of Civil Procedure, plaintiffs Judy Mesirov and Jean Vinyard ("Federal Plaintiffs") respectfully submit this memorandum in support of their Motion for Final Approval of Derivative Settlement[1] ("Motion") of the above-captioned shareholder derivative action ("Federal Derivative Action") brought on behalf of nominal defendant The Southern Company ("Southern" or "the Company"), on the terms set forth in the Amended Stipulation.

## I.    INTRODUCTION

Federal Plaintiffs are pleased to present for final approval the Settlement of derivative claims asserted on behalf of nominal defendant Southern arising out of the Company's failed attempt to build a commercial-scale integrated gasification

---

[1] Capitalized terms are defined in the Amended Stipulation and Agreement of Settlement dated March 10, 2022 ("Amended Stipulation" or "Am. Stip.") (ECF No. 99-1), or in the Declaration of Michael I. Fistel, Jr. in Support of Plaintiffs' Motion for Final Approval of Derivative Settlement ("Fistel Decl."), filed concurrently herewith. Citations are omitted and emphasis is added, unless otherwise indicated.

  Defendants do not oppose the relief requested by the Motion; however, Defendants do not endorse or adopt the characterization of the allegations or characterization of the implications and effects of the Settlement and the Reforms set forth herein or in the Fistel Decl., or in the Declaration of Lawrence A. Hamermesh ("Hamermesh Decl.") (Fistel Decl., Ex. 1) or the Declaration of Gaurav Jetley ("Jetley Decl.") (Fistel Decl., Ex. 2), and, as set forth in the Amended Stipulation, Defendants deny any and all allegations of fault, wrongdoing, liability, or damages whatsoever. Am. Stip. § III.

combined cycle ("IGCC") coal-fired power plant in Kemper County, Mississippi ("Kemper Project" or "Project").  If approved, the Settlement would resolve claims that the Individual Defendants, current and former directors and officers of Southern, breached fiduciary duties of loyalty and care and wasted corporate assets by failing to impose reasonable design, engineering, and planning discipline at the Project's inception; allowing Southern to commit to unreasonable cost and schedule targets to secure tax credits and other funding without establishing effective procedures and controls for vetting estimates, monitoring actual costs and progress, and ensuring that initial and revised estimates were grounded in fact; and pouring billions of dollars into the Project long after it had become clear that the IGCC could not be completed and operated cost-effectively.[2]

The Settlement commits Southern's Board to adopt and maintain for a period of not less than five (5) years a package of corporate governance, oversight, and internal controls reforms designed to address the alleged lapses in Board- and management-level supervision of Large Capital Projects ("LCPs") that Plaintiffs contend contributed to the Project's failure and caused Southern's losses.  *See* Am.

---

[2] The Settlement would also resolve a related derivative action pending in Georgia state court captioned, *Helen E. Piper Survivor's Trust, derivatively on behalf of The Southern Company v. Thomas A. Fanning et al.,* No. 17-A-04758-10, Superior Court of Gwinnett County, State of Georgia ("State Derivative Action").

Stip., Ex. A.  (the "Reforms").   As explained herein and in the accompanying declarations of Professor Lawrence A. Hamermesh[3] and Gaurav Jetley,[4] the Reforms will significantly reduce the probability and magnitude of losses in connection with LCPs going forward and lay the foundation necessary to restore confidence in Southern's ability to select, plan, and construct LCPs cost-effectively, and in the integrity of its financial and risk disclosures.  In sum, it is reasonable to assume that "the Reforms have the potential to contribute hundreds of millions of dollars in value to Southern over time."  Jetley Decl., ¶ 43.  Weighed against the significant risks, uncertainties, and delays that would be entailed in any attempt to improve upon the Settlement benefit through further litigation, the Settlement is substantively fair, reasonable, and adequate, and merits final approval.

Southern's Board unanimously approved a resolution reflecting its informed and good faith determination that: (i) the Reforms adopted, implemented, and/or maintained pursuant to the Settlement confer substantial corporate benefits on the Company and its stockholders; (ii) Plaintiffs' litigation and settlement efforts caused

---

[3] Professor Hamermesh is Professor Emeritus at Widener University Delaware Law School and Executive Director of the Institute for Law and Economics at the University of Pennsylvania Carey Law School.  *See* Fistel Decl., Ex. 1, ¶ 3.

[4] Mr. Jetley is Managing Principal at Analysis Group, one of the largest economic consulting firms in North America, *See* Fistel Decl., Ex. 2, ¶ 4.

the adoption, implementation, and/or maintenance of the Reforms for the Commitment Period; and (iii) the Settlement is fair, reasonable, and adequate, and serves the best interests of the Company and its stockholders. *See* Am. Stip., § IV.

The Settlement was achieved through a fair process and warrants the substantial deference courts afford compromises negotiated by experienced and well-informed counsel. The Settlement is the result of more than a year of vigorous, arm's-length negotiations among the Settling Parties, assisted by experienced neutral, David Murphy, Esq., of ADR Enterprises (the "Mediator" or "Mr. Murphy"). *See* Am. Stip., § I(C); Fistel Decl., Ex. 3 (Declaration of David Murphy, Esq. ("Murphy Decl.")). It is an outstanding result for Southern and its stockholders that will contribute real and substantial economic value to Southern's business.

In consideration for the substantial benefits conferred upon Southern and its stockholders through the Settlement, Southern shall cause its insurer(s) to pay to Federal Derivative Action Plaintiffs' Counsel attorneys' fees and expenses in the amount of $3.5 million, subject to Court approval.[5] The Federal Fee and Expense Amount was proposed by the Mediator and accepted by the Federal Parties following separate, arm's-length fee negotiations conducted after the execution of a Term

---

[5] Application for approval of the State Fee and Expense Amount shall be made in the State Court. *See* Am. Stip., § V(4.4).

Sheet reflecting the material substantive terms of the Settlement.  The agreed amount is a small fraction of the probable economic value of the Settlement benefit.[6]  Federal Plaintiffs also seek approval of nominal reasonable service awards of $3,000.00 each, to be paid from the Federal Fee and Expense Amount, in consideration for their essential contributions in commencing and overseeing the Federal Derivative Actions.

Consistent with the requirements of Rule 23.1 and due process standards, and in accordance with the process approved by the Court (ECF. No. 100, ¶ 2), Southern disseminated Notice of the Settlement to Current Southern Stockholders.  ECF. No. 103.  To date, no objections have been received.  *See* Fistel Decl., ¶ 12.

Accordingly, Federal Plaintiffs respectfully submit that the Settlement should be approved and ask that the Court enter the proposed Judgment.

