# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE THE SOUTHERN COMPANY SHAREHOLDER DERIVATIVE LITIGATION | CIVIL ACTION FILE NO. 1:17-CV-725-MHC |

## ORDER GRANTING FINAL APPROVAL OF SETTLEMENT, AND AWARDING ATTORNEYS' FEES, EXPENSES, AND DERIVATIVE PLAINTIFFS SERVICE AWARDS

This litigation arises out of a stockholder derivative action brought by Plaintiffs Jean Vinyard and Judy Mesirov on behalf of nominal defendant, the Southern Company ("Southern"), against current and former officers and directors of Southern for alleged breaches of fiduciary duties, unjust enrichment, and waste of corporate assets. Verified Shareholder Derivative Compl. [Doc. 1]; June 26, 2017, Order [Doc. 34] (consolidating the above-captioned action with Mesirov v. Fanning, No. 1:17-CV-1983-MHC (N.D. Ga. filed May 31, 2017)). In addition to the above-styled action (the "Federal Derivative Action"), there is a related derivative action pending in the Superior Court of Gwinnett County. Helen E. Piper Survivor's Tr., derivatively on behalf of The Southern Co. v. Thomas A. Fanning et al., No. 17-A-04758-10 (Super. Ct. of Gwinnett Cnty. filed May 15, 2017) (the "State Derivative Action"). The claims in the Federal Derivative Action

and the State Derivative Action (collectively, the "Derivative Actions") are based on Southern's attempted construction and subsequent decommissioning of a power plant in Kemper County, Mississippi, which resulted in financial losses.

On August 20, 2021, the Settling Parties[1] reached an agreement in principle on the material substantive terms of a global settlement of the Derivative Actions. Am. Stipulation and Agreement of Settlement ("Am. Stipulation") [Doc. 99-1]. On March 11, 2022, this Court issued the Preliminary Approval Order finding that "there is cause to believe that: (i) the Settlement is fair, reasonable, and adequate, and within the range of possible approval, as it provides a beneficial result for Southern and Current Southern Stockholders, (ii) the Settlement has been negotiated in good faith at arms-length between experienced attorneys for the Settling Parties familiar with the legal and factual issues of the Derivative Actions, and (iii) with respect to the forms of notice of the material terms of the Settlement to Current Southern Stockholders for their consideration and reaction, that notice is appropriate and warranted." Prelim. Approval Order [Doc. 100] at 3. This case is now before the Court on Plaintiffs' Motion for Final Approval of Derivative Settlement [Doc. 104]. After considering the entire record and the record of the

---

[1] Unless otherwise noted, for the purposes of this Order, the Court adopts all defined terms as set out in the Amended Stipulation.

Settlement Hearing held on June 1, 2022, the Court hereby issues this Order granting final approval of the Settlement and awarding attorneys' fees and expenses.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  Factual Background

Southern is a gas and electric utility holding company based in Atlanta, Georgia.  Decl. of Michael I. Fistel, Jr. in Supp. of Pls.' Mot. for Final Approval of Derivative Settlement ("Fistel Decl.") [Doc. 104-2] ¶ 13.  The Company's subsidiaries include public utility companies throughout the southeastern United States, including Mississippi Power Company ("Mississippi Power"), Alabama Power Company, Georgia Power Company ("Georgia Power"), Gulf Power Company, and Southern Power Company.  Id.  Mississippi Power, a wholly owned subsidiary of the Company, operates as a utility company providing power to retail customers in the State of Mississippi and to wholesale customers in the Southeastern United States.  Id.

The Derivative Actions arise out of Southern's construction and subsequent decommissioning of a commercial-scale integrated gasification combined cycle

("IGCC") lignite coal-fired power plant in Kemper County, Mississippi (the

"Kemper Plant" or "Project").  Am. Stipulation at 3-4.[2]

Plaintiffs contend that the Individual Defendants, current and former

directors and officers of Southern, breached fiduciary duties of loyalty and care

owed to Southern and its stockholders by: (i) failing to exercise oversight over the

design, planning and construction of the Project; (ii) failing to establish effective

systems for monitoring and controlling Project design and construction, budget and

schedule estimates, actual costs and schedules, and mitigation plans to address

design and construction problems, cost overruns, and schedule delays; (iii) failing

to ensure accurate and timely disclosure of material Project developments and

changes in key Project assumptions, including material increases in actual and

estimated costs and schedules, escalating risks to achievement of operational and

financial objectives, qualification for government-funded incentives, and prospects

for ratepayer recovery, and sustained declines in current and projected natural gas

prices; and (iv) failing to prevent billions of dollars in foreseeable losses resulting

from, *inter alia*, forfeited government incentives, rejected applications for

ratepayer cost recovery, and excess construction and decommissioning costs.  Id. at

---

[2] Citations to the Amended Stipulation are to CM/ECF document number rather
than the internal page number.

4.[3] Plaintiffs further contend that these alleged breaches of duty exposed Southern to liability in the Securities Action, and to civil and/or criminal sanctions in a continuing investigation by the U.S. Department of Justice. Id. at 5.

**B.     Procedural History[4]**

On February 27, 2017, Plaintiff Vinyard commenced the above-styled action. Verified Shareholder Derivative Compl. [Doc. 1]. Thereafter, upon agreement of the parties, the Court entered an order deferring the action pending a decision on the anticipated motion to dismiss in the Securities Action (Monroe Cnty Emps.' Retirement Sys. v. The Southern Co. et al., No. 1:17-CV-0241-WMR (N.D. Ga. filed Jan. 20, 2017)). Mar. 27, 2017, Order [Doc. 31]. Defendants also agreed, *inter alia*, to produce copies of documents and written discovery responses produced by Southern in the Securities Action and to engage in formal settlement discussions or mediation of the derivative claims in the event of similar discussions or mediation in the Securities Action. Am. Stipulation at 5-7.