## II. THE ALLEGATIONS, PROCEDURAL HISTORY, SETTLEMENT NEGOTIATIONS, AND SETTLEMENT CONSIDERATION

A detailed summary of the allegations and procedural history of the Derivative Actions, Plaintiffs' Counsel's investigation and litigation efforts, the settlement

---

[6] *See* Jetley Decl., ¶ 43 ("I can confidently say that [the Reforms'] value almost certainly exceeds by orders of magnitude the $4.5 million in total attorneys' fees and expenses sought by Federal and State Plaintiffs' Counsel in the related Federal and State Derivative Actions.").

negotiations, and the Settlement consideration is set forth in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative Settlement ("Preliminary Approval Memorandum") (ECF No. 97-1), Amended Stipulation (ECF No. 99-1), and the Fistel Decl., filed concurrently herewith.   To avoid repeating matters already presented, Federal Plaintiffs incorporate those filings by reference and respectfully refer the Court to them for a more thorough description of: (i) the factual background and summary of the allegations (Preliminary Approval Memorandum, pp. 4–13; Am. Stip., § I; Fistel Decl., ¶¶ 13–31); (ii) the procedural history of the Derivative Actions (Preliminary Approval Memorandum, pp. 13–18; Am. Stip., § I(A), (B); Fistel Decl., ¶¶ 32–41); (iii) Plaintiffs' Counsel's investigation and litigation efforts (Preliminary Approval Memorandum, pp. 13–18; Am. Stip., § I(A), (B), § II; Fistel Decl., ¶¶ 42–44); (iv) the Settling Parties' settlement negotiations (Preliminary Approval Memorandum, pp. 18–22; Am. Stip., § I(C); Fistel Decl., ¶¶ 45–54); and (v) the substantive consideration for the Settlement (Preliminary Approval Memorandum, pp. 22–32; Am. Stip., § V(2) and Ex. A; Fistel Decl., ¶¶ 57–80).

In addition, Professor Hamermesh's declaration provides a detailed discussion of how and why the Reforms will substantially reduce the probability and magnitude of loss in connection with pending and future LCPs and related enterprise risks

arising from LCP planning, funding, execution, and related public disclosures.  *See*
Fistel Decl., Ex. 2.  Jetley's declaration explains the Reforms' probable range of
economic value to Southern and its stockholders.  *See id*., Ex. 2.

## III.    STANDARDS GOVERNING FINAL APPROVAL

The Court's evaluation of the Settlement should be guided by the "strong
judicial policy favoring settlement[,] as well as by the realization that compromise
is the essence of settlement."  *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th
Cir. 1984); *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333
(N.D. Ga. 2000) (same).   "Settlements of shareholder derivative actions are
particularly favored because such litigation is 'notoriously difficult and
unpredictable[,]'" *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983), and
because they permit "management [to] return its attention and energy from the
courtroom to the corporation itself."  *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir.
1986).

In preliminarily approving the Settlement, the Court found that "there is cause
to believe that: (i) the Settlement is fair, reasonable, and adequate, and within the
range of possible approval, as it provides a beneficial result for Southern and Current
Southern Stockholders," that "(ii) the Settlement has been negotiated in good faith
at arms-length between experienced attorneys for the Settling Parties familiar with

the legal and factual issues of the Derivative Actions," and in approving to proposed form and manner of notice that "(iii) with respect to the forms of notice of the material terms of the Settlement to Current Southern Stockholders for their consideration and reaction, that notice is appropriate and warranted."  ECF No. 100 at 3. The Notice was disseminated as required (ECF. No. 103) and, to date, no shareholders have objected to the Settlement.  Fistel Decl., ¶ 12.

The question on final approval is "whether [the Settlement] is 'fair, adequate, reasonable, and not the product of collusion.'"  *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1369 (N.D. Ga. 2019) (citing, *inter alia*, *Leverso v. SouthTrust Bank*, 18 F.3d 1527, 1530 (11th Cir. 1994)); *see also Bennett*, 737 F.2d at 986; *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).  Relevant factors include:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986; *Lunsford v. Woodforest Nat'l Bank*, No. 1:12-cv-103-CAP, 2014 WL 12740375, at *6–*7 (N.D. Ga. May 19, 2014) (citing *Leverso*, 18 F.3d at 1530 n.6).

## IV.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.   The Settlement Merits a Strong Presumption that it Is Fair, Reasonable, and Adequate

"Determining the fairness of the settlement is left to the sound discretion of the trial court[.]" *Bennett*, 737 F.2d at 986.  In exercising this discretion, courts need not "reach[] ultimate conclusions on the issues underlying the dispute or substituting its business judgment for that of the parties."  *In re Chicken Antitrust Litig.*, 560 F. Supp. 957, 960 (N.D. Ga. 1980).   A proposed settlement "enjoys a strong presumption that it is fair, reasonable, and adequate" where it "is the product of extensive, arm's-length negotiations conducted by capable counsel who are well-experienced in class and derivative actions."  *Hugo ex rel. BankAtlantic Bancorp. v. Levan*, No. 08-61018-CIV, 2011 WL 13173025, at *5 (S.D. Fla. July 12, 2011); *see also Wal-Mart Stores Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (same); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) (same); *U.S. v. Tex. Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982) (same).

The presumption is strengthened where plaintiffs' counsel are '"nationally recognized members of the securities litigation bar[.]"'  *In re NeuStar, Inc. Sec. Litig.*, No. 1:14cv885 (JCC/TRJ), 2015 WL 8484438, at *4 (E.D. Va. Dec. 8, 2015); *see also Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995)

("Significant weight should be attributed 'to the belief of experienced counsel that settlement is in the best interest of the class.'").  "'[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel[.]'"  *In re Domestic Air Transp. Antitrust Litig*., 148 F.R.D. 297, 312–13 (N.D. Ga. 1993) (following *Bennett*, 737 F.2d at 986); *see also In re Smith*, 926 F.2d 1027, 1028 (11th Cir. 1991) ("trial judge ought not try the case during a settlement hearing and should be hesitant to substitute his or her own judgment for that of counsel").

As Mr. Murphy confirms, the Settlement is the product of hard fought, arm's-length negotiations by prepared, skilled, and experienced counsel conducted over the course of months through in-person, telephonic and written exchanges.  There was no collusion.  Murphy Decl., ¶¶ 4–16, 18, 20–21; *see also* Am. Stip., § I(C); Fistel Decl., ¶¶ 12, 45–54, 81, 86, 89.  Federal Derivative Action Plaintiffs' Counsel include nationally recognized leaders in shareholder litigation,[7] and, as discussed in Section IV.B., below, their recommendation and the Federal Plaintiff's decision to settle on the terms set forth in the Stipulation was well-informed.  *See also* Fistel

---

[7] *See* Fistel Decl., Exs. 6 (Johnson Fistel, LLP firm résumé) and 7 at Ex. A (Robbins, LLP firm résumé).

Decl., ¶¶ 36, 42-44, 46; Exs. 4 (Declaration of Jean Vinyard ("Vinyard Decl."), ¶ 6) and 5 (Declaration of Judy Mesirov ("Mesirov Decl."), ¶ 6).

Mr. Murphy's integral role in guiding the Federal Parties' negotiations strengthens the presumption of fairness. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("mediator's involvement … helps to ensure that the proceedings were free of collusion"); *George*, 369 F. Supp. 3d at 1370 ("mediation with an experienced mediator … further confirms that the process was procedurally sound and not collusive"). During the course of the negotiations, which continued for more than a year, the Settling Parties exchanged substantial confidential information regarding the merits, damages, insurance, and the Company's corporate governance and internal controls, in addition to numerous drafts of the Term Sheet and settlement-related documents detailing the key settlement terms. The Federal Parties' respective views regarding the strengths and weaknesses of the claims and defenses; the probable costs, risks, and duration of continued litigation; and the alleged governance and oversight weaknesses Federal Plaintiffs contend led to Southern's alleged losses were thoroughly rehearsed and tested in extensive written and verbal exchanges. Murphy Decl., ¶¶ 4–13, 18, 20–21; *see also* Am. Stip., § I(C); Fistel Decl., ¶¶ 45–52. There can be no doubt that the decision to settle was well-informed and diligently evaluated.