---

[3] As noted in the Amended Stipulation and at the Settlement Hearing, Defendants dispute and deny any and all such allegations and contentions. Am. Stipulation at 24-25.

[4] The parties to the State Derivative Action also are signatories to the Amended Stipulation and the Settlement also resolves that action. Per the Amended Stipulation, the State Fee and Expense Amount and State Plaintiff service award shall be approved by the State Court. Am. Stipulation at 39.

On May 31, 2017, Plaintiff Mesirov filed the Mesirov action, alleging similar claims for breach of fiduciary duty and waste, and adding a claim under §14(a) of the Securities Exchange Act of 1934. Mesirov v. Fanning, No. 1:17-CV-1983-MHC (N.D. Ga. filed May 31, 2017). After the consolidation of Mesirov into the above-styled action, the Federal Parties negotiated the terms of a proposed order governing the production and exchange of confidential information, which the Court entered on February 28, 2018. See Stipulation and Order for the Production and Exchange of Certain Confidential Information [Doc. 40]. Southern subsequently produced a large volume of non-public corporate books and records, which Federal Derivative Action Plaintiffs' Counsel reviewed and evaluated. See Am. Stipulation at 87-88.

On March 29, 2018, the Court granted in part and denied in part a motion to dismiss the Securities Action [ECF 39]. See also Am. Stipulation at 8. The Federal Parties met and conferred and agreed that Southern's interests would be best served by continuing the litigation deferral and information exchange arrangement. Am. Stipulation at 8-9; see also Consent Order Continuing Deferral of Litigation [Doc. 43].

On October 30, 2018, counsel for the Federal Parties executed the undertaking appended to the confidentiality protective order entered in the

Securities Action, following which Southern commenced a rolling production of documents, written discovery responses, discovery agreements, and deposition transcripts as they were generated in the Securities Action. Am. Stipulation at 9. Over the course of 24 months, Southern produced approximately 193,589 documents constituting more than four million pages documents, in addition to transcripts of depositions and other proceedings. Id. Federal Derivative Action Plaintiffs' Counsel used a search engine to identify over 81,000 highly relevant documents, and then organized these materials into smaller, topical datasets subject to further analysis. Id.

On February 20, 2020, the parties in the Derivative Actions attended an in-person mediation in New York supervised by the Mediator. Id. at 10. Before the mediation, Federal Derivative Action Plaintiffs' Counsel presented a detailed mediation statement informed by their evaluation of the discovery materials made available to date, and a proposed remedial framework. Id.

On August 17, 2020, the parties to the Securities Action notified the Court that they had reached an agreement in principle to settle. Id.; Joint Mot. to Stay Proceedings, Securities Action [ECF 215]. On September 25, 2020, Federal Plaintiffs filed a status report with the Court addressing the implications of the Securities Action settlement for the Federal Derivative Action and advised the

Court that the Federal Parties' mediator-facilitated settlement discussions were continuing, and that another formal mediation session was scheduled for November 12, 2020. Pls.' Status Report [Doc. 65]. Over the next eleven (11) months, the Court granted additional deferrals to facilitate the Federal Parties' ongoing mediator-facilitated settlement negotiations. [Docs. 67-88].

On August 23, 2021, the Federal Plaintiffs notified the Court that they had reached an agreement in principle to settle the Federal Derivative Action, subject to Board approval. See Aug. 23, 2021, Order [Doc. 90]. The Court entered an order continuing the deferral of the Federal Derivative Action pending the filing of a stipulation of settlement by the parties. Id.

On January 20, 2022, the parties executed the Stipulation and Agreement of Settlement, and Plaintiffs moved this Court to preliminarily approve the Settlement on January 21, 2022. Pls.' Unopposed Mot. for Prelim. Approval of Settlement [Doc. 97]. On March 10, 2022, the Federal Parties filed the Amended Stipulation with the Court. Am. Stipulation.

C.  **Preliminary Approval and Notice**

On March 11, 2022, this Court preliminarily approved the Settlement, authorized issuance of the Notice and the Summary Notice to shareholders, and set June 1, 2022, as the hearing date for final approval of the Settlement and payment

of attorneys' fees. Prelim. Approval Order [Doc. 100]. Southern disseminated the Notice in accordance with the process presented to and approved by the Court. Notice of Filing of Decl. Regarding Proof of Publication of the Notice and Summ. Notice [Doc. 103].

## II.  TERMS OF THE SETTLEMENT

The Settlement commits Southern, through its Board and/or committees of the Board or duly authorized officers of Southern, to adopt and/or maintain for a minimum period of five (5) years a comprehensive package of oversight and internal controls reforms designed to address the alleged lapses in Board- and management-level supervision of Large Capital Projects ("LCPs") that Plaintiffs contend contributed to the Project's failure and caused Southern's losses. Am. Stipulation at 34, 57-68.

Specifically, the Settlement includes, *inter alia*, the following categories of reforms:

- **Cost Tracking for Large Capital Projects:** The Reforms require Southern to implement comprehensive, standardized, and audited cost tracking systems and procedures to govern all LCPs.

- **Southern Disclosure Committee:** The Settlement requires Southern to improve the operation of the Southern Disclosure Committee by requiring consistency in membership, across relevant corporate functions, expanding its duties and responsibilities, and enhancing meeting and

reporting requirements designed to involve the Audit Committee directly in disclosure oversight and decision-making.

- **Chief Audit Executive:** The Reforms formalize the Chief Audit Executive's duties, responsibilities, authority, and reporting requirements to strengthen the rigor of Southern's executive- and Board-level oversight of internal controls over accounting, financial reporting, compliance, and operational risk management.

- **Internal Audit:** The Reforms further strengthen the Board's supervision of Southern's internal controls, compliance, and risk management through enhancements to the Company's Internal Audit process.

- **Management Oversight and Communication with the Board:** During the Commitment Period, executive management from both Southern and its operating subsidiaries responsible for building and operating LCPs will meet periodically to focus on material enterprise risks. Southern and its subsidiaries' executives will both engage in regular oversight of LCPs and communicate regularly with the Board and relevant Board committees, including through reports presented at Board and/or committee meetings.