Moreover, Southern's Board, including by unanimous vote of its non-defendant members, approved a resolution reflecting its informed and good faith determination that: (i) the Reforms adopted, implemented, and/or maintained pursuant to the Settlement confer substantial corporate benefits on the Company and its stockholders; (ii) Plaintiffs' litigation and settlement efforts caused the adoption, implementation, and/or maintenance of the Reforms for the Commitment Period; and (iii) the Settlement is fair, reasonable, and adequate, and serves the best interests of the Company and its stockholders.  Am. Stip., § IV.  The directors' exercise of business judgment with respect to the Settlement warrants substantial judicial deference.  *See Lunsford*, 2014 WL 12740375, at *4 ("Court 'will not substitute its business judgment for that of the parties'" regarding settlement) (citing *Rankin v. Rots*, No. 02-CV-71045, 2006 WL 1876538, at *3 (E.D. Mich. June 27, 2006)); *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1386 (Del. 1995) ("courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness"); *Brooks v. Am. Exp. Indus., Inc.*, 1977 U.S. Dist. LEXIS 17313, at *10 (S.D.N.Y. Feb. 17, 1977) (board's approval of settlement "is a business judgement with presumptive validity").

- 12 -

### B.   Plaintiffs' Counsel's Settlement Recommendation Is Well-Informed

The sixth *Bennett* factor regarding the "stage of proceedings" focuses on whether "[c]ounsel had sufficient information to adequately evaluate the merits of the case and weigh the benefits against further litigation," not whether there has been formal discovery. *Francisco v. Numismatic Guar. Corp.*, No. 06-61677-CIV, 2008 WL 649124, at *11 (S.D. Fla. Jan. 31, 2008). "[F]ormal discovery [is not] a necessary ticket to the bargaining table" where information has been gathered through other means. *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981); *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (same); *Cotton*, 559 F.2d at 1332 (finding that "very little formal discovery was conducted and there is no voluminous record in this case . . . does not compel the conclusion that insufficient discovery was conducted," as plaintiffs "achieved the desired quantum of information necessary to achieve a settlement" through investigation and informal discovery).

As noted, Federal Derivative Action Plaintiffs' Counsel's decision to settle was exceedingly well-informed by their intensive review and evaluation of the entire record of discovery generated in the Securities Action, the detailed record developed in nearly a decade of public PSC proceedings, whistleblower litigation, the *New York Times*' thorough investigative reporting, which was based on dozens of witness

interviews, as well as additional materials gathered during the course of Federal Derivative Action Plaintiffs' Counsel's ongoing investigation prior to and throughout the pendency of the Federal Derivative Action. *See* Fistel Decl., ¶¶ 36, 42–44, 46, 87–90. Federal Derivative Action Plaintiffs' Counsel's understanding of those materials and the relative strengths and weaknesses of their claims was further honed over the course of more than a year of mediation exchanges of briefs, documents, argument, and remedial analysis conducted with the assistance of Professor Hamermesh. *See* Fistel Decl., ¶ 88; Hamermesh Decl., ¶ 13. The theories of liability and available defenses were thoroughly evaluated during the extensive settlement negotiations between the Settling Parties, which continued for more than a year. *See* Fistel Decl., ¶ 89; Murphy Decl., ¶¶ 4–13.

As a result, Plaintiffs' Counsel had a strong understanding of the potential risks and rewards of pursuing further litigation; how Southern's and its stockholders' interests would be impacted across the broad range of possible litigation scenarios and outcomes; and the remedial measures that would be necessary to ensure the Company would not suffer the consequences of similar wrongdoing in the future, and to restore its credibility in the capital markets. *See* Fistel Decl., ¶ 90. Plaintiffs' Counsel's determination that the substantial benefits guaranteed by the Settlement far outweigh the value of any probable risk-adjusted monetary recovery that might

be secured through further litigation is thoroughly informed by their comprehensive review of the facts, circumstances, and law, as well as their decades of experience litigating and settling dozens of derivative actions of similar magnitude and complexity. *Id*. The evaluations of the Reforms by Professor Hamermesh and Mr. Jetley confirm Plaintiffs' Counsel's determination. *See* Hamermesh Decl., ¶ 2 ("Faithfully adopted and implemented, the Reforms should materially reduce the probability and magnitude of similar losses in connection with pending and future LCPs through improved information flows, more rigorous oversight, and better decision-making and disclosure processes."); Jetley Decl., ¶ 43 ("In [Jetley's] opinion, the Reforms have the potential to contribute hundreds of millions of dollars in value to Southern over time.").

Accordingly, this factor strongly supports final approval of the Settlement.

### C. Weighed Against the Possible Range of Recovery, the Substantial Benefits of the Settlement Merit Final Approval

"The second and third factors in the Eleventh Circuit's *Bennett* analysis call for the Court to determine the 'possible range of recovery' and then ascertain where within that range 'fair, adequate, and reasonable settlements lie.'" *Garst v. Franklin Life Ins. Co.*, 1999 U.S. Dist. LEXIS 22666, at *64 (N.D. Ala. June 25, 1999).

Determining the possible range of recovery involves weighing the benefits the Settlement guarantees against the range of possible recovery through further

litigation, discounted by the probability of success on the merits and the complexity, expense, and likely duration of the litigation. The reasonableness determination does not require "establishing success or failure to a certainty." *Corrugated Container*, 643 F.2d at 212. Reasonable estimates establishing "an arbitrary point between competing notions of reasonableness" can yield a "just result[.]" *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1325 (5th Cir. 1981). This factor does not require the Court to "'determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial.'" *George*, 369 F. Supp. 3d at 1369. "'[T]he only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'" *Lunsford*, 2014 WL 12740375, at *4 (citing *Rankin*, 2006 WL 1876538, at *3). The Settlement easily clears this hurdle.

The Settlement guarantees Southern and its stockholders the benefits of a comprehensive package of corporate governance, oversight, and internal controls reforms designed to address the alleged lapses in Board- and management-level supervision of LCPs and that will substantially reduce the likelihood that the Company will suffer from similar such lapses in the future. The Settlement also lays the foundation necessary for restoring Southern's credibility with the public utilities

commissions charged with setting the terms and conditions for project approval and approving the rate increases necessary to fund them, and with the investors and creditors who determine Southern's cost of capital and debt.  In their respective evaluations of the Reforms, both Professor Hamermesh and Mr. Jetley confirm Federal Derivative Action Plaintiffs' Counsel's judgment with respect to their substantial benefit and probable range of economic value.  *See, e.g.,* Hamermesh Decl., ¶ 2 ("the Reforms should materially reduce the probability and magnitude of similar losses in connection with pending and future LCPs."); Jetley Decl., ¶ 42 (stating "I expect that the mechanism via which improved governance results in materially higher valuations will hold true for Southern, and that the benefits of strengthened governance, oversight and disclosures in connection with LCPs will produce better outcomes, in the form of lower risk and higher valuation."); *see also* Fistel Decl. ¶¶ 57–80; Preliminary Approval Memorandum, pp. 22–32 (describing value of each major Reform element).  In sum, the economic value of these benefits is real and substantial, and likely exceeds the probable range of recovery at trial, especially when appropriately discounted for probable costs and delay, as well as the very real risk of no recovery.