- **Operations, Environmental and Safety Committee Oversight:** Oversight of policies and operating issues related to construction and licensing of new facilities or infrastructure, including the review of cost and schedule estimates, risks, and associated risk management activities, will be coordinated through the Board's Operations, Environmental and Safety Committee.

- **Board and Committee Authority:** The Reforms provide the Board and each Board committee with express authority to engage the services of advisors as it deems appropriate.

- **Alignment of Executive Compensation with LCP Milestones:** Performance pay decisions will incorporate objective measures, including: (i) deadline milestones; (ii) budget milestones; (iii) operational milestones; (iv) regulatory milestones; and (v) safety milestones. In the

event an LCP materially exceeds budget or schedule targets, the Compensation and Management Succession Committee must review the impact such event has on the Company's or subsidiary's financial performance and, where warranted, reduce the performance-based compensation payouts or recover previous payouts pursuant to Southern's enhanced Compensation Clawback Policy.

- **Compensation Clawback Policy:** The Clawback Policy now extends to annual Performance Pay Program awards and long-term incentive program awards to current and former executive officers and other senior management.

- **Director Education:** Within one year after a director's initial election to the Board, and at least once every three years thereafter, Southern will fund a director's continuing education program of their own choosing concerning, among other things, compliance with law and regulation, disclosures to shareholders, and fiduciary duties.

- **Compliance Education/Training:** Southern will fund enhanced training provided by the Office of the Chief Compliance Officer regarding the whistleblower provisions of the Sarbanes-Oxley Act and the Dodd-Frank Wall Street Reform and Consumer Protection Act, Southern's non-retaliation policy, and the Company's Concerns Program for receiving, investigating, and responding to employee complaints.

Id. at 57-68.

## III.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

The Court's evaluation of the Settlement is guided by the "strong judicial policy favoring settlement[,] as well as by the realization that compromise is the essence of settlement." Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984); In re Motorsports Merch. Antitrust Litig., 112 F. Supp. 2d 1329, 1333 (N.D.

Ga. 2000) (same). "Settlements of shareholder derivative actions are particularly

favored because such litigation is 'notoriously difficult and unpredictable[,]'"

Maher v. Zapata Corp., 714 F.2d 436, 455 (5th Cir. 1983), and because they permit

"management [to] return its attention and energy from the courtroom to the

corporation itself." Zimmerman v. Bell, 800 F.2d 386, 392 (4th Cir. 1986).

The question on final approval is "whether [the Settlement] is 'fair,

adequate, reasonable, and not the product of collusion.'" George v. Acad. Mortg.

Corp. (UT), 369 F. Supp. 3d 1356, 1369 (N.D. Ga. 2019) (quoting Phillips

Petroleum Co. v. Shutts, 472 U.S. 797, 812 (1985)); see also Leverso v. SouthTrust

Bank, 18 F.3d 1527, 1530 (11th Cir. 1994); Bennett, 737 F.2d at 986; Cotton v.

Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977)[5]).  Relevant factors include:

> (1) the likelihood of success at trial; (2) the range of possible recovery;
> (3) the point on or below the range of possible recovery at which a
> settlement is fair, adequate and reasonable; (4) the complexity, expense
> and duration of litigation; (5) the substance and amount of opposition
> to the settlement; and (6) the stage of proceedings at which the
> settlement was achieved.

Bennett, 737 F.2d at 986.  Here, each of these factors are met.

---

[5] Under Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en
banc), the Eleventh Circuit adopted as binding precedent all decisions of the
former Fifth Circuit handed down before October 1, 1981.

## A. The Settlement Merits a Strong Presumption that It Is Fair, Reasonable, and Adequate.

"Determining the fairness of the settlement is left to the sound discretion of the trial court . . . ." Id. In exercising this discretion, courts need not "reach[] ultimate conclusions on the issues underlying the dispute or substituting its business judgment for that of the parties." In re Chicken Antitrust Litig., 560 F. Supp. 957, 960 (N.D. Ga. 1980). A proposed settlement "enjoys a strong presumption that it is fair, reasonable, and adequate" where it "is the product of extensive, arm's-length negotiations conducted by capable counsel who are well-experienced in class and derivative actions." Hugo ex rel. BankAtlantic Bancorp. v. Levan, No. 08-61018-CIV, 2011 WL 13173025, at *5 (S.D. Fla. July 12, 2011).

The presumption is strengthened where plaintiffs' counsel are "nationally recognized members of the securities litigation bar[.]" In re NeuStar, Inc. Sec. Litig., No. 1:14cv885 (JCC/TRJ), 2015 WL 8484438, at *4 (E.D. Va. Dec. 8, 2015) (punctuation and citation omitted); see also Lake v. First Nationwide Bank, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant weight should be attributed 'to the belief of experienced counsel that settlement is in the best interest of the class.'"). "'The trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'" In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 312-13 (N.D. Ga. 1993) (quoting Cotton, 559

F.2d at 1330) (alterations accepted); see also In re Smith, 926 F.2d 1027, 1028 (11th Cir. 1991) ("trial judge ought not try the case during a settlement hearing and should be hesitant to substitute his or her own judgment for that of counsel").

Here, the Court finds that the Settlement is the product of hard-fought, arm's-length negotiations by prepared, skilled, and experienced counsel conducted over the course of months through in-person, telephonic and written exchanges, and that there is no evidence of collusion. Federal Derivative Action Plaintiffs' Counsel include nationally recognized leaders in shareholder litigation, and as detailed further herein, their recommendation and the Federal Plaintiff's decision to settle on the terms set forth in the Stipulation was well-informed. See Am. Stipulation at 13-19. Further, the Mediator's integral role in guiding the Federal Parties' negotiations strengthens the presumption of fairness. See D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001) (noting that a "mediator's involvement . . . helps to ensure that the proceedings were free of collusion"); George, 369 F. Supp. 3d at 1370 ("mediation with an experienced mediator . . . further confirms that the process was procedurally sound and not collusive").