Courts widely recognize that "a corporation may receive a 'substantial benefit' from a derivative suit . . . regardless of whether the benefit is pecuniary in

nature." *Mills v. Elec. Auto- Lite Co.*, 396 U.S. 375, 395 (1970); *see In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302(SWK), 2006 WL 2572114, at *4 (S.D.N.Y. Sept. 6, 2006) (non-monetary benefits can be "substantial enough to merit [settlement] approval"); *Lewis v. Anderson*, 692 F.2d 1267, 1271 (9th Cir. 1982) (same).  "Strong corporate governance is fundamental to the economic well-being and success of a corporation[,]" and governance reforms designed to prevent recurrence of alleged wrongdoing "provide valuable benefits to public companies[.]" *In re NVIDIA Corp. Derivative Litig.*, 2009 U.S. Dist. LEXIS 24973, at *11–*12 (N.D. Cal. Mar. 18, 2009).  Where, as here, the alleged wrongdoing caused substantial damage and reputational injury, the long-term economic value of effective non-monetary remediation can far outweigh any likely monetary recovery. *See Maher*, 714 F.2d at 461 ("effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor"); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005) (corporate governance reforms "achieved independently of any monetary benefits . . . are even more worthwhile").

Settlements supported by reforms "specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws" are generally approved because they make it "far less likely [that the corporation will] become

subject to long and costly securities litigation [or to] . . . prosecution or investigation by regulators and prosecutors[,]" and position the corporation to regain credibility in the capital markets following high profile misconduct.  *Id*. at 853–55; *see also In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving derivative settlement predicated on "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company"); *Unite Nat'l Ret. Fund v. Watts*, No. 04CV3603DMC, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005) (corporate governance benefits designed "to prevent future harm" support settlement); *In re Infinity Broad. Corp. S'holder Litig.*, 802 A.2d 285, 289–90 (Del. 2002) (settlement's future impact properly considered in evaluating fairness and adequacy).

Based on his substantial professional experience and review of the relevant academic and business literature, Professor Hamermesh confirms the premise of this jurisprudence:  "[F]inance literature supports the conclusion that strengthening corporate governance in ways that promote and facilitate oversight of senior management by directors, board committees, institutional investors, and other independent participants also enhances corporate performance, investor confidence, and, therefore, the value of the corporation and its stock.  "Simply put, that finance

literature indicates that strong corporate governance improves decision-making and correlates positively with significantly better risk-adjusted returns – advantages investors are willing to seek out and pay a premium for." Hamermesh Decl., ¶ 17. "The strong correlation observed in [those] studies and surveys between positive shareholder value and corporate governance and oversight regimes that ensure active, rigorous, and well-informed oversight of senior management, core operations, enterprise risks, and financial disclosures by an independent board comports with [his] own observations as a legal practitioner, law professor and advisor to corporations and litigants." *Id*., ¶¶ 17–18.

Professor Hamermesh then turns to the "character and likely impact" of the "Key Reforms," and finds that the Reforms effectively "address the Company's handling of [LCPs]" and "establish significant checks against misconduct or neglect in the management of the Company's affairs, and promote transparency in regard to such affairs." Hamermesh Decl., ¶¶ 19–20 (assessing impact of 11 of the Reforms found "particularly significant"). Four points bear emphasis.

First, Professor Hamermesh finds that "[t]he formal and public binding commitment to the Reforms . . . will establish standards of behavior and encourage a corporate culture that is likely to deter excessively risky and poorly planned and monitored actions, especially [LCPs], of the sort that led to the losses to the

Company addressed by this litigation.  He concludes that "[s]tandardizing the system of tracking costs of [LCPs], and requiring that those costs be closely monitored on an ongoing basis, will expose and discourage excessive risks and implementation failures as they occur, instead of enabling management to ignore or overlook developing risks before they become unmanageable."  Hamermesh Decl., ¶¶ 21.

Second, with respect to disclosure, Professor Hamermesh observes "[a]t critical points in corporate policy making and the process for preparing public disclosures about the Company's operations, the Reforms establish involvement of actors – notably the CAE (who reports to the Audit Committee) – who are independent of senior management and have broad authority to monitor the Company's accounting and reporting practices and thereby limit senior management's ability to cause the Company to take on excessive and/or undisclosed risks."  *Id*.

Third, Professor Hamermesh notes that by "[l]inking executive compensation to interrelated milestones associated with [LCPs], and reinforcing the Company's Clawback Policy, [the Reforms] will enhance incentives for senior management to manage key risks prudently and transparently" and that "[t]he provision in the Reforms that the board and each of its committees is authorized 'to retain the services of advisors and experts deemed necessary or appropriate with respect to

matters within its purview' will help assure that the board of directors and its committees have sufficient resources with which to carry out their oversight functions." *Id*.

Finally, with respect to the Minimum Term, Professor Hamermesh states that "[t]he fact that the Settlement Agreement, if approved, commits the Company to maintain the Reforms for five full years increases the likelihood that the practices embodied in the Reforms will become permanent and will establish an even longer-term commitment to sound corporate governance and disclosure practices." *Id*.

As Professor Hamermesh concludes, "the operational elements of the Reforms that address the specific oversight deficiencies Plaintiffs contend contributed to the [Kemper Project] experience will operate in conjunction with the Reforms' structural elements to enhance the quality of Southern's corporate governance structure, improve decision-making and disclosures with respect to LCPs, and materially reduce the chances of similar alleged oversight lapses in the future," and that "the Reforms [are] likely to restore or at least significantly enhance the confidence of investors and pertinent regulatory authorities in relation to the Company, and thus reduce the Company's cost of capital and improve the prospects for favorable regulatory treatment in ratemaking."  While quantification of the

Reforms' economic value lies beyond his expertise, Professor Hamermesh concludes their value is "likely to be substantial."  Hamermesh Decl., ¶¶ 21–22.

Mr. Jetley builds upon Professor Hamermesh's analysis and addresses the question of their probable range of value, concluding that it will exceed the total fee and expense amounts Southern has agreed to pay Plaintiffs' Counsel in the Federal and State Derivative actions "by orders of magnitude."  Jetley Decl., ¶¶ 3, 8, 43.

Like Professor Hamermesh, Mr. Jetley's opinion is based on his substantial professional experience and comprehensive review of the relevant academic and business literature and surveys, and a firm grip on the facts, circumstances, allegations, and contentions regarding the Kemper Project, derived from case-specific materials reviewed by Mr. Jetley and his team, including relevant SEC filings, public utilities commission records, records in related whistleblower and securities litigation, SEC filings, Plaintiffs' Counsel's confidential analytic work product, and, of course, Professor Hamermesh's Declaration.  Jetley Decl., ¶¶ 4–7, 9, 16, 18, 20–35.

Mr. Jetley finds that, in addition to the Reforms' value in preventing future loss, "the Reforms are designed to incorporate a number of the 'strong governance' value drivers the academic literature documents correlate with improved operational and financial performance, better returns, and long-term value creation.  In this

particular context, I expect that the Reforms should improve Southern's decision-making and management in connection with LCPs and throughout the enterprise, through improved disclosure, more rigorous oversight processes, and alignment of key incentive structures with corporate goals and interests." *Id.*, ¶ 3.  The Reform's broader palliative effects on Southern's corporate culture, the Board's access to key information, enhanced oversight procedures, and more rigorous engagement, and alignment of executive incentives with LCP performance and long-term shareholder value generation "have the potential to alleviate the agency problem at Southern, particularly with respect to the deployment of capital in connection with LCPs like the Kemper Plant." *Id.*, ¶¶ 36–40.