Further, during the course of the negotiations, which continued for more than a year, the Settling Parties exchanged substantial confidential information regarding the merits, damages, insurance, and the Company's corporate

governance and internal controls, in addition to numerous drafts of the Term Sheet and settlement-related documents detailing the key settlement terms. Fistel Decl. ¶ 89. The Federal Parties' respective views regarding the strengths and weaknesses of the claims and defenses; the probable costs, risks, and duration of continued litigation; and the alleged governance and oversight weaknesses Federal Plaintiffs contend led to Southern's alleged losses were thoroughly rehearsed and tested in extensive written and verbal exchanges. See Am. Stipulation at 13-20.

Moreover, Southern's Board, including by unanimous vote of its non-defendant members, approved a resolution reflecting its informed and good faith determination that: (i) the Reforms adopted, implemented, and/or maintained pursuant to the Settlement confer substantial corporate benefits on the Company and its stockholders; (ii) Plaintiffs' litigation and settlement efforts caused the adoption, implementation, and/or maintenance of the Reforms for the Commitment Period; and (iii) the Settlement is fair, reasonable, and adequate, and serves the best interests of the Company and its stockholders. Id. at 25. The directors' exercise of business judgment with respect to the Settlement warrants substantial judicial deference. See Lunsford v. Woodforest Nat'l Bank, No. 1:12-cv-103-CAP, 2014 WL 12740375, at *4 (N.D. Ga. May 19, 2014) (quoting Rankin v. Rots, No. 02-CV-71045, 2006 WL 1876538, at *3 (E.D. Mich. June 27, 2006))

(Regarding settlement, "the Court 'will not substitute its business judgment for that of the parties[.]'"); <u>Unitrin, Inc. v. Am. Gen. Corp.</u>, 651 A.2d 1361, 1386 (Del. 1995) (citation omitted) ("[C]ourts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness[.]"); <u>Brooks v. Am. Exp. Indus., Inc.</u>, 1977 U.S. Dist. LEXIS 17313, at *10 (S.D.N.Y. Feb. 17, 1977) (board's approval of settlement "is a business judgement with presumptive validity").

Accordingly, the Court finds that the Settlement is presumptively fair, adequate, and reasonable.

**B.     Plaintiffs' Counsel's Settlement Recommendation Is Well-Informed.**

The sixth <u>Bennett</u> factor regarding the "stage of proceedings" focuses on whether "[c]ounsel had sufficient information to adequately evaluate the merits of the case and weigh the benefits against further litigation," not whether there has been formal discovery. <u>Francisco v. Numismatic Guar. Corp.</u>, No. 06-61677-CIV, 2008 WL 649124, at *11 (S.D. Fla. Jan. 31, 2008) (citing <u>Cotton</u>, 559 F.2d at 1332)). Where information has been gathered through other means "formal discovery [is not] a necessary ticket to the bargaining table." <u>In re Corrugated Container Antitrust Litig.</u>, 643 F.2d 195, 211 (5th Cir. 1981); <u>see also</u> <u>In re Mego Fin. Corp. Sec. Litig.</u>, 213 F.3d 454, 459 (9th Cir. 2000) (same); <u>Cotton</u>, 559 F.2d

at 1332 (finding that "very little formal discovery was conducted and there [was] no voluminous record in this case" but that "the lack of such does not compel the conclusion that insufficient discovery was conducted," as plaintiffs "achieved the desired quantum of information necessary to achieve a settlement" through investigation and informal discovery).

Here, Federal Derivative Action Plaintiffs' Counsel's decision to settle was exceedingly well-informed, see Fistel Decl. ¶¶ 9, 73, 82; and the Court finds that Federal Derivative Action Plaintiffs' Counsel had a strong understanding of the potential risks and rewards of pursuing further litigation, how Southern's and its stockholders' interests would be impacted across the broad range of possible litigation scenarios and outcomes, and the remedial measures that would be necessary to ensure the Company would not suffer the alleged consequences of similar alleged wrongdoing in the future.

This Court also finds that the Federal Derivative Action Plaintiffs' Counsel's determination that the substantial benefits guaranteed by the Settlement far outweigh the value of any probable risk-adjusted monetary recovery that might be secured through further litigation is thoroughly informed by their comprehensive review of the facts, circumstances, and law, as well as their decades of experience litigating and settling dozens of derivative actions of similar magnitude and

complexity.  Id. ¶¶ 82, 90.  The evaluations of the Reforms by Professor

Hamermesh and Mr. Jetley confirm Plaintiffs' Counsel's determination.  Decl. of

Lawrence A. Hamermesh ("Hamermesh Decl.") [Doc. 104-3] ¶¶ 16-22; Decl. of

Guarav Jetley ("Jetley Decl.") [Doc. 104-4] ¶¶ 19-43.

Accordingly, the Court finds this factor strongly supports final approval of

the Settlement.

**C.      Weighed Against the Possible Range of Recovery, the Substantial Benefits of the Settlement Merit Final Approval.**

"The second and third factors in the Eleventh Circuit's Bennett analysis call

for the Court to determine the 'possible range of recovery' and then ascertain

where within that range 'fair, adequate, and reasonable settlements lie.'"  Deas v.

Russell Stover Candies, Inc., No. CV-04-C-0491-S, 2005 WL 8158201, at *11

(N.D. Ala. Dec. 22, 2005) (citation omitted).

The Settlement provides Southern and its stockholders the benefits of a

comprehensive package of oversight and internal controls reforms designed to

address the alleged lapses in Board- and management-level supervision of LCPs

and that will reduce the likelihood that the Company will suffer from similar such

lapses in the future.  Fistel Decl. ¶ 91; Hamermesh Decl. ¶¶ 14, 22; Jetley Decl.