As Mr. Jetley explains, "[m]ultiple studies have illustrated that disclosure serves as an effective monitoring tool, as increased transparency causes managers to act more in the interests of shareholders" and that "[t]he Reforms are expected to contribute to both internal transparency, through improved auditing, cost tracking and board oversight, and external transparency, through increased disclosure standards."  *Id.*, ¶ 38.  In addition, the Reforms' "align[ment of] executive compensation with the timely progress and completion of large capital projects" through the addition of "objective measures, including: (i) deadline milestones; (ii) budget milestones; (iii) operational milestones; (iv) regulatory milestones; and (v)

safety milestones during the relevant time period" to executives' performance pay goals, provides Southern's executives "stronger incentives to carefully evaluate future LCPs before taking them on and to closely monitor and evaluate budget and schedule estimates, and accurately report on progress to ensure the successful implementation of these projects." *Id.*, ¶ 39.

Mr. Jetley concludes that "the Reforms are designed to make significant governance and oversight improvements overall, and in specific areas, including disclosure standards, audit processes, management and board oversight practices, and executive compensation, that the academic literature confirms correlate with higher firm value[,]" and that he "expect[s] that the mechanism via which improved governance results in materially higher valuations will hold true for Southern," producing "better outcomes, in the form of lower risk and higher valuation." *Id.*, ¶¶ 41–42.  In sum, Mr. Jetley confirms that "the Reforms will contribute substantial economic value to Southern and its stockholders" (*id.*, ¶ 3) and that "the Reforms have the potential to contribute hundreds of millions of dollars in value to Southern over time." *Id.*, ¶ 43.

Weighed against the substantial benefits guaranteed by the Settlement, the probability that Plaintiffs would secure a net monetary recovery ranging into the hundreds of millions of dollars is vanishingly low.  *See* Section IV.D., *infra*.

**D.   The Substantial Costs, Delays, and Risks of Further Litigation Support Settlement Approval**

The first and fourth *Bennett* factors concerning the expected complexity, expense, and duration of further litigation and the likelihood of success at trial weigh heavily in favor of final approval.   Courts universally recognize that shareholder derivative litigation is "notoriously difficult and unpredictable."   *Maher*, 714 F.2d at 455.   Simply put, "the odds of winning [a] derivative lawsuit [are] extremely small[.]"   *In re Pac. Enters. Sec. Lit.*, 47 F.3d 373, 378 (9th Cir. 1995).   Moreover, the breach of the duty of oversight claim at the heart of the Derivative Actions is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."   *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996); *see In re The Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d 1317, 1325 (N.D. Ga. 2016) ("where the [p]laintiffs allege a failure of oversight on the part of the [b]oard, the [p]laintiffs must show that the [d]irectors either *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act.").   Federal Plaintiffs' decision to lock in the Settlement's guarantee that the Reforms will be implemented and maintained for at least half a decade, rather than to sacrifice that benefit in order to pursue the remote

possibility that a "home run" monetary recovery might exceed the Reforms' value, is eminently reasonable.

Should the litigation continue, Defendants, led by a preeminent corporate defense firm, can be expected to mount a vigorous defense, aided in every phase of the proceedings by favorable legal standards designed to protect their clients' exercise of business judgment from judicial scrutiny.

The first challenge would involve overcoming pleadings challenges under Federal Rule of Civil Procedure 23.1 for failing to plead with the requisite particularity why making a demand on the Board would have been futile, and under Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. The Individual Defendants would argue that a non-exculpable breach of fiduciary duty cannot be stated and that their decisions are presumptively protected business judgments. *See Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 62–63 (Del. Ch. 2015) ("Where, as here, the corporation's charter includes an exculpatory provision pursuant to 8 Del. C. § 102(b)(7), a substantial likelihood of liability 'may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts.") (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (business judgment rule "is a presumption that in making a business

decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."); 8 Del. Code § 102(b)(7); Fistel Decl., ¶ 108.

Even if Federal Plaintiffs were to defeat motions to dismiss, the deferential business judgment and director exculpation statutes would come into play again at summary judgment and trial. *See Malpiede v. Townson*, 780 A.2d 1075, 1092 (Del. 2001) ("The Section 102(b)(7) bar may be raised on a Rule 12(b)(6) motion to dismiss (with or without the filing of an answer), a motion for judgment on the pleadings (after filing an answer), or a motion for summary judgment (or partial summary judgment) under Rule 56 after an answer, with or without supporting affidavits."). Establishing liability with primarily circumstantial evidence would be difficult and uncertain. Pursuing the discovery necessary to defeat summary judgement motions, secure a verdict, and defeat post-trial motions would be a costly years'-long effort. Millions of pages of documents would have to be gathered and reviewed, and deposition of dozens of percipient and expert witnesses would have to be taken. Fistel Decl., ¶ 109.

When and if the case reached trial, witnesses could be unavailable or unable to recall critical information. The trier of fact could react to the evidence in unpredictable and unfavorable ways. And "even if liability were established, the

amount of recoverable damages would [be] uncertain[.]" *Levan*, 2011 WL 13173025, at *6; Fistel Decl., ¶ 109.

Defendants would certainly appeal any verdict in favor of Federal Plaintiffs, introducing further delay and risk that a judgment would be reduced or vacated. *See, e.g.*, *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1326, 1340 (11th Cir. 1999) (affirming reduction of $45 million award to $4.35 million); *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1477 (11th Cir. 1989) (affirming reduction of $18.5 million award to $2 million); Fistel Decl., ¶ 110.

In these circumstances, "it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end." *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960); *see also Maher*, 714 F.2d at 458, 461 (prospects for superior recovery "problematical" and "did not outweigh the costs, both legal and otherwise"); *Lunsford*, 2014 WL 12740375, at *8 ("'[T]he class faced a multitude of potentially serious, substantive defenses, any one of which could have precluded or drastically reduced the prospects of recovery. . . . Given the innumerable risks . . . as well as the certainty of substantial delay and expense from ongoing litigation, the [s]ettlement cannot be seen as anything except a fair compromise."). Put simply, the likelihood of securing a net monetary recovery substantially greater than the

probable range of economic value of the Reforms over time and across dozens of future LCPs is highly unlikely, and the Settlement eliminates all such risks.  Fistel Decl., ¶ 111.

As such, the first and fourth *Bennett* factors concerning the expected complexity, expense, and duration of further litigation and the likelihood of success at trial weigh heavily in favor of final approval.

### E.    The Reaction of Current Southern Stockholders Supports Approval

The Court should also consider the reaction of Current Southern Stockholders to the Settlement.  *Bennett*, 737 F.2d at 986.  Here, Southern disseminated the Summary Notice and Long-Form Notice of the Settlement in accordance with the process approved by the Court and as consistent with the requirements of Rule 23.1 and due process.  *See* ECF Nos. 100, 103.  The Notices informed investors of their rights under the Settlement, including by specifying procedures for raising any objections to the Settlement.  The deadline for submitting objections is May 18, 2022.  To date, no objection to the Settlement has been received.[8]  Fistel Decl., ¶ 112.

---

[8] Any shareholder comments received before the May 18, 2022, deadline passes will be addressed in the reply papers due on May 25, 2022.