¶ 18.

Courts widely recognize that "a corporation may receive a 'substantial benefit' from a derivative suit . . . regardless of whether the benefit is pecuniary in nature." Mills v. Elec. Auto- Lite Co., 396 U.S. 375, 395 (1970); see In re AOL Time Warner S'holder Derivative Litig., No. 02 Civ. 6302(SWK), 2006 WL 2572114, at *4 (S.D.N.Y. Sept. 6, 2006) (non-monetary benefits can be "substantial enough to merit [settlement] approval"); Lewis v. Anderson, 692 F.2d 1267, 1271 (9th Cir. 1982) (same). "Strong corporate governance is fundamental to the economic well-being and success of a corporation[,]" and governance reforms designed to prevent recurrence of alleged wrongdoing "provide valuable benefits to public companies." In re NVIDIA Corp. Derivative Litig., 2009 U.S. Dist. LEXIS 24973, at *11–*12 (N.D. Cal. Mar. 18, 2009). Further, settlements supported by reforms "specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws" are generally approved because they make it "far less likely [that the corporation will] become subject to long and costly securities litigation [or to] . . . prosecution or investigation by regulators and prosecutors." Cohn v. Nelson, 375 F. Supp. 2d 844, 853-55 (E.D. Mo. 2005); see also In re Pfizer Inc. S'holder Derivative Litig., 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving derivative settlement predicated on "a significantly improved institutional structure for detecting and rectifying the types

of wrongdoing that have, in recent years, caused extensive harm to the company");

Unite Nat'l Ret. Fund v. Watts, No. 04CV3603DMC, 2005 WL 2877899, at *2

(D.N.J. Oct. 28, 2005) (corporate governance benefits designed "to prevent future

harm" support settlement); In re Infinity Broad. Corp. S'holder Litig., 802 A.2d

285, 289-90 (Del. 2002) (settlement's future impact properly considered in

evaluating fairness and adequacy).

Considering the substantial benefits guaranteed by the Settlement weighed

against the possible range of recovery, the Court finds the second and third factors

in the Eleventh Circuit's Bennett analysis factors are satisfied and support

settlement approval.

### D. The Substantial Costs, Delays, and Risks of Further Litigation Support Settlement Approval.

The first and fourth Bennett factors concerning the expected complexity,

expense, and duration of further litigation and the likelihood of success at trial

weigh heavily in favor of final approval. Shareholder derivative litigation is

"notoriously difficult and unpredictable." Maher, 714 F.2d at 455 (punctuation

and citation omitted). Moreover, the breach of the duty of oversight claim at the

heart of the Derivative Actions is "possibly the most difficult theory in corporation

law upon which a plaintiff might hope to win a judgment." In re Caremark Int'l

Inc. Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996); see In re The Home

Depot, Inc. S'holder Derivative Litig., 223 F. Supp. 3d 1317, 1325 (N.D. Ga. 2016). In these circumstances, "it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end." Fla. Trailer & Equip. Co. v. Deal, 284 F.2d 567, 573 (5th Cir. 1960); see also Maher, 714 F.2d at 458, 461 (affirming district court's approval of a settlement where prospects for superior recovery were "problematical" and "did not outweigh the costs, both legal and otherwise"); Lunsford, 2014 WL 12740375, at *8 ("'[T]he class faced a multitude of potentially serious, substantive defenses, any one of which could have precluded or drastically reduced the prospects of recovery. . . . Given the innumerable risks . . . as well as the certainty of substantial delay and expense from ongoing litigation, the [s]ettlement cannot be seen as anything except a fair compromise.'").

Federal Plaintiffs' decision to lock in the Settlement's guarantee that the Reforms will be implemented and maintained for at least half of a decade, rather than to sacrifice that benefit in order to pursue the remote possibility of a monetary recovery exceeding the Reforms' value, is eminently reasonable. As such, the first and fourth Bennett factors concerning the expected complexity, expense, and duration of further litigation and the likelihood of success at trial weigh heavily in favor of final approval.

21

### E. The Reaction of Current Southern Stockholders Supports Approval.

The Court also considers the "substance and amount of opposition to the [S]ettlement[,]" which includes the reaction of Current Southern Stockholders to the Settlement. Bennett, 737 F.2d at 986. Here, Southern disseminated the Summary Notice and Long-Form Notice of the Settlement in accordance with the process approved by the Court and as consistent with the requirements of Rule 23.1 and due process. See Prelim. Approval Order; Notice of Filing of Decl. Regarding Proof of Publication of the Notice and Summ. Notice. The Notices informed investors of their rights under the Settlement, including by specifying procedures for raising any objections to the Settlement. See Notice of Proposed Settlement [Doc. 103-4]. The deadline for submitting objections was May 18, 2022. See Prelim. Approval Order at 8. There were no objections to the Settlement. See Pls.' Reply in Supp. of Pls.' Mot. for Final Approval [Doc. 105]. The Court finds that the absence of a single objection to the Settlement demonstrates the fairness of the Settlement and weighs in favor of approval.

Based on the foregoing, the Court hereby finally **APPROVES** in all respects the Settlement, and finds that the Settlement is fair, reasonable, and adequate.

## IV. THE FEDERAL FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE.

Federal Derivative Action Plaintiffs' Counsel seek approval of an agreed-to fee and expenses amount of $3.5 million. Am. Stipulation at 96-97; Mem. of Law in Supp. of Pls.' Mot. for Final Approval [Doc. 104-1] at 4. For the reasons detailed below, the Federal Fee and Expense Amount is **APPROVED** as fair and reasonable.