## V.   THE FEDERAL FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE

### A.   The Federal Parties' Agreement Merits Substantial Deference

The U.S. Supreme Court has endorsed the consensual resolution of the amount of attorneys' fees to be paid to plaintiffs' counsel in representative litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation.  Ideally … litigants will settle the amount of a fee.").  "[T]he court's intrusion upon what is otherwise a private consensual agreement . . . must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."  *Officers for Justice v. Civil Ser. Comm'n of City and Cty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).  Where there is no evidence of collusion, courts accord substantial deference to fee and expense amounts determined by the parties.  *See Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) (affording "substantial weight to a negotiated fee amount"); *Cohn*, 375 F. Supp. 2d at 861 ("where . . . the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference").

Here, the Court is not called upon to fashion a fee and expense award, but rather to evaluate the reasonableness and fairness of an agreed amount recommended by an experienced mediator following arm's-length negotiations among sophisticated parties represented by competent counsel.  Murphy Decl., ¶¶ 2–3, 17–18, 21; Fistel Decl., ¶¶ 81–84, 86, 126.  Unlike in class actions, where the diverging interests of class counsel and absent class members warrants judicial scrutiny of uncontested fee requests, in the Federal Derivative Action, Southern and its insurers were directly involved, represented by counsel, and had every incentive to negotiate the lowest reasonable fee.  Fistel Decl., ¶¶ 53, 113 and at Ex. 8 (*In re Google Inc. S'holder Derivative Litig.*, No. 4:11-cv-04248-PJH, Transcript of Fairness Hearing (N.D. Cal. Jan. 21, 2015) at 11–12 (in evaluating fee awards negotiated in derivative actions, "the Court's responsibility is a little different than in your typical class action given the determination by the corporate entity that the amount is satisfactory")).

The negotiations were based on an informed analysis of the appropriate fee range in light of the Settlement benefits' value, contingency risk, and fees approved by courts in comparable cases, and were facilitated and supervised by Mr. Murphy, who was familiar with the complexity of the issues, the risks and challenges confronted by Federal Plaintiffs, as well as the magnitude and quality of Federal

- 32 -

Derivative Action Plaintiffs' Counsel's efforts in securing the Settlement benefit. Fistel Decl., ¶ 114; Murphy Decl., ¶¶ 8, 11–13, 15–19, 21.  Following a number of exchanges through Mr. Murphy, the Federal Parties accepted the Mediator's proposal, agreeing on the Federal Fee and Expense Amount of $3.5 million, to be funded by Southern's insurers, as consideration for the substantial benefits conferred upon Southern and its stockholders by Federal Derivative Action Plaintiffs' Counsel through the Settlement, subject to the Court's approval.  Am. Stip., § V(4.1); Fistel Decl., ¶¶ 53, 115; Murphy Decl., ¶¶ 15–16.   Mr. Murphy's role in the negotiations provides further assurances that the process was fair and the amount reasonable.  *See In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302(CM), 2010 WL 363113, at *24 (S.D.N.Y. Feb. 1, 2010) ("[M]ediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure"); *see also* Murphy Decl., ¶¶ 18, 20–21.

Under these circumstances, the Federal Parties' agreement and the Board's informed exercise of business judgment with respect to the Fee and Expense Amount warrant substantial deference.  *See In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568–70 (7th Cir. 1992) (market factors best understood by the negotiating parties should determine the quantum of attorneys' fees); *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) ("we encourage counsel . . . to utilize their best

efforts to . . . arrive at a settlement as to attorneys' fees"), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989); Fistel Decl., Ex. 9 (*In re comScore Shareholder Derivative Litigation*, No. 1:16-cv-09855-JGK, Excerpts from Final Approval Hearing Transcript (S.D.N.Y. June 7, 2018) at 20–21 (approving settlement and fees approved by disinterested directors)).  Indeed, the end result of the Federal Parties' informed negotiations, which was arrived at following the Mediator's proposal, is entitled to great weight in evaluating Plaintiffs' Counsel's request for approval of the agreed-to Federal Fee and Expense Amount. *Johnson*, 488 F.2d at 720 (encouraging counsel to "arrive at a settlement as to attorneys' fees.").

### B.    The *Johnson* Factors Support the Fee Agreement

Courts in the Eleventh Circuit evaluate proposed fee awards guided by the following factors articulated in *Johnson*: (1) the results obtained; (2) the novelty and difficulty of the questions involved; (3) the preclusion of other employment due to the acceptance of the case; (4) whether the fee is fixed or contingent; (5) the experience, reputation, and ability of the attorneys; and (6) the time and labor required.  488 F.2d at 717-19.  "[N]ot every [*Johnson*] factor need be necessarily considered."  *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 502 (N.D. Miss. 1996).  "'[T]he most critical factor' in determining the reasonableness of a fee award 'is the

degree of success obtained.'" *Klein v. City of Laguna Beach*, 810 F.3d 693, 698–99 (9th Cir. 2016) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)).  Application of the relevant *Johnson* factors confirms the fairness and reasonableness of the agreed Federal Fee and Expense Amount.

### 1.     The Results Obtained and Fee Awards in Comparable Cases

While the Settlement benefit is non-pecuniary, it confers real and substantial economic benefits "orders of magnitude" greater than the agreed $3.5 million Federal Fee and Expense Amount.  Jetley Decl., ¶¶ 3, 8, 43.  Indeed, courts have long recognized that a "corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature[,]" *Mills*, 396 U.S. at 395–96, and that the value of effective corporate therapeutics may well exceed the value of any probable monetary judgment.  *Maher*, 714 F.2d at 461 ("the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor").

As discussed in Section IV.C., *supra*, the Reforms confer substantial economic benefits on Southern and its stockholders by ensuring more rigorous, better-informed Board- and executive-level supervision of LCP design, engineering, construction plans, budgets, schedules, and execution, which will in turn

significantly reduce the probability and costs of major LCP failures going forward. As a result of the Reforms, Southern's Board and executive team will be better equipped to critically assess: (i) the scope, objectives, and risks of proposed LCPs; (ii) pre-construction design, engineering, and cost and schedule estimates; (iii) construction budget and schedule revisions and mitigation strategies; and (iv) the timing and content of disclosures addressing potentially material operational and financial risks as they arise.  In the wake of the widely publicized Kemper Project debacle, the Reforms lay the foundation necessary to restore confidence in Southern's ability to select, plan, and construct LCPs cost-effectively, and in the integrity of its financial and risk disclosures.  *See, e.g.,* Hamermesh Decl., ¶¶ 2, 20–22; Jetley Decl., ¶¶ 2–3, 17–18, 41–42.  Weighed against the economic value of these Settlement benefits, which Mr. Jetley concludes "have the potential to contribute hundreds of millions of dollars in value to Southern over time[,]" the $3.5 million Federal Fee and Expense Amount is eminently reasonable.  Jetley Decl., ¶ 43.