### A. The Federal Parties' Agreement Merits Substantial Deference.

The Supreme Court of the United States has endorsed the consensual resolution of the amount of attorneys' fees to be paid to plaintiffs' counsel in representative litigation. Hensley v. Eckerhart, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally . . . litigants will settle the amount of a fee."). "[T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." Officers for Justice v. Civil Ser. Comm'n of City and Cnty. of S.F., 688 F.2d 615, 625 (9th Cir. 1982). Where there is no evidence of collusion, courts accord substantial deference to fee and expense amounts

23

determined by the parties. See Ingram v. The Coca-Cola Co., 200 F.R.D. 685, 695 (N.D. Ga. 2001) (affording "substantial weight to a negotiated fee amount"); Cohn, 375 F. Supp. 2d at 861 ("where . . . the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference").

The Federal Parties' negotiations were based on an informed analysis of the appropriate fee range in light of the Settlement benefits' value, contingency risk, and fees approved by courts in comparable cases, and the negotiations were facilitated and supervised by the Mediator, who was familiar with the complexity of the issues, the risks and challenges confronted by Federal Plaintiffs, as well as the magnitude and quality of Federal Derivative Action Plaintiffs' Counsel's efforts in securing the Settlement benefit. Fistel Decl. ¶¶ 114-15; Decl. of David M. Murphy, Esq. ("Murphy Decl.") [Doc. 104-5] ¶¶ 15-16. Following a number of exchanges through the Mediator, the Federal Parties accepted his double-blind proposal, agreeing on the Federal Fee and Expense Amount of $3.5 million, to be funded by Southern's insurers, as consideration for the substantial benefits conferred upon Southern and its stockholders by Federal Derivative Action Plaintiffs' Counsel through the Settlement, subject to the Court's approval. Murphy Decl. ¶¶ 15-16. The Mediator's role in the negotiations provides further

assurances that the process was fair and the amount reasonable. See In re AOL Time Warner S'holder Derivative Litig., No. 02 Civ. 6302(CM), 2010 WL 363113, at *24 (S.D.N.Y. Feb. 1, 2010) (punctuation and citation omitted) ("[M]ediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure").

The Court finds that the result of the Federal Parties' informed negotiations, which was arrived at following the Mediator's proposal, is entitled to great weight in evaluating Federal Derivative Action Plaintiffs' Counsel's request for approval of the agreed-to Federal Fee and Expense Amount. Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 720 (5th Cir. 1974) ("Johnson") (encouraging counsel to "arrive at a settlement as to attorney's fees.").

**B. The Johnson Factors Support the Fee Agreement.**

In the Eleventh Circuit, courts evaluate proposed fee awards guided by the factors articulated in Johnson, including: (1) the results obtained and fees in similar cases; (2) the novelty and difficulty of the questions involved; (3) the preclusion of other employment due to the acceptance of the case; (4) whether the fee is fixed or contingent; (5) the experience, reputation, and ability of the attorneys; and (6) the time and labor required. 488 F.2d at 717-19. "[N]ot every [Johnson] factor need be necessarily considered." In re Catfish Antitrust Litig., 939 F. Supp. 493, 502

(N.D. Miss. 1996). "'[T]he most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'" Klein v. City of Laguna Beach, 810 F.3d 693, 698-99 (9th Cir. 2016) (quoting Farrar v. Hobby, 506 U.S. 103, 114 (1992)). As discussed below, the application of the relevant Johnson factors confirms the fairness and reasonableness of the agreed-to Federal Fee and Expense Amount.

### 1. The Results Obtained and Fee Awards in Comparable Cases

While the Settlement benefit is non-pecuniary, it does confer real and substantial corporate benefits to Southern. See Hamermesh Decl. ¶ 2. Courts have long recognized that a "corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature[,]" Mills, 396 U.S. at 395-96, and that the value of effective corporate therapeutics may well exceed the value of any probable monetary judgment. Maher, 714 F.2d at 461 ("the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor").

Further, the Federal Fee and Expense Amount also appears reasonable when measured against attorneys' fees approved in comparable derivative settlements.

See In re Schering-Plough Corp. S'holders Derivative Litig., No. 01–1412, 2008 WL 185809, at *1, *5 (D.N.J. Jan. 14, 2008) (approving $9.5 million fee and noting "[t]he adoption of the corporate governance and compliance mechanisms required by the settlement can prevent breakdowns in oversight that would otherwise subject the company to the risk of regulatory action, or uncover and remedy a problem at the early stages before it becomes the subject of a government investigation. Effective corporate governance can also affect stock price by bolstering investor confidence and improving consumer perceptions.").[6]

The Court finds that the results obtained through the Settlement, as well as fee awards in comparable derivative cases, support approval of the agreed-to $3.5 million Federal Fee and Expense Amount.

---

[6] See also, City of Pontiac Gen. Emps.' Ret. Sys. v. Langone, No. 2006-cv-122302, slip op. (Ga. Super. Ct. of Fulton Cnty. June 10, 2008) ($14.5 million fee in governance-based settlement) [Doc. 104-12]; In re Motorola, Inc., Derivative Litig., No. 07CH23297, slip op. (Ill. Cir. Ct. of Cook Cnty. Nov. 29, 2012) ($9.5 million fee in governance-based settlement) [Doc. 104-13]; Warner v. Lesar, No. 2011-09567, slip op. (Tex. Dist. Ct. of Harris Cnty. Oct. 1, 2012) ($7.75 million fee in governance-based settlement) [Doc. 104-14]; In re Lifelock, Inc. Derivative Litig., No. CV2015-054087, slip op. (Ariz. Super. Ct. of Maricopa Cnty. Sept. 8, 2016) ($6 million fee for governance, compliance and internal controls reforms) [Doc. 104-15]; In re F5 Networks, Inc. Derivative Litig., No. C06-794 RSL, slip op. (W.D. Wash. Jan. 6, 2011) ($5 million fee in governance-based settlement) [Doc. 104-17]; In re MiMedx Group, Inc. S'holder Derivative Litig., No. 1:18-cv-04486-WMR (N.D.Ga. Dec. 21, 2020), Final Order and Judgment, ¶ 11 ($3.5 million fee in governance-based settlement) [Doc. 104-20].