The Federal Fee and Expense Amount also appears reasonable measured against attorneys' fees approved in comparable derivative settlements.  *See In re Schering-Plough Corp. S'holders Derivative Litig.*, No. 01–1412, 2008 WL 185809, at *1, *5 (D.N.J. Jan. 14, 2008) (Approving $9.5 million fee and noting "[t]he

adoption of the corporate governance and compliance mechanisms required by the settlement can prevent breakdowns in oversight that would otherwise subject the company to the risk of regulatory action, or uncover and remedy a problem at the early stages before it becomes the subject of a government investigation.  Effective corporate governance can also affect stock price by bolstering investor confidence and improving consumer perceptions.").[9]

---

[9] *See also*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Langone*, No. 2006-cv-122302, slip op. (Ga. Super. Ct.-Fulton Cty. June 10, 2008) ($14.5 million fee in governance-based settlement) (attached to the Fistel Decl. at Ex. 10); *In re Motorola, Inc., Derivative Litig.*, No. 07CH23297, slip op. (Ill. Cir. Ct.-Cook Cty. Nov. 29, 2012) ($9.5 million fee in governance-based settlement) (attached to the Fistel Decl. at Ex. 11); *Warner v. Lesar*, No. 2011-09567, slip op. (Tex. Dist. Ct., Harris Cty. Oct. 1, 2012) ($7.75 million fee in governance-based settlement) (attached to the Fistel Decl. at Ex. 12); *In re Lifelock, Inc. Derivative Litig.*, No. CV2015-054087, slip op. (Ariz. Super. Ct.-Maricopa Cty. Sept. 8, 2016) ($6 million fee for governance, compliance and internal controls reforms) (attached to the Fistel Decl. at Ex. 13); *In re Alphatec Holdings, Inc., Derivative S'holder Litig.*, No. 37-2010-58586-CU-BT-NC, slip op. (Cal. Super. Ct.-San Diego Cty. Aug. 18, 2014) ($5.25 million fee for corporate therapeutics) (attached to the Fistel Decl. at Ex. 14); *In re F5 Networks, Inc. Derivative Litig.*, No. 2:06-cv-00794-RSL, slip op. (W.D. Wash. Jan. 6, 2011) ($5 million fee in governance-based settlement) (attached to the Fistel Decl. at Ex. 15); *In re Avon Products, Inc.*, No. 651304/2010 (N.Y. Sup.-New York Cnty. Jul. 7, 2016) ($4 million in attorneys' fees awarded in governance-only settlement) (attached to the Fistel Decl. at Ex. 16); *Rubery v. Kleinfeld*, No. 2:12-cv-00844-DWA, slip op. (W.D. Pa. Jan. 20, 2015) ($3.75 million fee in governance-based settlement) (attached to the Fistel Decl. at Ex. 17); *In re MiMedx Group, Inc. S'holder Derivative Litig.*, No. 1:18-cv-04486-WMR (N.D.Ga. Dec. 21, 2020), Final Order and Judgment, ¶ 11 ($3.5 million fee in governance-based settlement) (attached to the Fistel Decl. at Ex. 18).

### 2.    The Novelty and Difficulty of the Questions Involved

Shareholder derivative actions are "notoriously difficult and unpredictable[.]" *Maher*, 714 F.2d at 455.  The present case was no exception.

This matter encompassed a sprawling and highly technical fact pattern involving cutting edge coal gasification and carbon sequestration technologies, complex economic and financial projections, and related design, engineering, and construction planning, scheduling and budget issues.  Dozens of percipient witnesses were involved.  The complex and voluminous records developed in the PSC proceedings, the related whistleblower and securities litigation, and the SEC and DOJ investigations were implicated.  The documentary record required to fairly present the nearly decade-long narrative of the Kemper Project was enormous.  To date Defendants have provided Federal Plaintiffs with nearly 200,000 documents containing more than four million pages of material, in addition to transcripts of depositions and other proceedings.

Adding to the novelty and difficulty in this case is the fact that Plaintiffs' claims centered on breach of the duty of oversight, widely recognized as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d at 967.  *See In re The Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d at 1325 ("where

the [p]laintiffs allege a failure of oversight on the part of the [b]oard, the [p]laintiffs must show that the [d]irectors either *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act.").  Oversight claims against outside directors based primarily upon circumstantial evidence are extremely difficult to present and prevail on, even where plaintiffs' counsel devote substantial time and resources to the effort.  It is safe to say that this case would prove to be most challenging and complex if ever brought to trial.  Fistel Decl., ¶ 123.

### 3.   The Skill, Experience, and Reputation of Counsel

Federal Derivative Action Plaintiffs' Counsel have strong reputations and long track records of exemplary results in shareholder litigation.  *See* Fistel Decl., ¶ 142; Declaration of Craig W. Smith in Support of Federal Derivative Action Plaintiffs' Counsel's Motion for Final Approval of Derivative Settlement ("Smith Decl."), attached to the Fistel Decl. at Ex. 7.  Their successful navigation of the complex issues and significant challenges posed by this matter speaks to their skill. Murphy Decl., ¶¶ 18, 21.  Defendants were represented by Jones Day, a leading corporate defense firm whose lawyers zealously and effectively represented their interests.  Murphy Decl., ¶¶ 18, 21; *see In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d

1323, 1334 (S.D. Fla. 2001) (quality of opposing counsel substantiates quality of plaintiffs' counsel's work); *In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 634 (D. Colo. 1976) (similar).  Accordingly, the experience, reputation, and ability of counsel likewise supports the Federal Fee and Expense Amount as being fair and reasonable.

### 4. The Contingent Nature of the Fee

Federal Derivative Action Plaintiffs' Counsel devoted significant time and effort to this matter on a wholly contingent basis.  *See* Section V.B.6, *infra*.  Sound practical and policy reasons support the reasonableness of the compensation sought for the substantial contingency risk Federal Derivative Action Plaintiffs' Counsel assumed in pursuing a case of this complexity and difficulty.  *See Johnson*, 488 F.2d at 717–19; *see also Behrens v. Wometco Enters., Inc*., 118 F.R.D. 534, 548 (S.D. Fla. 1988) ("[C]ontingency fee arrangement often justifies an increase in the award of attorneys' fees. . . . If this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risk of recovering nothing."), *aff'd*, 899 F.2d 21 (11th Cir. 1990); *Milstein v. Werner*, 58 F.R.D. 544, 549 (S.D.N.Y. 1973) (derivative suit fee "should be viewed as an incentive, as much as a just reward

for services performed").  This factor, too, supports the fairness and reasonableness of the Federal Fee and Expense Amount.

### 5.    The Preclusion of Other Employment Due to the Acceptance of the Case

As discussed in greater detail in Section IV.D, *supra*, as well as in the Fistel Decl. (¶¶ 126-129), the legal and factual issues presented in the Federal Derivative Action were difficult and complex, requiring significant resources in order to be able to obtain the excellent result that has been achieved through the Settlement.  Fistel Decl., ¶¶ 126-129.  As a result, Federal Derivative Action Plaintiffs' Counsel were precluded from expending the same time and resources on other matters.  Fistel Decl., ¶¶ 126-129.

### 6.    The Time and Labor Required to Secure the Result

The agreed Federal Fee and Expense Amount is reasonable in light of Federal Derivative Action Plaintiffs' Counsel's substantial investments of time and expenses on a wholly contingent basis.  Fistel Decl., ¶¶ 130, 143.  Federal Derivative Action Plaintiffs' Counsel in the Federal Derivative Action incurred $213,886.06 in out-of-pocket expenses, and expended 8,371.2 hours in the investigation, commencement, prosecution, and settlement of the Federal Derivative Action, amounting to lodestar of $4,158,081.00 using counsel's ordinary hourly rates, which have been approved by courts nationwide and fall within the range found reasonable by Courts in this

District for lawyers of comparable skill and experience.  Fistel Decl., ¶ 143 and Exs.