## 2.    The Novelty and Difficulty of the Questions Involved

As noted herein, shareholder derivative actions are "notoriously difficult and unpredictable[.]" Maher, 714 F.2d at 455. This action is no different; it involved a sprawling and highly technical fact pattern involving cutting-edge coal gasification and carbon sequestration technologies, complex economic and financial projections, and related design, engineering, and construction planning, scheduling, and budget issues. Dozens of witnesses were involved, and the documentary record was extensive. See Am. Stipulation at 13-19; Fistel Decl. ¶ 121. Adding to the novelty and difficulty in this case is the fact that Plaintiffs' claims centered on breach of the duty of oversight, widely recognized as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." In re Caremark Int'l Inc. Derivative Litig., 698 A.2d at 967; see also Fistel Decl. ¶ 122; In re The Home Depot, Inc. S'holder Derivative Litig., 223 F. Supp. 3d at 1325 ("where the [p]laintiffs allege a failure of oversight on the part of the [b]oard, the [p]laintiffs must show that the [d]irectors either *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act.") (emphasis in original) (punctuation and citation omitted).

Accordingly, the Court finds that the novelty and difficulty of the legal and factual issues faced by the Federal Derivative Plaintiffs' Counsel supports a finding that the Federal Fee and Expense Amount is reasonable.

### 3. The Skill, Experience, and Reputation of Counsel

Federal Derivative Action Plaintiffs' Counsel have strong reputations and long track records of exemplary results in shareholder litigation. Fistel Decl. ¶ 124; Johnson Fistel, LLP Firm Resume [Doc. 104-8]; Decl. of Craig W. Smith in Supp. of Pls.' Mot. for Final Approval ("Smith Decl.") [Doc. 104-9] ¶¶ 1-4. Their successful navigation of the complex issues and significant challenges posed by this matter speaks to their skill as practitioners and their value as counsel. Further, Defendants were represented by Jones Day, a leading corporate defense firm, whose lawyers zealously and effectively represented their interests. See In re Sunbeam Sec. Litig., 176 F. Supp. 2d 1323, 1334 (S.D. Fla. 2001) (quality of opposing counsel substantiates quality of plaintiffs' counsel's work).

Accordingly, the Court finds the experience, reputation, and ability of Federal Derivative Action Plaintiffs' Counsel supports approval of the Federal Fee and Expense Amount.

### 4. The Contingent Nature of the Fee

Courts have consistently recognized that another important factor in evaluating an application for fees is the contingent nature of the fee. Johnson, 488

F. 2d at 718-19; see also Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 548 (S.D. Fla. 1988) ("A contingency fee arrangement often justifies an increase in the award of attorneys' fees. . . . If this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risk of recovering nothing."), aff'd, 899 F.2d 21 (11th Cir. 1990); Milstein v. Werner, 58 F.R.D. 544, 549 (S.D.N.Y. 1973) (derivative suit fee "should be viewed as an incentive, as much as a just reward for services performed"). Here, Federal Derivative Action Plaintiffs' Counsel devoted significant time and effort to this matter on a wholly contingent basis. Fistel Decl. ¶ 125.

Thus, the Court finds that this factor, too, supports the fairness and reasonableness of the Federal Fee and Expense Amount.

### 5. The Preclusion of Other Employment Due to the Acceptance of the Case

The Federal Derivative Action was filed in 2017. Since then, Federal Derivative Action Plaintiffs' Counsel spent substantial time and resources prosecuting the Federal Derivative Action. Fistel Decl. ¶¶ 126-29. Thus, Federal Derivative Actions Plaintiffs' Counsel's prosecution of the Federal Derivative Action necessarily precluded them from devoting resources to other litigation and

the prosecution of additional cases. See id. Accordingly, the Court finds that this factor supports a finding that the Federal Fee and Expense Amount is reasonable.

### 6. The Time and Labor Required to Secure the Result

Federal Derivative Action Plaintiffs' Counsel incurred $200,288.30 in out-of-pocket expenses,[7] and expended 8,371.2 hours in the investigation, commencement, prosecution, and settlement of the Federal Derivative Action, amounting to lodestar of $4,158,081.00 using counsel's ordinary hourly rates.[8]

---

[7] Federal Derivative Action Plaintiffs' Counsel advised the Court that since the filing of the Motion on May 4, 2022, Federal Derivative Action Plaintiffs' Counsel received a check in the amount of $13,597.76 from State Derivative Action Plaintiffs' Counsel towards expert fees, reducing Federal Derivative Action Plaintiffs' Counsel's total unreimbursed expenses from $213,886.06 to $200,288.30. Pls.' Reply in Supp. of Mot. for Final Approval.

[8] Federal Derivative Action Plaintiffs' Counsel's hourly rates are consistent with the rates submitted by other plaintiff's-side shareholder law firms. For example, hourly rates charged by partners of Federal Derivative Action Plaintiffs' Counsel in the Federal Derivative Action range from $875.00 to $1,100.00, associate, staff attorney, and of counsel rates range from $311.15 to $675.00, and professional staff rates range from $193.00 to $385.00. Fistel Decl. ¶¶ 138-39. Federal and state courts across the nation (including the Northern District of Georgia) have approved similar rates for lawyers of comparable skill and experience. See, e.g., In re Equifax Inc. Customer Data Security Breach Litig., No. 1:17-md-2800-TWT, 2020 WL 256132, at *39 (N.D. Ga. Mar. 17, 2020) (finding hourly rates of more than $1,000 for counsel reasonable and noting that prevailing rates for complex litigation in Atlanta and around the country are commensurate with or even in excess of those hourly rates); In re MiMedx Group, Inc. S'holder Derivative Litig., No. 1:18-cv-04486-WMR (N.D. Ga.) (approving similar hourly rates).

Fistel Decl. ¶¶ 138-43.  This time was spent on over five years of tasks and led to

the recovery.  See id. ¶¶ 126-37.