6 (Johnson Fistel, LLP firm résumé) and 7 (Smith Decl. at Ex. A) thereto.[10]

## VI.    THE FEDERAL PLAINTIFFS' SERVICE AWARDS SHOULD BE APPROVED

The Amended Stipulation provides that Federal Derivative Action Plaintiffs'

Counsel may apply for Service Awards on behalf of Federal Plaintiffs in the amount

of $3,000 each, to be paid from the Federal Fee and Expense Amount.  *See* Am.

Stip., § V(4.9).  The requested Service Awards are customary and reasonable in

recognition of the substantial benefits these stockholders helped to create for

Southern.  *See Pledger, et al. v. Reliance Trust Company and Insperity Holdings,*

*Inc.*, No. 1:15-CV-04444-MHC (N.D. GA Mar. 8, 2021), Order Granting Final

---

[10] Although a lodestar "cross-check" is not required, *see Camden I Condominium Association, Inc. v. Dunkle*, 946 F.2d 768, 773–75 (11th Cir. 1991) (criticizing inefficiencies and incentives of lodestar approach), if one is conducted here, the Federal Fee and Expense Amount represents a ***negative*** lodestar multiplier of .84. Courts in the Eleventh Circuit routinely approve fee awards amounting to ***positive*** multipliers on counsel's time, further evidencing the reasonableness of the agreed Federal Fee and Expense Amount.  *See Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007) (multipliers "'in large and complicated class actions' range from 2.26 to 4.5 . . . 'three appears to be the average'"); *Ingram*, 200 F.R.D. at 694–96 (multipliers between 2.5 and 4 generally approved); *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 679, 702 (M.D. Ala. 1988) (multiplier of 3.1 "not unusual or unreasonable"); *In re MiMedx Group, Inc. S'holder Derivative Litig.*, No. 1:18-cv-04486-WMR (N.D. Ga.) (approving fee and expense amount with 1.57 multiplier) (Fistel Decl., Ex. 18); *In Re Equifax, Inc. Derivative Litigation*, Civil Action No. 1:18-CV-00317-TWT, 2020 WL 256132, at *39–*40 (N.D. Ga. Mar. 17, 2020) (approving fee and expense amount with 1.543 multiplier).

Approval of Settlement at 24–25 (approving service awards of $25,000 to each of five class representatives) (attached to the Fistel Decl. at Ex. 19); *Henderson v. Emory Univ. et al.*, No. 16-cv-2920-CAP (N.D. Ga. Nov. 4, 2020), Memorandum and Order, ECF No. 236 at 12–13 (approving service awards of $25,000 to each of nine class representatives) (attached to the Fistel Decl. at Ex. 20); Fistel Decl., ¶ 146.

Neither of the Federal Plaintiffs were offered assurances that they would receive any compensation for bringing the Federal Derivative Action, and "the prospect of such an award was not a factor in [their] decision[s] to initiate, pursue, or settle the [Federal Derivative Action]." Vinyard Decl., ¶ 7; Mesirov Decl., ¶ 7. Federal Plaintiffs maintained ownership of their Southern stock continuously throughout the over five-year pendency of the litigation in order to maintain standing to pursue the Federal Derivative Action and to secure the Settlement's substantial benefits. Fistel Decl., ¶ 147; Vinyard Decl., ¶¶ 3, 5, 7; Mesirov Decl., ¶¶ 3, 5, 7.

Indeed, as a matter of policy, engaged and concerned stockholders such as Federal Plaintiffs in the Federal Derivative Actions should be encouraged to step forward to prosecute viable stockholder derivative claims in order to check the conduct of corporate boards. Approval of the modest service awards sought by

Federal Plaintiffs here would serve this salutary purpose.  The Service Awards should therefore be approved.[11]

## VII.   CONCLUSION

Plaintiffs respectfully submit that the Settlement should be approved in all respects and the proposed Judgment and Order entered.

---

[11] The Eleventh Circuit's decision in *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244 (11th Cir. 2020) (petition for *en banc* review pending; mandate withheld) is distinguishable.  First, *Johnson* involved an incentive award derived from a common fund in a class case.  Here, the Service Awards are to be paid out of the Federal Fee and Expense Amount; they will not reduce the net benefits to the Company or to its stockholders.  Second, *Johnson* involved a settlement for alleged violations of the Telephone Consumer Protection Act that included payment to class representatives characterized as "part salary and part bounty."  *Id.* at 1258.  Here, Plaintiffs were not promised a "bonus" or "salary."  They elected to serve as derivative plaintiffs for the benefit of Southern, without any expectation that they would be compensated or rewarded.  *See* Fistel Decl., ¶147; Vinyard Decl., ¶ 7; Mesirov Decl., ¶ 7.  Indeed, federal courts have long authorized service awards for representative plaintiffs in stockholder actions like those requested here.  *See, e.g.*, *In re Presidential Life Sec.*, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) (incentive awards "need not be subjected to intense scrutiny inasmuch as these funds will come out of the attorney's fees"); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) ("Such enforcement is vital because if there were no individual shareholders willing to step forward and pursue a claim on behalf of other investors, many violations of law might go unprosecuted.").  In fact, courts within this District have approved service awards post-Johnson.  *See Pledger*, Order Granting Final Approval of Settlement at 26 (Fistel Decl., Ex. 19) (approving $125,000 in total service awards to five class representatives); *Henderson*, Memorandum and Order, ECF No. 236 at 11–13 (Fistel Decl., Ex. 20) (approving service awards of $25,000 to each of nine class representatives noting that "[t]he award does not constitute either a salary or a bounty[]" and that "[w]ithout [class representatives], the class members would receive nothing[.]").

Dated: May 4, 2022

**JOHNSON FISTEL, LLP**

*/s/ Michael I. Fistel, Jr.*

MICHAEL I. FISTEL JR.
Georgia Bar No. 262062
WILLIAM W. STONE
Georgia Bar No. 273907
ADAM J. SUNSTROM
Georgia Bar No. 556579
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
E-mail: michaelf@johnsonfistel.com
            williams@johnsonfistel.com
            adams@johnsonfistel.com

*Lead Counsel for Plaintiffs*

**ROBBINS LLP**

CRAIG W. SMITH
BRIAN J. ROBBINS
SHANE P. SANDERS
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: csmith@robbinsllp.com
            brobbins@robbinsllp.com
            ssanders@robbinsllp.com

*Additional Counsel for Plaintiffs*

## <u>CERTIFICATION UNDER L.R. 7.1(D)</u>

Pursuant to Northern District of Georgia Local Rule 7.1(D), the undersigned hereby certifies that the above and foregoing is a computer document prepared in Times New Roman (14 point) font in accordance with Local Rule 5.1(B).

So certified, this 4th day of May 2022.

**JOHNSON FISTEL, LLP**

*/s/ Michael I. Fistel, Jr.*
MICHAEL I. FISTEL, JR.

## CERTIFICATION OF SERVICE

The undersigned counsel certifies that on this day that on this day the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will automatically send email notification to all counsel of record who have appeared in this matter.

So certified, this 4th day of May 2022.

**JOHNSON FISTEL, LLP**

*/s/ Michael I. Fistel, Jr.*

MICHAEL I. FISTEL, JR.