Finally, although a lodestar "cross-check" is not required, see Camden I

Condominium Association, Inc. v. Dunkle, 946 F.2d 768, 773-75 (11th Cir. 1991)

(criticizing inefficiencies and incentives of lodestar approach), if one is conducted

here, the Federal Fee and Expense Amount actually represents a negative lodestar

multiplier of .84.  Fistel Decl. ¶ 144.  Indeed, courts in the Eleventh Circuit

routinely approve fee awards amounting to positive multipliers on counsel's time

to compensate them for the risky nature of representative litigation.[9]  Given the

foregoing, the Federal Fee and Expense Amount is reasonable.

### 7.  Lack of Objections to the Federal Fee and Expense Amount

No Current Southern Stockholder objected to the Federal Fee and Expense

Amount.  See In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 305 (3d Cir. 2005)

(fact that only two class members objected to proposed fee award supports

---

[9] See Pinto v. Princess Cruise Lines, Ltd., 513 F. Supp. 2d 1334, 1344 (S.D. Fla.
2007) (citation omitted) (noting that lodestar multipliers "'in large and complicated
class actions' range from 2.26 to 4.5, while 'three appears to be the average.'");
Ingram, 200 F.R.D. at 694-96 (finding a multiplier between 2.5 and 4 to be
reasonable); Mashburn v. Nat'l Healthcare, Inc., 684 F. Supp. 679, 702 (M.D. Ala.
1988) (a multiplier of 3.1 is "not unusual or unreasonable"); In re MiMedx Group,
Inc. S'holder Derivative Litig., No. 1:18-cv-04486-WMR (N.D. Ga.) (approving
fee and expense amount with 1.57 multiplier).

approval); In re The Mills Corp. Sec. Litig., 265 F.R.D. 246, 261-62 (E.D. Va. 2009) (fact that only two of 128,000 class members objected to fee and expense application "[f]urther indicat[es] the [c]lass' approval of the result realized by this [s]ettlement"). Accordingly, his factor also weighs in favor of approving the Federal Fee and Expense Amount.

## V. FEDERAL PLAINTIFFS' REQUESTED SERVICE AWARDS

The Amended Stipulation provides that "[t]he Settling Parties agree that Federal Plaintiffs and State Plaintiff may seek service awards, not to exceed $3,000 per Plaintiff, to be paid out of their counsel's respective fee and expense amounts, subject to approval by the Court or State Court, respectively." Am. Stipulation at 43.

Prior to September 17, 2020, courts in this circuit routinely approved incentive awards to compensate class representatives for the services they provide and the risks they incur on behalf of the Class. See, e.g., Ingram, 200 F.R.D. at 695-96. On that date, the United States Court of Appeals for the Eleventh Circuit decided Johnson v. NPAS Sols., 975 F.3d 1244 (11th Cir. 2020),[10] in which the

---

[10] A petition for en banc review is pending in NPAS Solutions, and a judge of the Eleventh Circuit has withheld issuance of the mandate. Order, Johnson v. NPAS Sols., No. 18-12344 (entered for the court Nov. 9, 2020) (withholding issuance of the mandate in the appeal); Pet. for Reh'g or for Reh'g En Banc, Johnson v. NPAS Sols., No. 18-12344 (filed Oct. 22, 2020).

court held that "[a] plaintiff suing on behalf of a class . . . cannot be paid a salary

or be reimbursed for his personal expenses." Id. at 1257.  In Johnson, the Eleventh

Circuit was presented with a class action settlement arising out of alleged

violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, that

included an incentive payment to the class representative.  After reviewing the

Nineteenth Century precedents of Trustees v. Greenough, 105 U.S. 527 (1882),

and Cent. R.R. & Banking Co. v. Pettus, 113 U.S. 116 (1885), the court found that

these two cases "prohibit the type of incentive award that the district court

approved here—one that compensates a class representative for his time and

rewards him for bringing a lawsuit." NPAS Sols., 975 F.3d at 1260.

Considering the Plaintiffs' requested service awards in light of the precedent

of NPAS Solutions, the Court will deny the service awards without prejudice and

retain jurisdiction for the limited purpose of revisiting this issue if NPAS Solutions

is reversed.  See In re Equifax Inc. Customer Data Sec. Breach Litig., 999 F.3d

1247, 1281-82 (11th Cir. 2021) (vacating incentive awards made by the district

court prior to the opinion in NPAS Solutions).  The Court finds this appropriate,

given that the mandate in NPAS Solutions has been withheld and there still is a

pending petition for en banc review.  See Sabal Trail Transmission, LLC v.

Lasseter, 823 F. App'x 914, 918 (11th Cir. 2020) (quoting Flagship Marine Svcs.,

Inc. v. Belcher Towing Co., 23 F.3d 341, 342 (11th Cir. 1994) ("Until a mandate issues, an appellate judgment is not final; the decision reached in the opinion may be revised by the panel, or reconsidered by the *en banc* court, or certiorari may be granted by the Supreme Court."); see also Fruitstone v. Spartan Race, Inc., No. 20-cv-20836-BLOOM/Louis, 2021 WL 2012362, at *13 (S.D. Fla. May 20, 2021) (disapproving service award but reserving jurisdiction to allow Class Counsel to renew the request should NPAS Solutions be reversed).

## VI. CONCLUSION

For the reasons set forth above, it is hereby **ORDERED** that:

(1) Plaintiffs' Motion for Final Approval of Derivative Settlement [Doc. 104] is **GRANTED**.

(2) The Federal Fee and Expense Amount of $3,500,000 is **APPROVED**.

(3) Federal Plaintiffs' requested service awards in the amount of $3,000 each, to be paid out of the Federal Fee and Expense Amount, are **DENIED WITHOUT PREJUDICE**.

(4) The Court will concurrently herewith enter the Order and Final Judgment

submitted by the Federal Parties.

**IT IS SO ORDERED** this 9th day of June, 2022.

MARK H. COHEN
UNITED STATES DISTRICT JUDGE